# EXHIBIT 2







*Firm Profile*

1.2015



# Stephen Saltz
**Founder**
1941-2006

Stephen T. Saltz, the gifted lawyer-mentor and co-founder of Saltz Mongeluzzi Barrett & Bendesky, PC, a leading Philadelphia plaintiff litigation firm, died Tuesday, September 6, after a long illness. Not surprisingly to those familiar with Mr. Saltz and his passion for advocacy, he continued to work and battle on behalf of his clients during much of his own bout with cancer.

Mr. Saltz, born November 11, 1941, was a skilled litigator whose courtroom tenacity was in marked contrast to his typically easy-going manner, became a co-founder of the Firm following a distinguished public sector career that included representing indigent clients as a criminal defense attorney with the Philadelphia Defenders Association and later as a Deputy City Solicitor and then Solicitor in Charge of the Philadelphia Office of Civil Rights Office Litigation.

During his nearly 40-year legal career, the former president of the Philadelphia Trial Lawyers Association developed a renowned reputation within the Philadelphia legal community as a relentless fighter for his clients – winning many landmark personal injury and civil rights cases -- while always following the highest ethical standards of legal practice. In so many ways, he was regarded among his peers as "the lawyer's lawyer". Mr. Saltz was selected by his colleagues as one of Pennsylvania's "Super Lawyers" every year since the list was first published in 2004.

"As part of his extended family, we mourn Steve's passing along with his loved ones and celebrate his extraordinary accomplishments during his brilliant legal career in which he positively influenced the lives of so many, especially those who were the victims of injustice," said Michael Barrett of the Firm. It is so rare in any profession to find someone who is universally liked and respected, but that was Steve. He set the bar very high and challenged us all to raise it even higher."

He faced his illness with the same drive and determination he handled the most difficult legal cases. He trained for and rode in the 2005 American Cancer Society 62-mile Bikeathon, serving as co-chair of the Philadelphia Bar Association Bikeathon team.

A 1967 graduate of the Villanova University School of Law, Mr. Saltz held an undergraduate degree from the University of Miami. He chaired the Pennsylvania Supreme Court Disciplinary System between 1994 and 1996 following four years as a hearing examiner for the system. He also was a judge pro tem of the Philadelphia Court of Common Pleas since 1991 and served as a federal mediator for the U.S. District Court between 1992 and 2003.

He was also a member of the boards of governors of the Philadelphia Bar Association (1987-89) and the Philadelphia Trial Lawyers Association (1992) and a seven-year member of the Temple American Inn of Court. He chaired several Bar committees.

Mr. Saltz is survived by his wife, Rowena, of 36 years.



# Robert J. Mongeluzzi
**Founder**

Office: 215.575.2989
rmongeluzzi@smbb.com

Robert J. Mongeluzzi is the most respected and successful construction accident attorney in the United States. A founder of Saltz Mongeluzzi Barrett & Bendesky, he has been a driving force in establishing the firm's reputation as one of the Philadelphia region's leading plaintiff personal injury law firms and the leading U.S. law firm representing construction accident victims. He was co-lead counsel for the largest recovery of a construction accident case in American history.

Mr. Mongeluzzi also focuses on cases involving catastrophic injury and death stemming from electrical accidents, crane accidents, aerial lift accidents, brain injuries, burn injuries, product liability and sports and recreational accidents.

For clients in Philadelphia, Pennsylvania and New Jersey and elsewhere, Mr. Mongeluzzi has more than 150 verdicts and settlements of a million dollars or more in construction accidents alone, more than any attorney in the world. Overall, he has secured at least a million dollars in more than 200 cases, including:

* $101 million settlement - the largest in U.S. history - in the collapse of the Tropicana Casino parking garage
* $75 million verdict - the largest for an individual construction worker in U.S. history

Mr. Mongeluzzi has consistently ranked second out of 48,000 Pennsylvania lawyers in Philadelphia magazine's peer-selected Super Lawyers of Pennsylvania publication. That magazine, in a cover story entitled "Don't Mess with Mongo," noted his "reputation as one of the top construction accident plaintiff's attorneys in the country and probably the leading lawyer for accidents involving cranes and aerial lifts."

The Philadelphia Inquirer stated that he "has made a career representing the victims of construction accidents." The Philadelphia Business Journal added that "when someone … is catastrophically injured in a workplace accident and millions of dollars are at stake chances are … Robert Mongeluzzi will have a hand in representing the plaintiff." Finally, Lawdragon magazine selected him as one of the 500 best attorneys in American and called him "the king of construction site accidents." He was named Philadelphia's 2009 Litigator of the Year.

Mr. Mongeluzzi graduated from the University of Pennsylvania and earned his law degree from the Fordham University School of Law (1981). He is also a graduate of the nationally ranked LL.M. (Master's of Law) in Trial Advocacy program at the Temple University Beasley School of Law, where he currently serves as an adjunct professor of law.

His commitment to preserve and protect the rights of working men and women is rooted in his own family history. His great grandfather was killed and his grandfather was seriously disabled in workplace accidents. Witnessing the consequences of having insufficient legal resources, Mr. Mongeluzzi now devotes himself to representing catastrophically injured workers.

Mr. Mongeluzzi is the author of the Construction Accident Litigation chapter in Tort Litigation, the American Association for Justice's most ambitious publication ever. For decades he also has written about and taught other lawyers how to handle construction accident and workplace accident cases at seminars throughout the region and the country. He also frequently appears in print and electronic media as a legal expert on construction and workplace accidents.

Mr. Mongeluzzi is a member of the Board of Trustees of Drexel University and a former member of the board of directors of the Phoenix Society, which supports burn survivors. He also coaches youth and high school lacrosse players.



# Larry Bendesky
## Shareholder

Office: 215.575.2952
lbendesky@smbb.com

Larry Bendesky is a personal injury attorney who focuses on complex civil product liability cases and catastrophic construction accident cases in Philadelphia, Pennsylvania and New Jersey. As a product liability attorney, he has successfully handled cases involving the operation of elevators, motor vehicles, motorcycles, power tools and a wide array of equipment used in industry and manufacturing.

A skilled trial lawyer, Mr. Bendesky has been lead or co-counsel in numerous complex, high-profile cases - including more than 50 cases that resulted in verdicts or settlements over $1 million for Saltz Mongeluzzi Barrett & Bendesky clients. Among them:

* $101 million settlement - the largest in U.S. history - in the collapse of the Tropicana Casino parking garage
* $14 million settlement for a roofer whose skull was crushed by a falling hoist

Mr. Bendesky is considered one of Pennsylvania's best product liability attorneys and construction accident attorneys. He has been a member of Philadelphia magazine's peer-selected, top 5 percent Super Lawyers of Pennsylvania every year since he became eligible in 2004. In 2009 the same publication named him one of the 100 best lawyers in both Philadelphia and in the Commonwealth of Pennsylvania. Mr. Bendesky also has been named one of the Best Lawyers in America by Best Lawyers®, the U.S. legal profession's oldest peer-review publication.

Mr. Bendesky is an honors graduate of Pennsylvania State University and holds a law degree from the Widener University School of Law (1987). He is also a graduate of the nationally ranked LL.M. (Master's of Law) in Trial Advocacy program at the Temple University Beasley School of Law. Based on his outstanding courtroom performance, at graduation he received the Faculty Award as his class's outstanding student/lawyer. He is now an adjunct professor of law with the Temple Master's of Law program and co-director of its Experts Program. He also serves as a judge pro tempore, or temporary judge, for the Philadelphia Court of Common Pleas.

Mr. Bendesky has lectured lawyers, judges and other professional groups more than 35 times on trial techniques, cross-examinations, evidence and the latest developments in product liability and construction litigation.

Mr. Bendesky laid the foundation for his significant appeals court experience by serving as chief clerk to the Honorable James R. Melinson of the Superior Court of Pennsylvania. Relying upon that expertise, in 2008 the Supreme Court of Pennsylvania appointed him to its Appellate Rules Committee, where he continues to serve. Professional Service

Mr. Bendesky's current service to the legal profession includes:
* Board of Governors, Pennsylvania Association for Justice
* Board of Directors, Philadelphia Trial Lawyers Association
* President of the Temple American Inn of Court, a group of judges and lawyers devoted to promoting professionalism and ethics in the practice of law

Mr. Bendesky's past service to the legal profession includes:
* Hearing Committee Chairman, Disciplinary Board of the Supreme Court of Pennsylvania

A long-time basketball and little league baseball coach, Mr. Bendesky is the immediate past president of the 2,000-member Lower Merion Little League.



# Robert N. Braker
**Partner**
Office: 215.575.2985
rbraker@smbb.com

Robert N. Braker, Esquire, a Partner in the firm, focuses his practice on civil litigation, motor vehicle accidents and premises liability.

His concern for the rights of victims is greatly influenced by his father, Herbert Braker, a practicing Plaintiff's personal injury attorney for more than 50 years prior to retiring in 2002.

He specializes his practice in handling complex motor vehicle and trucking accident cases as well as premises liability cases. He has handled thousands of cases successfully throughout his career with numerous 6 and 7 figure settlements and verdicts.

Mr. Braker has been selected by his peers as a Pennsylvania Super Lawyer for the past 6 consecutive years (2005-2010). He was recently named as one of the "Top 100 Trial Lawyers" by the American Trial Lawyers Association for 2009.

He is a member of the American, Pennsylvania and Philadelphia Bar Associations, the Pennsylvania and Philadelphia Trial Lawyers Associations, and the Association of Trial Lawyers of America.

---



# David L. Kwass
**Partner**
Office: 215.575.2978
dkwass@smbb.com

David L. Kwass, a partner at Saltz, Mongeluzzi, Barrett & Bendesky, PC, focuses his practice on cases involving constructions accidents, crane and aerial lift accidents, equipment tipover accidents, electrical contacts, workplace falls, recreational products, and liquor liability.

He is the co-chairman of the Crane and Aerial Lift Litigation Group of the American Association for Justice. His passion for workplace safety and safe product design has resulted in more than 40 separate verdicts and settlements in excess of $1 million. Mr. Kwass is a 1987 graduate of Haverford College, receiving a B.A. with Honors. He earned a Masters degree from Georgetown University (1989), a J.D. from the University of Virginia School of Law in 1992, and in 2002, a Masters degree with honors in Trial Advocacy from the Temple University School of Law.

Mr. Kwass counts among his greatest successes his pro bono representation of a boy who needed surgery on both hips just to be able to walk. His insurance carrier denied coverage, deeming the femoro-acetabular surgery to be "experimental." Mr. Kwass brought suit in federal court, and marshaled a substantial body of medical literature to prove that the procedure was both safe and effective. In the fall of 2009, the insurance carrier not only agreed to cover his client's surgery, but also changed its classification of the surgery, and now provides routine coverage of the surgery for all its subscribers.



# Ara R. Avrigan
**Partner**
Office: 215.575.2971
aavrigan@smbb.com

Ara Richard Avrigian, a partner in the Firm, joined Saltz Mongeluzzi Barrett & Bendesky in 1998. He concentrates in medical malpractice liability, motor vehicle accidents, workplace accidents, premises liability and product liability.

He is a 1988 graduate of Moravian College, received his J.D. from Penn State Dickinson School of Law in 1992 and his LLM in trial advocacy from Temple University in 2003. His court admissions include the State of New Jersey, the Commonwealth of Pennsylvania and The United States Court of Appeals, Third Circuit

Mr. Avrigian serves as a Judge Pro Tempore for the Philadelphia Court of Common Pleas in medical malpractice cases. Prior to joining the Firm, Mr. Avrigian worked as a medical malpractice defense associate with Wright Young & McGilvery, where he participated in bringing more than 25 malpractice trials to verdict over the course of five years.

He is a member of the American, Pennsylvania and Montgomery County Bar Associations, and the Pennsylvania and Philadelphia Trial Lawyers Associations.



# Andrew R. Duffy
**Partner**
Office: 215.575.2988
aduffy@smbb.com

Andrew R. "Drew" Duffy is a personal injury attorney who focuses on catastrophic construction accident cases, product liability cases and premises liability cases in Pennsylvania and New Jersey. He has successfully handled cases involving construction accidents, falls from scaffolding and roofs, industrial plant accidents, defective products, explosions, tractor-trailer/automobile accidents and other preventable events.

Mr. Duffy has achieved numerous multi-million dollar verdicts and settlements for Saltz Mongeluzzi Barrett & Bendesky clients, including:

* $16.5 million settlement for a millwright who suffered burns over 60 percent of his body
* $10 million settlement for a warehouse worker paralyzed by a defective racking system

Mr. Duffy is considered one of Pennsylvania's best construction accident attorneys and premises liability attorneys. He is a member of Philadelphia magazine's peer-selected, top 5 percent Super Lawyers of Pennsylvania. In recognition of his trial skills, the New York City Bar Association also presented Mr. Duffy with its Award for Trial Advocacy.



# Simon B. Paris
**Partner**
Office: 215.575.3986
sparis@smbb.com

Simon Bahne Paris, Chair of the Firm's Class Action Practice Group, is consistently recognized by his peers for his novel approach to identifying and challenging improper business practices.

Mr. Paris represents businesses and consumers in complex class actions with a focus on antitrust and consumer protection matters. His recent successes include In re OSB Antitrust Litigation (E.D. Pa.) where he was the first to uncover a conspiracy to fix prices amongst the largest producers of oriented strand board in the United States, which resulted in settlements of over $120 million.

Before joining Saltz Mongeluzzi Barrett & Bendesky, P.C., Mr. Paris served as an Assistant State Attorney for the State of Florida, where he was lead trial counsel in over fifty jury trials. A 1993 graduate of Rutgers University, Mr. Paris received his law degree from Widener University School of Law in 1996. He has been admitted to practice in the courts of New Jersey, Florida, the United States Courts of Appeals for the Third Circuit, and the United States District Courts for the District of New Jersey.



# Patrick Howard
**Partner**
Office: 215.575.3892
phoward@smbb.com

Patrick Howard joined SMBB in 2007 as an associate in the firm's Class Action Practice Group. Mr. Howard brings with him significant experience in the prosecution of consumer fraud and antitrust cases.

Mr. Howard's efforts resulted in SMBB's appointment as lead counsel to a class of over 17,000 consumers in Weldon v. Cherry Hill Nissan, Inc., a case arising out of the alleged deceptive sales practices of an automobile dealership.  Without a single objection, the Court approved a settlement that provided consumers with the option to receive a cash payment or a discounted future service of their choice.

For his efforts, Mr. Howard was recently selected from among thousands of attorneys for inclusion in the December 2008 issue of Pennsylvania Super Lawyers—Rising Stars edition, a listing which includes the top 2.5 percent of attorneys in the state who are 40 years old or younger or who have been practicing less than 10 years.

Mr. Howard is a 1998 graduate of the University of Scranton, where he received a B.S. in both Political Science and History. He received his law degree from the University Of Pittsburgh School Of Law in 2001. While in law school, Mr. Howard received Dean's Honors, was a member of the school's Moot Court Board and participated in the Robert Wagner National Labor and Employment Moot Court Competition.



# Adam Pantano
**Partner**
Office: 215.575.2954
apantano@smbb.com

Adam J. Pantano is an accomplished trial lawyer in complex civil matters including construction, products liability, crane accident, and premises liability cases involving catastrophic injuries.

While he now exclusively represents injured victims, prior to joining SMBB, Mr. Pantano served as one of the lead attorneys of a National Coordinating Counsel team for a leading national insurance company's Crane and Heavy Machinery Program. Mr. Pantano is experienced handling crane-related accidents involving both personal injury and property damage claims in the millions of dollars.

Mr. Pantano was recognized as a "Rising Star" in 2008, 2010 and 2011 by Pennsylvania Super Lawyers editions of Pennsylvania Super Lawyers Rising Stars, a distinction reserved for only the top 2.5 percent of attorneys 40 and younger.

Mr. Pantano is a 1995 graduate of West Chester State University and a 1999 graduate of Widener University School of Law. His law school honors include memberships in the Moot Court Honor Society and the Moe Levine Trial Advocacy Honor Society.



# Keith Mecca
**Of Counsel**
Office: 215.575.3862
kmecca@smbb.com

Keith Mecca is a personal injury attorney who focuses on cases involving catastrophic construction accidents, workplace accidents and medical malpractice in Pennsylvania and New Jersey.

Mr. Mecca is a graduate of Drexel University, where he was a dean's list student and named to the North Atlantic Conference Honor Roll as a member of the men's varsity lacrosse team. He earned his law degree from the Villanova University School of Law (2001), where he was a staff member of the Villanova Sports & Entertainment Law Journal and served as an assistant coach for the Villanova men's varsity lacrosse team.

A native of Scranton, Pa., Mr. Mecca extends the reach of Saltz Mongeluzzi Barrett & Bendesky into Northeastern Pennsylvania, including Lackawanna and Luzerne counties. His interest in serving injured workers was inspired by his grandfather, who was executive director of the Pennsylvania State Council of Public Employees., an affiliate of the American Federation of Labor (now part of the AFL-CIO).

Mr. Mecca also negotiates commercial real estate transactions as a staff member of Professional Realty Advisors in Wayne, Pa.

---



# Catherine E. Margolis
**Of Counsel**
Office: 215.575.2962
cmargolis@smbb.com

Catherine E. Margolis, an associate with the Firm, works with partner Robert Braker, handling motor vehicle and premises liability cases in New Jersey and Pennsylvania. Since 2002, Ms. Margolis has worked on several negligence cases which resulted in settlements in excess of $1 million.

Born and raised in Connecticut, Ms. Margolis attended Vassar College and obtained her B.A. in Political Science. Upon graduation from college, Ms. Margolis worked as a paralegal for several Connecticut and New York law firms. After receiving her J.D. from Temple University School of Law in 1989, Ms. Margolis made Philadelphia her home and has worked for several Philadelphia law firms, joining the Firm in 2001.

Ms. Margolis is admitted to practice in Pennsylvania, New Jersey, the Eastern District of Pennsylvania and the United States District Court. She is a member of the Philadelphia Bar Association and the Philadelphia Trial Lawyers Association.



# Carmen P. Belefonte
## Managing Attorney, Delaware County Office
Office: 610-627-9777
cbelefonte@smbb.com

Carmen Belefonte, the managing attorney of the firm's Delaware County office in Media, Pa., is a personal injury attorney. He focuses on medical malpractice cases, premises liability cases and professional liability cases in Pennsylvania.

With more than 40 years of highly successful and diverse trial experience, Mr. Belefonte has achieved numerous settlements and verdicts in excess of $1 million for Saltz Mongeluzzi Barrett & Bendesky clients, including: a $12 million life care plan settlement for a two-year-old boy who suffered brain damage due to an emergency room misdiagnosis.

Mr. Belefonte is considered one of Pennsylvania's best medical malpractice attorneys and premises liability attorneys. He is a perennial member of Philadelphia magazine's peer-selected, top 5 percent Super Lawyers of Pennsylvania list. Nationally, in 2007 Mr. Belefonte was chosen as one of the top 500 personal injury lawyers in America by an independent survey group and Lawdragon magazine. In 2010 the Pennsylvania Association for Justice honored him with its President's Award.



# Mary T. Gidaro
**Associate**
Office: 215.575.2979
mgidaro@smbb.com

Mary T. Gidaro is a personal injury attorney who focuses on medical malprac-
tice liability cases and other complex civil litigation cases in Pennsylvania and
New Jersey.

Ms. Gidaro has assisted on several million-dollar medical malpractice liability
cases for Saltz Mongeluzzi Barrett & Bendesky clients.

Ms. Gidaro is a graduate of Pennsylvania State University who earned her master's degree from Boston
University and her law degree from the Villanova University School of Law (1992). She also is a graduate of
the nationally ranked LL.M. (Master's of Law) in Trial Advocacy program at the Temple University Beasley
School of Law.

Prior to joining Saltz Mongeluzzi Barrett & Bendesky in 2002, for nearly a decade Ms. Gidaro successfully
arbitrated and tried medical malpractice cases as a defense attorney. That different perspective today allows
her to anticipate and overcome defense strategies.

Ms. Gidaro also serves as an arbitrator for civil cases for the Philadelphia Court of Common Pleas.



# Tracy D. Schwartz
**Associate**
Office: 215.575.3988
tschwartz@smbb.com

Tracy D. Schwartz is a personal injury attorney who focuses on medical
malpractice cases and other complex civil litigation cases in Philadelphia,
Pennsylvania and New Jersey.

Ms. Schwartz has assisted on several multi-million dollar verdicts and
settlements for Saltz Mongeluzzi Barrett & Bendesky clients.

Ms. Schwartz is an Honors College graduate of West Chester University of Pennsylvania and earned her law
degree from the Temple University Beasley School of Law (2007), where she received awards for
distinguished class performance. During law school she also interned with a law firm where she helped draft
entertainment contracts for musicians who achieved platinum recording sales status.

A passionate animal advocate, Ms. Schwartz serves as a member of the Pennsylvania Bar Association Animal
Law Committee.



# Robert W. Zimmerman
**Associate**
Office: 215.575.3898
rzimmerman@smbb.com

Robert W. Zimmerman is a personal injury lawyer who focuses on construction accident, workplace accident, crane tipover, aerial lift tipover, burn injury, electrical accident and product liability cases in Pennsylvania and New Jersey.

Mr. Zimmerman has assisted on a number of multi-million verdicts and settlements for Saltz Mongeluzzi Barrett & Bendesky clients.

Mr. Zimmerman is a graduate of King's College, in Wilkes-Barre, Pa., where he was a member of the Mu Kappa Tau Honor Society and student government, and was the basketball team's lead play-by-play radio broad-caster.

Mr. Zimmerman holds a law degree from the Villanova University School of Law (2008). During law school he served a judicial externship with Philadelphia Court of Common Pleas Judge Frederica Massiah-Jackson. In May 2011 Mr. Zimmerman  graduated from the nationally ranked LL.M. (Master's of Law) in Trial Advocacy program at the Temple University Beasley School of Law.



# Jeffrey P. Goodman
**Associate**
Office: 215.575.2970
jgoodman@smbb.com

Jeffrey P. Goodman is a personal injury attorney who focuses on catastrophic personal injury cases in Pennsylvania and New Jersey. These personal injuries result from construction accidents, electrical accidents and defective or malfunctioning products.

Mr. Goodman is a graduate of The George Washington University and a graduate of the Temple University Beasley School of Law (2010). Excelling in trial advocacy, he was the first ever first-year law student to compete on Temple's renowned National Trial Team. In trial advocacy competitions he was honored as the individual national champion after winning the "Top Gun" Challenge in Texas and twice was a national quarter-finalist and regional champion. While in law school he also served as president of Temple's Moot Court Honor Society and won both of Temple's moot court championships.

Mr. Goodman interned with the Montgomery County, Pa., District Attorney's Office and the Public Defender Service for the District of Columbia. He also served as a summer clerk for the Hon. Juan R. Sanchez of the U.S. District Court for the Eastern District of Pennsylvania.



# David Langsam
**Associate**
Office: 215.575.2958
dlangsam@smbb.com

David J. Langsam is a personal injury attorney who focuses on construction accidents, premises liability and civil rights cases in Pennsylvania and New Jersey.

Mr. Langsam is a dean's list, honors graduate of Lehigh University and earned his law degree from the Villanova University School of Law (2010). While in law school Mr. Langsam excelled in both legal writing and oral advocacy. As a member of the Moot Court Board, Mr. Langsam represented Villanova at the National Evidence Moot Court Competition at Brooklyn Law School and the National Security Law Moot Court Competition at the George Washington University School of Law. During his second year, Mr. Langsam was a semi-finalist in the prestigious Theodore L. Reimel Moot Court Competition.

Mr. Langsam's dedication to plaintiffs' rights has been influenced by his father, a personal injury attorney for more than 30 years. Mr. Langsam joined Saltz Mongeluzzi Barrett & Bendesky as a law clerk in 2009.

---



# Benjamin J. Baer
**Associate**
Office: 215-575-2984
bbaer@smbb.com

Benjamin J. Baer is a personal injury attorney who focuses on catastrophic personal injury cases in Pennsylvania. These personal injuries result from construction accidents, workplace accidents, electrical accidents and defective or malfunctioning products.

Mr. Baer is a graduate of the University of Michigan and a graduate of the University of Pittsburgh School of Law (2007). Mr. Baer graduated from the John P. Gismondi Civil Litigation Certificate Program with a concentration in civil practice. While in law school, Mr. Baer won the Murray S. Love Mock Trial Competition and was recognized as the tournament's top advocate. Additionally, Mr. Baer was recognized with an individual award as the top overall student in Trial Advocacy. Mr. Baer also clerked for the Honorable Ralph J. Cappy, Chief Justice of the Pennsylvania Supreme Court.

Upon graduation from law school, Mr. Baer served as an Assistant District Attorney for the Philadelphia District Attorney's Office. There he tried more than 15 jury trials as lead counsel and was the sole prosecutor on hundreds of other nonjury trials in the Court of Common Pleas and Municipal Court. Mr. Baer prosecuted major felony crimes including attempted murders, aggravated assaults and other violent crimes. Mr. Baer uses his significant trial experience fighting for the victims of crime to better advocate for his current clients at Saltz, Mongeluzzi, Barrett & Bendesky.



# Michael A. Budner
## Associate
Office: 215-575-3875
mbudner@smbb.com

Michael A. Budner is a personal injury attorney who focuses on catastrophic personal injury cases in Pennsylvania and New Jersey. These personal injury cases result from construction accidents, workplace accidents, electrical accidents, negligently-maintained premises, defective or malfunctioning products, motor vehicle accidents, and medical malpractice.

Mr. Budner is a graduate of Emory University (2009) and earned his law degree from the Temple University Beasley School of Law (2012). While in law school, Mr. Budner excelled in legal research and writing as well as oral advocacy. Mr. Budner served as a staff member of the Temple Political and Civil Rights Law Review.

Mr. Budner interned for the Honorable Joseph D. O'Keefe, Administrative Judge of the Orphans' Court Division of the Philadelphia Court of Common Pleas. While in law school, Mr. Budner joined Saltz, Mongeluzzi, Barrett & Bendesky as a law clerk in 2010. He returned to the firm full-time following his graduation from law school in 2012. Mr. Budner is admitted to practice law before the Supreme Courts of Pennsylvania and New Jersey, as well as the United States District Court for the Eastern District of Pennsylvania. Mr. Budner is a member of the American Association for Justice, the Pennsylvania Association for Justice, the Philadelphia Trial Lawyers Association, and the Philadelphia Bar Association.



# Matthew A. Grubman
## Associate
Office: 215-575-2996
mgrubman@smbb.com

Matthew A. Grubman is a personal injury attorney who focuses on motor vehicle and premises liability cases in Pennsylvania and New Jersey.

Mr. Grubman is a graduate of University of Delaware's Honor's Program (2006) and earned his law degree from the Temple University Beasley School of Law (2011). While in law school, Mr. Grubman worked for the Philadelphia Court of Common Pleas Complex Litigation Center and as an Equal Justice Fellow for Community Legal Aid Society in Wilmington, Delaware. While at Temple, Mr. Grubman also studied abroad in Tokyo.

Mr. Grubman joined Saltz, Mongeluzzi, Barrett & Bendesky as a law clerk in 2011.

Mr. Grubman is admitted to practice in Pennsylvania and New Jersey.



# Drew Heinold

## Associate

Office: 215-575-32982
dheinold@smbb.com

Andrew (Drew) Heinold is a personal injury attorney who focuses on catastrophic injury cases in Pennsylvania and New Jersey. These cases result from construction accidents, workplace accidents, electrical accidents, negligently-maintained premises, defective or malfunctioning products, motor vehicle accidents, and medical malpractice.

Mr. Heinold is a graduate of Villanova University (2010), where he was a four year member of the Varsity Men's Soccer team. Following his time at Villanova, Mr. Heinold attended Rutgers School of Law-Camden where he focused his studies on the procedural and substantive issues that he now deals with on a daily basis. In his first year at Rutgers, Mr. Heinold received an award for Excellence in Oral Advocacy. Additionally, he was a finalist in the Rutgers School of Law-Camden Intramural Mock Trial Competition.

During law school, Mr. Heinold gained a valuable understanding of the judicial system through his multiple internships. Mr. Heinold interned for the Honorable Marie E. Lihotz of the New Jersey Superior Court-Appellate Division (2013) and Honorable John E. Harrington of the New Jersey Superior Court-Law Division, Burlington County (2012). Thereafter, Mr. Heinold joined Saltz, Mongeluzzi, Barrett & Bendesky as a law clerk in 2013. During these experiences, Mr. Heinold was able to witness and learn from some of the top litigators in Philadelphia and New Jersey.



**NOW INCLUDING DELAWARE**

# PENNSYLVANIA
# Super Lawyers

superlawyers.com

**2007**

# THE TOP ATTORNEYS
## IN PENNSYLVANIA
## AND DELAWARE

## Like a Good Neighbor
**Why people call Stephen Cozen in a crisis**

## Doing What Ought to Be Done
**Community Legal Services' Sharon Dietrich**

## Freedom Fighters
**Michael Banks and J. Gordon Cooney: Soon to Be Played by Matt and Ben**

## Don't Mess With Mongo
**Robert Mongeluzzi battles workplace negligence**

**LAW & POLITICS**

and the publishers of

ROBERT MONGELUZZI COMES FROM A LONG LINE OF PEOPLE
INJURED ON THE JOB, WHICH IS WHY HE FIGHTS SO HARD
AGAINST WORKPLACE NEGLIGENCE

**by TIMOTHY HARPER**
PORTRAIT BY LUIGI CIUFFETELLI

# DON'T MESS

# WITH MONGO

**R**obert Mongeluzzi is just back from
Augusta, Ga., where he was trying to work out a settle-
ment for a client who had multiple amputations—both legs, right arm, genitals, pelvis,
hips, buttocks—as a result of a construction accident.

Mongeluzzi, head of the 21-lawyer Philadelphia firm Saltz Mongeluzzi Barrett & Bendesky, talks about how his client, Emmanuel Martinez, now has to use a custom-made plastic "bucket" to sit up in a wheelchair. It's so painful he can only manage four to six hours a day out of bed.

Nonetheless, doctors say Martinez could live a long life. The quality of that life will depend largely on how his lawsuit turns out. "The stress of being a trial lawyer is unbelievable," Mongeluzzi says. "What you do affects the rest of [the clients'] lives, and their families' lives. Where they're going to live. Whether their kids are going to go to college. What sort of life they're going to have."

Mongeluzzi, it should be pointed out, is not merely a sufferer of stress. He's a known provider of it as well—espe-cially for defense attorneys who oppose him. During the past quarter-century, Mongeluzzi has carved out a reputa-tion as one of the top construction-accident plaintiffs' attorneys in the country, and probably the leading lawyer for accidents involving cranes and aerial lifts.

Mongeluzzi has been lead counsel for more than 100 seven-figure and eight-figure verdicts and settlements, including a $29.6 million settlement in the Pier 34 nightclub collapse that killed three women, and $12.7 million for seven of the eight workers injured in the Kimmel Center scaffolding collapse. In 2004, he won one of the biggest verdicts in Pennsylvania history—$75.6 million, including $25 million in punitive damages—for a drunken-driving accident victim who was left a quadriplegic.

His opponents are right to feel stressed.



Like his hero
Bruce Springsteen,
Mongeluzzi always
keeps the interests
of the working man
in mind.





**M**ongeluzzi's office, with floor-to-ceiling glass walls on the 52nd floor of One Liberty Place, affords sweeping views of downtown Philadelphia and off into New Jersey. He looks down and points to building after building where there have been construction accidents: he earned $1 million for a client there, $2 million there, $3 million there. All his current cases are "catastrophic," he says: brain damage, paralysis, horrific burns and "many deaths," including the 2003 Tropicana Casino garage collapse that killed four and injured 21 others in Atlantic City. That trial is scheduled to begin in June.

Talking about his clients and their injuries, he pats his heart, just above the "Mongo" stitched onto his shirt—call it a "Mongogram." The other kids gave him that nickname in the mixed white-collar and working-class neighborhood in Huntington, Long Island, where Mongeluzzi grew up with family stories of workplace accidents. His great-grandfather was killed when a locomotive engine fell off a hoist. His grandfather was disabled in an accident at his job in a sugar factory. Consequently, Mongeluzzi's father received public assistance. "My great-grandfather, my grandfather and my father were all affected by workplace injuries," Mongeluzzi says. "My great-grandparents' family sued, and had a local lawyer. The railroad company had the highly paid, top-notch guys. My family lost. That's had an impact on me, that the three generations before me were all affected by workplace injury."

Mongeluzzi's father went on to become an executive with a shoe distribution company, and Mongeluzzi himself grew up in a rollicking neighborhood where his best friends were the sons of a cop, a plumber and a butcher. They played whatever sport was in season.

"I was your basic jock," Mongeluzzi says. When he went out for the Huntington High freshman baseball team, he found himself bored while standing in the outfield, waiting for something to happen. He noticed some other kids on the next field running nonstop, chasing a ball with sticks and knocking each other down. He talked Jim Burke, a buddy on the baseball team, into quitting baseball with him and switching to lacrosse. Mongeluzzi retold the story years later, when he gave Burke's induction speech at the National Lacrosse Hall of Fame.

Mongeluzzi wasn't quite that good, but he was decent enough to play for four years at Penn, and compete in top-level club lacrosse for 10 years. He coached club lacrosse for five years, and was twice named the southern division coach of the year. He's been coaching grade-school and middle-school kids in recent years—the most

rewarding time he's ever had in the game—and still plays during the summer. Packing a solid 188 pounds on his 5-foot-9-inch frame, the 51-year-old Mongeluzzi is still one of the fastest guys on the field. In 2006, he was a defensive mainstay for the USA Geezers, the club that won the over-50 title at the lacrosse world championships in Canada. "I was always hyper-competitive," he says.

At Fordham Law School, he found that all those years of being coached in sports made it easier for him to absorb criticism from professors. "I was getting screamed at my whole life," he says. "The best lessons you learn as a lawyer are when things go wrong, and particularly when things begin going wrong in the courtroom. You've got to be able to take the hit and keep moving and not crumple and lose focus."

During law school he worked part time selling women's shoes at Bergdorf Goodman in Manhattan, where he learned the importance of establishing credibility with people. "You could be selling shoes, computers, real estate or your lawsuit," he says. "If they believe you and trust you, and you can relate to them and connect to them, you'll do well."

After graduating in 1981 from Fordham, where he was an editor of the law review, Mongeluzzi joined New York firm Cahill Gordon & Reindel. He soon realized he didn't have the patience to work his way up through a big firm. "There were guys there in their 40s who had never tried a case," he says.

So he moved to Philadelphia and what was then Daniels Golden & Saltz. One of his first major cases was on behalf of a dock builder injured in a crane accident. He settled the liability portion of the case quickly and favorably, and 10 days later when another dock builder was killed when a crane hit a power line, a member of the dock builders' union recommended Mongeluzzi. Three months after that, two more dock builders were killed when another crane hit a power line, and he got those cases, too. Mongeluzzi was suddenly an expert in construction accidents. He found himself handling crane cases from across the country, and then a broader range of construction accidents, including electrical accidents. He founded practice sections within the American Association for Justice for both electrical- and crane-accident cases, and wrote the organization's standard text, *Handling Construction Accident Cases*.

Besides a telescope for zooming in on the Delaware River boat and barge traffic, Mongeluzzi's office features bookshelves stocked with an eclectic mix of biographies, histories and books on religion, philosophy, entertainment and rock 'n' roll trivia, along



From far left: Mongeluzzi receives his lacrosse trophy from NFL coach Dan Reeves, and at play and rest with the USA Geezers.

5 percent we'll try. So they all have to be prepared." And the cost of preparing a case can easily run into six figures. He routinely prepares videos and mini-documentaries about his clients and their cases to encourage insurance companies to settle. And he has pioneered the use of videos—particularly videos of defense witnesses during depositions—during his opening statements. For example, the video about Emmanuel Martinez, the young man in Georgia who had the multiple amputations, is a professional, powerful production that shows how physically painful his life is, how difficult it is for his family to take care of him, how he needs so much high-tech equipment and skilled care, and most of all, how much the young man tries to remain positive. It shows he has learned to speak English, he has taught himself to paint, and during the brief daily periods when he is upright in his plastic "bucket," he volunteers at a local burn unit. "One of the things that we've lost in this profession, and one of the things that I think great trial lawyers have, is creativity," Mongeluzzi says. "It almost gets beaten out of you in law school, and that's a shame. Go out and take a risk."

Earlier this year Mongeluzzi represented Andrea Lane, a 42-year-old Philadelphia policewoman who suffered a disabling arm injury while training for bicycle patrol; her bike slipped and she crashed on a city trail that had not been properly maintained. Mongeluzzi filed a lawsuit against the contracting firm that was responsible for the trail's upkeep. The turning point in the trial came when testimony from a defense witness, an economist, suggested that Lane's damages for lost wages should be limited because she would have been eligible to retire from the police force at age 57. Mongeluzzi began his cross-examination abruptly.

"Who's Joey?" he asked the economist.

The economist was mystified.

Mongeluzzi went over to the gallery behind his client, reached into the audience and patted the head of Joey, 9, the youngest of Lane's six children. Then Mongeluzzi asked the economist how old Lane would be when Joey graduates from college. Probably 56. Did it seem like Lane would be able to retire at age 57, when she was just starting to pay back six sets of college loans?

The jury deliberated two and a half hours and came back with a verdict of $3.5 million. The other lawyers in Mongeluzzi's office now call it the "Who's Joey?" cross-examination.

Mongeluzzi can tick off a long list of great thrills he's had in life, playing lacrosse, launching himself down a mountain of shining, untouched powder, ripping down a steep rocky hill on a mountain bike. "But I don't think there's a bigger thrill than cross-examining someone in a courtroom," he says.

Mongeluzzi has served on various bar committees and often teaches trial techniques to other lawyers, but he also occasionally sticks his head into the lion's den, speaking to those in the insurance and construction industries. "Put me out of business," he challenges them.

If contractors and employers provided proper safeguards for their workers, he insists, he'd be happy to give up all those contingency fees and find another way to make a living as a lawyer.

"I wouldn't have to sit across from a widow ever again." ❖

*Timothy Harper, based at www.timharper.com, is a lawyer, author and editorial/publishing consultant who helps individuals and organizations write and publish their own books, including personal and corporate histories.*

---

with an extensive collection of CDs, many by Bruce Springsteen. Mongeluzzi pops one into his state-of-the-art sound system and suddenly his office is a small club in Bryn Mawr in February 1975, where the E Street Band, a regional group popular from Philly to the Jersey Shore, is playing one of its last gigs before heading off on a national tour that will land Springsteen on the covers of *Time* and *Newsweek*. Mongeluzzi has seen 125 Springsteen concerts. The only time they met, however, was a few years ago in Pittsburgh, where Mongeluzzi had scheduled depositions to coincide with a Springsteen concert. Mongeluzzi was taking the hotel elevator down, the door opened, and the Boss stepped in and said hello. Now, in his office, Mongeluzzi points to a limited-edition Springsteen photo. "He's never lost that connection with the blue-collar world where he grew up," he says. Mongeluzzi slips a line or two from a Springsteen song into the opening or closing statement of every trial—he recently used "[Some guys] start dying little by little, piece by piece" from the song "Racing in the Street"—to remind himself of where he is from.

On one shelf in his office is a model of his Ford GT; it's a muscle car, with a top speed of 205 mph, but Mongeluzzi drives it only about 2,000 miles a year. His everyday cars are a Porsche Cayenne Turbo, a rocket disguised as an SUV, top speed around 170 mph, and a BMW M5, a sports sedan with a top speed of … Mongo isn't sure yet.

Fast cars aren't the only outlet for his adrenaline jones. He has also run the New York marathon, he skis 20 dawn-to-dusk days each winter out West—on black double-diamond runs—and drives up into the mountains of Pennsylvania several times a month to plunge down rocky trails on his high-tech mountain bike. "I'm a bit of a risk taker," he says, "which also plays into being a personal injury lawyer who works on a contingency fee."

He takes on several dozen cases a year. Seven or eight go to trial, and a couple typically go to verdict. "Ninety-five percent of my cases settle," Mongeluzzi says. "The problem is, we don't know the

# The Philadelphia Inquirer

## Plainspoken advocate for trade unions
### The attorney in the Tropicana case specializes in construction accidents, and minces few words.

**By Chris Mondics**
*Inquirer Staff Writer*

Robert J. Mongeluzzi, the lead lawyer for victims in the Tropicana Casino Resort settlement, is a candid former college athlete with a fierce devotion to his clients and a deep conviction that plain talk, not legal gymnastics, will win over jurors.

The $101 million settlement announced Wednesday in the garage-construction collapse that claimed four lives and injured dozens of others in Atlantic City in 2003 was said to be the largest ever in the region.

But it wasn't the first time that Mongeluzzi has tussled with construction firms and others where huge sums were at stake.

Mongeluzzi, 51, a Fordham University law school graduate, has made a career representing the victims of construction accidents.

He says the proliferation of building projects in Philadelphia and Atlantic City has produced a tragic offshoot: a huge number of accidents.

"I think you are seeing it more prevalently in this area. We have been undergoing a construction boom, and Philadelphia has seen a significant amount of new construction," he said. "With that is the unfortunate fact there are a significant amount of construction injuries."

In one case filed by Mongeluzzi, a Philadelphia jury awarded $75.6 million in 2004 to a road flagman who was rendered paraplegic by a drunken driver.

He was also lead counsel for the families of victims, including the families of three women killed in the May 2000 Pier 34 collapse, which resulted in a $29.6 million settlement.

In another case, Mongeluzzi represented a West Point cadet whose neck was broken when a railing collapsed during the 1998 Army-Navy football game at Veterans Stadium. The cadet, who recovered and went on to run in the Boston Marathon, won a $1 million settlement.

Trial lawyers have come under sharp criticism in recent years with a series of unflattering stories on seemingly inexplicable judgments and and lawsuits, such as a complaint filed by a McDonald's customer who claimed an injury from overheated coffee.

But it would seem hard to argue that serious issues were not at stake in the Tropicana garage collapse.

The top five floors collapsed as concrete was being poured on the top level of the 10-story structure.

Mongeluzzi, who is a founder of Saltz Mongeluzzi Barrett & Bendesky in Center City, said the floors were never properly attached to the walls.

Mongeluzzi - a graduate of the University of Pennsylvania, where he played both football and lacrosse - said his focus on construction accidents began serendipitously in the mid-1980s, when he handled several large personal-injury cases. Those cases resulted in further referrals. He now advises insurers and construction companies on how to avoid accidents.



*PETER TOBIA / Inquirer Staff Photographer*
*Robert J. Mongeluzzi in his office at One Liberty Place. His focus on construction accidents began serendipitously in the mid-1980s. He now advises insurers and construction firms on how to avert accidents. "I challenge them to put me out of business," he says.*

"I challenge them to put me out of business," he said.

Mongeluzzi, who lives in Merion Station, grew up in a neighborhood of white- and blue-collar workers on the north shore of Long Island, and he says he identifies with the day-to-day challenges faced by construction workers and others employed in trades. He is politically active and was one of a number of area trial lawyers who supported Democrat John Edwards, also a trial lawyer, in the 2004 primaries.

He says that in cases like the Tropicana collapse, plain language is best in the courtroom.

"I teach trial advocacy, and one of the things I teach is, you have to be a normal person in the courtroom," he said. "I don't use words in a courtroom that you would not use in a bar. People don't connect with it."

# PHILADELPHIA
# BUSINESS JOURNAL

# 'Mongo' makes his name in construction injury cases

## BY JEFF BLUMENTHAL

Mongo.

It sounds like a nickname for a whacky fraternity buddy. But for those in the local construction industry, it is a name that generates fear.

When someone in the Delaware Valley is catastrophically injured in a workplace accident and millions of dollars are at stake, chances are Mongo, also known as Robert Mongeluzzi, will have a hand in representing the plaintiff. He has secured multi-million dollar awards for those injured in the Veterans Stadium railing collapse at the 1998 Army-Navy football game, the February 2000 Kimmel Center scaffolding collapse and the May 2000 Pier 34 collapse. And now he is in the midst of discovery for a case involving the October 2003 Tropicana Casino garage collapse in Atlantic City. In all, Mongeluzzi has earned more than 100 seven- and eight-figure verdicts and settlements, 14 of which came during this calendar year.

Mongeluzzi, 49, a partner at Saltz Mongeluzzi Barrett & Bendesky, has become one of the city's most successful plaintiffs personal injury lawyers. But unlike many other plaintiffs firms that have focused on medical malpractice, Saltz Mongeluzzi has attempted to brand itself in a single area -- workplace accidents.

"I truly believe that if an injured worker has us representing them, they have an advantage," Mongeluzzi said. "I'm not saying there aren't other good firms out there doing this work, but if you had a kid with a brain tumor, would you send him to a doctor that had dealt with a few of them or one that has handled hundreds of them."

The Long Island native graduated from the University of Pennsylvania and Fordham University Law School before spending a year practicing commercial litigation at New York's Cahill Gordon. He returned to Philadelphia in 1982 to practice at plaintiffs personal injury firm Daniels Golden & Saltz, where he was mentored by former Philadelphia Bar Association chancellor Robert Daniels.



Mongeluzzi began handling construction cases in 1983 when he and Daniels represented a dock worker injured in a crane accident. That case led to another from the same union. Mongeluzzi said in doing discovery for the second case, he realized there were hundreds of similar accidents across the country and most involved cranes hitting power lines. So he started a practice section within the Association of Trial Lawyers of America and began getting publicity and referrals.

In the early 1990s, Mongeluzzi took the practice to the next level when he began hiring lawyers who were members of local trade unions, which gave the firm enhanced skill sets and connections to potential clients.

Daniels left the firm in 1998 when it had only nine lawyers. Mongeluzzi said the firm has experienced a 400 percent increase in caseload since that time. While partners Steve Saltz and Michael Barrett handle medical malpractice work and the firm had done some auto and class action cases, Mongeluzzi continued to grow his niche practice. The firm now has 21 lawyers and 55 employees, with two-thirds of its

revenue generated by its 12-lawyer workplace injury group.

Unlike many of his trial lawyer brethren working in the med mal area, Mongeluzzi is rarely handcuffed by confidentiality agreements in settlements. This has thrust his name into the spotlight as the results of his cases often appear in both print and broadcast media. But such self-promotion has raised a few eyebrows among his trial lawyer peers.

"If we were a paper tiger and we didn't produce, I'd feel awkward about it," Mongeluzzi said. "Verdicts and settlements are the most powerful marketing tool for a trial lawyer. Part of it comes from my background at Wharton where I learned you have to brand yourself and then constantly live up to it."

More than 95 percent of the workplace accident cases settle before trial, something Mongeluzzi said can be attributed to injured construction workers being extremely sympathetic victims and juries not being affected by the negative publicity that has been thrust on medical malpractice cases. He said the firm can invest more than \$100,000 per case in experts, discovery and computer animation.

"Bob invests the time and money to be fully prepared and also has a wealth of knowledge about construction," said Marshall Dennehey Warner Coleman & Goggin partner Thomas Bracaglia, who has defended clients against Mongeluzzi.

Mongeluzzi said he has good relations with both opposing counsel and those whom he sues. For example, he said he has probably sued Peco Energy more than any other entity but he has never had an issue with the company's head of claims. He often gives lectures to the constituencies of those he sues in the insurance and construction industries.

"I challenge them to put me out of business," Mongeluzzi said. "It's not hard to make the changes they need to make. I've sat across from too many widows and crying kids. If these cases dry up, I'm a pretty good lawyer and I can find something else to do."



HOME: STYLE ON A BUDGET • WILL ZINC REALLY CURE YOUR COLD?

**BAD CHEMISTRY:** THE *OTHER* DU PONT MURDER

# Philadelphia

# BEST LAWYERS

## DIVORCE • EMPLOYMENT LAW
## ESTATE PLANNING
## LITIGATION • ELDER LAW
## PERSONAL INJURY
### PLUS 25 OTHER SPECIALTIES
#### WE HOPE YOU NEVER NEED

MARCH 1999 $3.50



**Robert Mongeluzzi** *Saltz, Mongeluzzi, Barrett & Bendesky*
Gets big verdicts for workers hurt in construction accidents.

NO
AMBULANCE
CHASERS
HERE
Leading personal
injury lawyers (from left)
Robert Mongeluzzi,
Herb Kolsby, Arthur Raynes,
Jim Colleran and Gerry Litvin.



# LAW DRAGON

## *the* 500 BETTER THAN THE BEST

> **ALSO:**
COHEN MILSTEIN'S PLAN FOR EUROPE – A NEW ORLEANS PHOTO ESSAY
TRENDS IN ISLAMIC BANKING, GLOBAL LITIGATION, FAMILY LAW AND MORE



**Michael Mone** Esdaille Barrett (Boston) For medmal, insurance law, aviation claims and professional malpractice/disciplinary matters, Mone's your man. **Robert Mongeluzzi** Saltz Mongeluzzi (Philadelphia) He's the king of construction-site accidents, after recovering seven-figure sums in more than 100 such cases. **H. Laddie Montague** Berger & Montague (Philadelphia) Montague's made his mark against Big Tobacco, Big Oil and the infant-formula cartel. **Thomas Moore** Kramer Dilloff (New York) He's the impassioned star of the plaintiff bar, with 82 verdicts topping $1M, including $31M to a young mother who suffered negligent care during delivery, resulting in permanent brain damage to her baby. **James Morphy** Sullivan & Cromwell (New York) If a big deal is going down, the masterful Morphy is likely involved, advising BCE in its sale to Ontario Teachers' Pension & Providence ($48.8B); the Board of Directors of First Data in its KKR-led LBO ($29B); and a Wall Street Journal director in the News Corp. purchase ($5B). **Mark Morton** Potter Anderson (Wilmington) Morton makes deals happen, including Biosite's $1.55B sale to Inverness Medical and Siebel Systems' purchase by Oracle. **Edward Moss** Shook Hardy (Miami) Moss has rolled like a stone over opponents facing American Motors, DuPont, Otis Elevator, United Technologies and Westinghouse Corp. **Ronald Motley** Motley Rice (Mount Pleasant, South Carolina) Motley's charisma, courtroom skills and work ethic continue to pay major dividends. **Chip Mulaney** Skadden Arps (New York) Mulaney moved mountains so Sara Lee Corp. could buy The Earthgrains Company, and Abbott Laboratories could acquire TheraSense.

# AMERICAN ASSOCIATION *for* JUSTICE

# SPOTLIGHT

## After parking garage collapses, attorneys join together to help injured workers

*In re: Tropicana Parking Garage Collapse Litig.*, N.J., Atlantic Co. Super., No. ATL-L-1551-04, July 20, 2007.

Competition in the Atlantic City, New Jersey, casino world is fierce. So when Tropicana Casino and Resort wanted to expand its property to add a new hotel, retail center, and parking garage, it had to move fast to complete the project before another casino finished its own renovation. Unfortunately, the workers building the parking garage did not know that it was not being constructed in accordance with the design. Nor did they know when they left for work one morning in October 2003, that within hours, four of them would be dead and many more would be severely injured.

On that day, steel workers James Bigelow, a 29-year-old with a wife and an infant son, and Michael Wittland, a 53-year-old close to retirement who had one of his sons working with him, were assigned to work in the stairwells on the lower floors of the garage. For steel workers, who often have to work high up in dangerous situations, an indoor job in a stairwell is safe in comparison. At the same time, cement finishers 42-year-old Robert Tartaglio, who had a wife and two small children, and Scott Pietrosante, a relative newcomer at 21, were working on the fifth floor.

As cement workers were pouring concrete on the eighth floor, a large section of the garage suddenly collapsed, sending five levels crashing down on all of the workers below. James, Michael, Robert, and Scott, who is survived by his father and brother, were killed instantly. About 36 other workers were injured, including Michael's son Ed, who suffered a neck fracture and brain damage.

To find out what they needed to do to obtain reimbursement for medical costs and other expenses, the injured workers and the families of the four who died soon contacted attorneys with experience in workplace injury cases. AAJ member Paul D'Amato, of Linwood, New Jersey, who has practiced in the Atlantic City area for decades and seen many workers get hurt in casino construction projects, took several cases. "There have been so many prior accidents because there's always a rush to get casinos open, and we had a history of catastrophic injuries. This was the culmination. It was absolutely horrendous."

AAJ members Robert Mongeluzzi and Larry Bendesky, along with their associate V. Paul Bucci II, all of

Philadelphia, and Michael Maggiano, of Fort Lee, New Jersey, all of whom have extensive experience in workplace injury suits, also felt compelled to help the workers. "In this case, we had guys who never came home again, workers whose careers ended, families whose lives were changed forever," says Mongeluzzi. "It's a small community down there, and it was a devastating insult and blow to the whole area."

Together with 16 other attorneys hired by workers, the attorneys decided to join forces and create a litigation group to combat the many defendants involved. "We had to go up against 16 defendants, all funded by multimillion dollar companies. We decided we were going to work as a team," says Mongeluzzi. The group agreed to use liability experts collectively and share the costs. The attorneys divided into trial and non-trial teams and set to work on a case that would take almost four years of their time and generate more than 23,000 court filings.

The team sued several parties, including Tropicana, the general contractor, the concrete and rebar placement subcontractors, the inspection agency, the manufacturer of the precast concrete, the structural engineers, the architects, and members of the project safety team. The plaintiffs generally alleged the garage lacked three necessary steel-to-steel connections that were supposed to hold the floors up: (1) the steel bar connecting the bottom of the floors to the side columns, which was in the structural designs but never got built into the garage; (2) the steel connection from the top of the slabs to the columns, which defendants replaced with a weaker steel mesh that did not properly connect; and (3) steel running from column to column, which also did not fully connect. An investigation by the U.S. Occupational Safety and Health Administration confirmed that these problems weakened the support system, causing the building to fall. "To make it simple, the floors weren't connected to the walls," explains Mongeluzzi.

Although the obvious cause of the collapse might have made the case appear to be an easy one, the attorneys faced many obstacles. The defendants split into essentially two groups—the construction defendants and the design defendants—and each group blamed the other. Because many of the design defendants had little or no insurance in a state that does not have joint and several liability, it was crucial that the plaintiffs be able to prove that the construction defendants were liable as well, which was difficult because even the plaintiffs' experts confirmed that the design did not meet code requirements.

Through hundreds of depositions and discovery documents, the plaintiffs were able to show that the construction defendants were responsible for both the construction and the design safety. "Unlike other construction projects, where the owner has little involvement," D'Amato says, "casinos develop an in-house staff of construction engineers and managers." In fact, one of Tropicana's executives, whose title was vice president of design and construction, had to approve all changes to the erection of the steel.

The litigation team also hired highly regarded experts in their respective fields, including W. Gene Corley, a structural engineer from Chicago, who wrote much of the code on concrete reinforcement. Corley felt that, although the design did not meet code standards, the building would not have collapsed had it been built properly. "Corley was steadfast in his belief that the building would have held," says Bendesky. "We were able to show construction errors, lack of safety, and that the general contractor's contract made it responsible for both construction and design."

During discovery, the attorneys also became involved in several declaratory judgment actions filed by the general contractor's insurers. Tropicana had a primary policy on the project for $25 million, and the insurers for the general contractor's two policies argued that Tropicana's insurer was solely responsible. As a result, the lawyers found themselves in the middle of an insurance dispute, trying to obtain coverage for whatever money their clients might be awarded. After the court—the same court deciding the garage collapse litigation—ruled the insurers had to provide coverage, the plaintiffs gained leverage in settlement negotiations.

Finally, in April 2007, two months before trial was to begin, the parties reached a global settlement with a total value of $101 million, including $82.5 million in cash, continued payment of each injured worker's accident-related medical expenses, and a waiver of all workers' compensation liens. An arbitrator determined each plaintiff's confidential share in July. Defendants' individual contributions are confidential.

The attorneys feel this case presents an important lesson for plaintiffs' counsel. "One of the greatest things was not only truly representing people who needed our help, but the tremendous effort among the plaintiffs' attorneys," says Bendesky. Mongeluzzi agrees. "Many times in a massive disaster, there are egos and power plays. But here, it was the blueprint for a collaborative effort. We worked together, and it paid off for our clients, which was great."

**COURTNEY L. DAVENPORT**

*Comment:* Plaintiffs' counsel also included many other AAJ members. They are listed in the online version of "Spotlight" on AAJ's Web site at www.justice.org.

# TRIAL

## JOURNAL OF THE AMERICAN ASSOCIATION FOR JUSTICE

# Electrocution Accidents On the Job

## Heavy-Equipment Workers Put Their Lives on the Line

*By Robert J. Mongeluzzi*

The number of deaths and crippling injuries caused by contact of mechanical equipment, such as cranes, derricks, aerial hoists, pole diggers, and concrete pump trucks, with overhead uninsulated power lines is increasing. Electrocution is now the fifth leading cause of work-related deaths in the United States, with over 50 percent of the total occurring in the construction industry.[1]

The National Institute for Occupational Safety and Health analyzed data compiled by the Bureau of Labor Statistics and found 2,300 crane contacts with power lines annually, resulting in 115 deaths, 200 permanent total disabilities, and 1,800 other injuries.[2] National Safety Council statistics show an estimated annual average of 150 fatalities resulting from such incidents.[3] With the increasing use of equipment capable of reaching 22 feet and the continuing electrification of our nation, the problem can only worsen.

Deaths and catastrophic burn injuries caused by these accidents often lead to litigation. There are three major groups of defendants who may be liable for such incidents: equipment manufacturers, construction entities, and utility companies.

## Equipment Manufacturers

It is foreseeable that equipment extending high enough to reach a power line may come into contact with a live wire. The question is not if, but when, this will happen. If any part of the equipment is made of metal, it will conduct electricity; any person in the path of the direct current may be killed or injured.

Boomed hoisting equipment, like cranes, most often have steel hoisting cables attached to hooks to lift and move big loads. Usually the energized power lines come in contact with either the boom or the hoisting cable.[4]

Most hoisting equipment can be fitted with a proximity warning device similar to a radar detector. As the boom approaches the energy field, the warning device senses the electromagnetic signals emitted by energized power lines and sounds an alarm inside the operating cabin and sets off a speaker-horn outside, warning that the crane is approaching live power lines. This device, manufactured by Sigalarm, Inc., has been commercially available in the United States since the 1950s.[5]

The hoisting device may also be equipped with an insulated boom cage, a metallic cage that surrounds the boom but is separated from it by insulated attachments. If the cage hits a power line, electricity cannot reach the boom or be conducted into the crane. This device has also been commercially available since the 1950s.[6]

A significant percentage of deaths and injuries are sustained by load handlers who steady the load at ground level. In such cases, the hoisting cable usually contacts a power line, and the electricity is conducted through the hoisting cable into the crane hook, into the equipment being hoisted, and then into the load handler.

Most of these injuries and deaths can be prevented by using an insulated link, a component of the hoisting apparatus usually placed between the block and the hook. Made of dielec-tric material, the link electrically isolates the cable from the hook and effectively prevents conduction of electricity into the load handler. This safety device has also been commercially available since the 1950s.[7]

Under OSHA Regulation § 1910 180(j)(2), the proximity warning device, the insulated boom cage, and the insulated link may be used on cranes or other hoisting devices, but their use is not required. Several states require either proximity warning devices or insulated links on certain type cranes operating near power lines.[8]

The efficacy and reliability of these devices have been disputed by equipment manufacturers and by experts who have testified on their behalf.[9] The manufacturers contend that the proximity warning device is not effective because multiple power lines emit different amounts of electromagnetic energy leading to unreliable performance. The manufacturers also assert that the device gives crane operators a false sense of security, eliminates their reliance on their own senses, and causes more rather than fewer accidents.

Manufacturers also say the boom cage and the insulated link give operators and other workers a false sense of security and contend that although such devices may provide effective insulation in a vacuum, they are ineffective in the field because of dust, cement, and moisture contamination.[10] Although the two devices have been used in the field for 30 years, there has been no reported death or injury caused by their failure to perform effectively.

Materials-handling equipment and concrete pump trucks, which are operated by a control center attached to a flexible wire (called a "pigtail"), also come into contact with power lines. Electricity is conducted through

---

*Robert J. Mongeluzzi, a partner in Daniels, Saltz & Mongeluzzi, founded the ATLA Crane Injury Litigation Group. Mr. Mongeluzzi primarily handles products liability and construction negligence cases.*

the equipment, its wire, and into the operator.

It is technologically feasible to insulate the operating control box and its levers by use of pneumatic hoses or by use of radio remote control. For those pieces of equipment not operated through a mobile-connected control box, but from a control panel located on the equipment, it is possible to design the equipment so that the operator must stand on a safely grounded platform.

When plaintiffs' lawyers begin discovery, critical avenues to explore are how much the manufacturer knows about the risk of electrocution and all electrocution cases in which it has been a party. The manufacturer's knowledge of the risk of electrocution is relevant to the proof of foreseeability and the necessity of warnings and of insulation.

Plaintiffs' lawyers should obtain all the manufacturer's prior litigation files, because many of the sophisticated defenses now encountered were not fully developed in the early 1970s and files from those years may be rife with impeachment material. For ex-

ample, many early cases were defended on the basis that no technologically feasible alternatives existed. Now, cases are defended on the basis that the devices, although technologically feasible, are not reliable.

Many manufacturers have been in litigation dozens of times and have experienced and sophisticated experts.

The victim's attorney must be aware of the "standard" defenses before discovery to avoid pitfalls that may occur even during factual discovery of eyewitnesses. For example, weather conditions or cleanliness of the equipment might prove critical. The careful advocate must comprehend the implications of these facts before discovery begins.

## Construction Entities

Many equipment-power line contacts occur on construction projects. There are many other culprits who can and should take the necessary steps to control the power-line hazard. For example, landowners who contract for construction on their premises or lease their property as a construction or storage site know, or

should know, that construction work necessarily involves the use of boomed equipment that is capable of making contact with overhead energized power lines, which have been described by the New Jersey Supreme Court as "the most dangerous contrivances known to man."[11]

Owners should require that these uninsulated power lines be buried, relocated, insulated, or de-energized, or, if these alternatives are impossible, strictly regulate and control this hazard. Such controls include marking the minimum 10-foot-clearance distance [12] to power lines at ground level with high visibility caution tape; precluding crane operations in certain areas; and holding meetings onsite among the project safety engineer, crane operator, foreperson, and crew members before crane operations are planned or begun.

The general contractor may also be jointly responsible for control of the power-line hazard. Large and complex construction projects often require the services of a certified safety professional and a vigorous and comprehensive safety program. More-

over, the general contractor in control of the entire construction project should control hazards that expose employees of subcontractors to possible injury or death. The responsibility of the general contractor, however, depends on several variables, all of which must be analyzed.

Many incidents occur during the movement of stored material. For example, construction projects use the services of design professionals, such as site engineers. Site engineers should not locate storage areas near or beneath power lines and should identify prohibited areas of crane operations on the actual site plans.

In addition, many insurance companies conduct job-site safety inspections to control their risks. In several states, New Jersey, for example, loss-control representatives who negligently perform a loss-control inspection may be liable to a worker injured on that project.[13] Even if a carrier cannot be sued, he or she should be deposed. In one litigation we handled, a loss-control memo was discovered that showed that the loss-control carrier had recommended that the gen-

eral contractor take precautions to avoid a possible crane electrocution. The recommendations were ignored, and a worker was electrocuted two weeks later.

The greatest exposure to the power-line hazard occurs during highway construction. Many utility distribution lines are located in rights-of-way along streets, roads, and highways, and the heavy equipment needed to construct the highway may contact the overhead power lines. A highway department that lets a job to a general contractor without determining how the power-line hazard is to be controlled may be liable if a piece of equipment contacts a line.

Each potential defendant normally defends a case by blaming the accident on the plaintiff or the plaintiff's employer. Although the plaintiff is alleged to have assumed the risk, consumer studies show that the average person believes that most power lines are insulated and thus pose no risk.[14] This misconception is also fostered by the use of the term "telephone poles" that is used to describe the utility poles carrying uninsulated high-voltage

energized power lines.

Plaintiff's co-employee, the crane operator, may be negligent in operating the crane and may strike a power line. Sometimes, however, as human factors studies have shown, crane operators cannot accurately estimate the distance between the end of their boom lines and quarter-inch power lines running horizontally against a featureless sky.[15]

## Electric Utility Companies

The utility company responsible for maintaining and controlling power lines is a prime defendant. Lines at or near construction sites or other areas where heavy equipment is operated must be designed or modified to prevent contact.

It is technologically feasible to bury power lines underground, to insulate them by replacing the standard insulated metal wire with aerial cable (wire covered with dielectric material), to deenergize the power lines, or to barricade them with a neutral cable. Temporary insulation known as rubber snakes can be installed over a section of a line if work must be per-

formed in a limited area and other alternatives are not feasible. If none of these methods is feasible, then the lines can be brightly marked or flagged to increase their visibility.

The utility-company defense is that the power lines were stationary and the equipment was carelessly operated, causing it to strike the lines. Companies also assert that they had no notice work was being performed near their lines.

Although direct notice may be difficult to prove, indirect notice is not. Power companies employ tree trimmers to ensure that trees do not come into contact with their power lines.

Moreover, meter readers examine meters so that the utility company can bill its customers. Supplying power to a construction trailer may have required a job-site hookup. The first move of the lawyer for the plaintiff, then, should be to depose a designee of the company to find out if any of its tree trimmers or meter readers were in the area during the construction project.

Plaintiffs' lawyers also should focus on the failure of utility companies to educate the general public and construction entities about the need to coordinate all operations near power lines. Many men and women have been killed or injured as a result of equipment and power-line contact. In light of this, utility companies have an obligation to educate the general public and companies working near power lines about proper work procedures. The safety policies and educational programs of utility companies must be discovered and scrutinized.

## The Committed Advocate

The advocate must master the independent yet interrelated disciplines of construction practices, electrical-utility practice, and machine design and performance. A thorough understanding of the interrelationship between the various construction entities and the types of documents created and maintained, along with a practical understanding of the reality of construction practices, is crucial.

Electricity travels at nearly the speed of light, burns like fire, and explodes like a bomb. With careful planning and extensive discovery, the committed advocate can help victims pick up whatever pieces are left of their lives.  ∎

## ATLA Crane Injury Litigation Group Provides Up-To-Date Information

The ATLA Crane Injury Litigation Group, formed in early 1987, coordinates the exchange of information on recurring crane accidents such as crane electrocutions, crane tipovers, and two-blocking.

The group has compiled an extensive database containing crane-accident statistics, articles on craning and craning hazards, internal documents of crane manufacturers, depositions of defense experts, and crane safety-device patents. The group has compiled the most information on crane-electrocution cases and has materials pertinent to litigation against the crane manufacturers, the electric utilities, and the construction industry.

The second most commonly litigated area of crane accidents involves crane rollovers or tipovers. A recent industry publication concluded that more than 99 percent of all operators have never learned to read a load chart. This deficiency leads to overloading, which can cause the crane either to tip over or to structurally fail.

This hazard can be eliminated by the use of a safe load moment-sensing device that will automatically warn the operator and prevent the operator from doing anything that might cause the crane to tip over. One manufacturer recently made this equipment standard on most of its models.

Another recurring area of litigation arises from situations in which the operator has accidentally drawn the hook of the crane up into the boom, and, in doing so, broken the hoisting cable. This foreseeable accident can be prevented by the use of an anti-two-block device. OSHA now requires this device on all cranes that will be used to hoist man baskets. Plaintiffs' lawyers litigating these cases should be aware of all these facts.

The crane is probably only second to the automobile in the number of deaths caused by a manufactured product. The Crane Injury Litigation Group is an effective network and information base, providing technical and litigation assistance to those who represent the victims of equipment that has been aptly described as a "widow maker."

The group was founded and is chaired by Robert J. Mongeluzzi, Daniels, Saltz & Mongeluzzi, 211 South Broad Street, 17th Floor, Philadelphia, PA 19107, (215) 545-8282.  ∎

### Notes

1. NIOSH ALERT: Request for Assistance in Preventing Electrocutions from Contact Between Cranes and Power Lines, U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, National Institute for Occupational Safety and Health, 4676 Columbia Parkway, Cincinnati, OH 45226.

2. National Safety Council Utility Study, 1964-1968, Accident Facts, Chicago, Illinois.

3. Suruda, *Electrocution at Work*, PROFESSIONAL SAFETY, July 1988, at 27.

4. OSHA FATALFAXES concerning equipment/power line contacts issued from 1983 to 1987 show that contact between the boom and a power line accounted for 41 percent of such contacts; contact between the hoisting block and a power line, 12 percent of such contacts. In 12 percent of such contacts, either the boom or the cable contacted a power line, and contact between the hoisting cable and a power line accounted for 35 percent of such contacts.

5. Sigalarm, Inc., P.O. Box 18883, Irvine, CA 92713.

6. SAF-T-BOOM, 1613 Main Street, Little Rock, AR 72206.

7. H.J. Hirtzer & Assocs., 1308 Martino Road, Lafayette, CA 94549.

8. TEX. REV. STAT. ANN. art. 1436c (Vernon 1980); ARK. STAT. ANN. § 11-5-308 (1963).

9. *See, e.g.*, Hamilton & Morgan, *Final Report on an Evaluation of Mobile Crane Safety Devices to Bucyrus-Erie, Inc.* (Jan. 1982).

10. *Id.*

11. Black v. Public Serv. Elec. & Gas Co., 265 A.2d 12 (N.J. 1970).

12. Occupational Safety and Health Act, 29 C.F.R. § 1910.180(j)(1) (1983).

13. Viducich v. Greater N.J. Mut. Ins. Co., 192 A.2d 596 (N.J. Super. Ct. App. Div.), *cert. denied*, 195 A.2d 21 (N.J. 1963).

14. Consumer Products Safety Commission, *Evaluation Report: Evaluation of the Impact of the Communications Antenna Labeling Rule* (1980).

15. Middendorf, Human Factors: Judging Clearance Distances Near Overhead Power Lines, paper presented at the Sixth International System Safety Conference, Houston, Texas (Sept. 28, 1983); Cunitz & Middendorf, *Problems in the Perception of Overhead Power Lines*, HAZARD PREVENTION (Mar./Apr. 1985).

# Try opening with a videotaped deposition

*To get jurors' attention during your opening statement, let them see your opponents' admissions on screen, in their own words.*

ROBERT J. MONGELUZZI AND DAVID L. KWASS

Most courts now allow the use of various types of exhibits during opening statement. Some forward-thinking judges are even allowing lawyers to play videotaped depositions during the lawyers' opening remarks.

It's a persuasive trial technique. An opening accompanied by a video showing a defendant making a damaging admission—in his or her own words—is simply more convincing to jurors than a traditional opening.

This is partly because jurors are accustomed to receiving information in fast-changing, multimedia formats. Alternating from the trial lawyer to a witness's taped deposition merely replicates what many jurors see every day on television. For example, news programs switch back and forth from anchors in the studio to reporters in field locations and from live broadcast to videotaped segments.

Television crime shows—like the *CSI* programs—have also affected juror expectations. Jurors not only assume that the lawyers will have conducted a thorough investigation using modern technology, but they will also want proof of this.

Playing videotaped deposition segments on an interactive board with high-quality resolution and sound brings the jury into the case investigation. It allows them to experience the facts as they were discovered.

A juror's view of you and your client's case at the start of trial can range from healthy skepticism to outright mistrust. You can help build trust with audiovisual proof of the elements of your client's case as you present them in your opening statement. By providing this evidence early, you can establish yourself as a truth-teller right from the start.

Four principles guide the presentation of videotaped deposition testimony during an opening statement. First, tell the jury that you will prove each element of your case using your opponent's own words. Say, "I'm not going to ask you to believe me. You will hear the actual words of the witnesses, spoken by the witnesses themselves." The video clips you use should correspond closely with the elements they are offered to satisfy.

Second, make sure that the presentation's audio and visual quality is excellent. Use an interactive whiteboard such as a SMART Board, for example, which has outstanding visual and audio quality.[1]

Third, be prepared to confront objections, both to the practice of playing video depositions in your opening and to the specific content of the segments you wish to show. Make sure your clips will actually be admitted into evidence later.

Typically, admissions of a party opponent are safe bets to get into evidence during trial. If the admission is being offered against a company, be certain the witness will be considered an authorized representative or agent, so that the words will constitute an admission of the company.[2]

Finally, decide well in advance of trial which deposition segments you will show during your opening and provide this information to your opponents.

ROBERT J. MONGELUZZI *and* DAVID L. KWASS *practice law at Saltz, Mongeluzzi, Barrett & Bendesky in Philadelphia. The views expressed in this article are the authors' and do not constitute an endorsement of any product by* TRIAL *or the American Association for Justice.*

The more notice they have, the less likely that the trial court will sustain their objections.

## The legal framework

The rule in many states and the federal courts is that at the trial, "any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof."[3] By this standard alone, videotaped depositions would appear allowable in openings. That opening statements should enable the jury to grasp the key issues is an oft-repeated truism: "The purpose of the opening statement 'is to prepare the minds of the jury to follow the evidence and to more readily discern its materiality, force, and effect.'"[4]

Videotaped depositions serve this purpose well. From the opening, jurors will know not only the key issues of the case, but also precisely what the parties had to say on the key issues during their depositions.

Seeing the videotaped deposition during opening arms jurors with a specific expectation about *what* the witness will say and *how* he or she will say it. By allowing the jury to see deposition testimony early, jurors get a baseline—a standard against which to

judge the witness's demeanor and, consequently, an enhanced ability to assess witness credibility.

These considerations drive the modern judicial view, which allows the use of exhibits during opening statement.[5] As one leading commentator has said,

> It is well settled that, within the discretion of the trial judge, diagrams, charts, and graphs can properly be used in opening statement. The rule extends both (1) to exhibits that counsel intends later to introduce and (2) to those that will not be used subsequently in the trial but are either extemporized (as a blackboard) or prepared in advance of trial to summarize a claim.[6]

Before the 1970s, however, most courts prohibited the use of exhibits during opening statement. The South Dakota Supreme Court set forth the traditional rule in *Binegar v. Day:*

> The purpose and object of the opening statement is to briefly and concisely state the issues involved in the litigation and familiarize the trial judge and jury with the nature of the case and the evidence to be produced. It is not evidence. It should not be argument. Counsel should not name or identify any witness or exhibit. At this stage of the trial, the jury is peculiarly alert and impressionable and the importance of confining the opening statement to the language and intent of the statute is obvious. The use of the blackboard in the opening statement in the manner employed by defendant's counsel was improper and the statements of counsel in connection with its usage and his comments on the items of special damage were highly irregular.[7]

While some judges still adhere to this view (check the judicial profiles of many federal judges), two new approaches have emerged. Some courts allow lawyers to use exhibits during opening only if their opponent consents to it.[8] In another approach, the court may allow counsel to use exhibits but admonish them that they bear the risk that they've promised the jury an exhibit they couldn't deliver into evidence in the event it excludes the evidence later.[9]

Even under today's more liberal approach, two objections are frequently made to opening statements with video depositions: prejudice and incompleteness. The prejudice argument is based on concerns that the jury will "prejudge" the case before it hears any evidence. As one objecting attorney argued, "[I]t is an attempt to introduce to the jury an exhibit before the exhibit is introduced, before there is evidence to substantiate it."[10]

Creating the impression in opening that your side should win is, of course, the purpose of the opening generally, and of playing depositions in particular. But that does not make it prejudicial. To the contrary, playing a party's actual words, with the witness's own inflections and expressions, is far fairer to that party than having the presenting lawyer read those words or, as is traditional, paraphrase the testimony



In this demonstration in Courtroom 21—a project of the Center for Legal and Court Technology in Williamsburg, Virginia—jurors view a videotaped deposition. More courts are allowing attorneys to present video deposition segments in opening statement to give jurors a preview of trial testimony.

while telling the jury what he or she thinks the evidence will show.

The incompleteness objection is also untenable. The objection is typically made that the proffered video clips are taken out of context and do not fairly reflect the whole of the witness's deposition testimony. The answer is to allow opposing counsel to play segments that explain or soften the admissions in opening. Counter-designations are fair game.[11]

Although the case law specifically supporting the use of videotaped depositions during openings is not yet developed, many cases from around the country support closely related propositions, such as allowing depositions to be read during openings. For example, in *Spence v. Southern Pine Electric Cooperative*, the plaintiff contended that the trial court erred by allowing the defendant to use enlarged excerpts of deposition testimony of two of her witnesses during opening statements.[12]

Rejecting the plaintiff's contention, the Alabama Supreme Court concluded that the trial court was well within its discretion to allow defense counsel to use the blowups:

> This court has long upheld the use of visual aids to illustrate testimony or arguments. Ms. Spence's witnesses testified at the trial exactly as they had previously testified in their depositions. Nothing in the record indicates that the use of the props prejudiced Ms. Spence or that the trial court abused its discretion in allowing the defendant's attorney to use them.[13]

Similarly, in *Thunder Hawk ex rel. Jensen v. Union Pacific Railroad Co.*, the Wyoming Supreme Court rejected the plaintiff's contention that the trial court had erred in permitting defense counsel to read from the plaintiff's deposition transcript during

opening statements.[14] The plaintiff argued that reading his deposition was improper because he had testified in person and was cross-examined. The court summarily disposed of this objection, reasoning that the Wyoming civil procedure rules allow "any deposition to be used against any party for any purpose which is permitted by the Wyoming Rules of Evidence. The statements which [the plaintiff] made in his deposition were admissible because they were admissions by a party-opponent."[15]

## *Be prepared to confront objections, both to the practice of playing video depositions in your opening and to the specific content of the segments you wish to show.*

Courts are also increasingly comfortable with the use of PowerPoint presentations. In *State of Arizona v. Sucharew*, the defendant argued that the trial court abused its discretion in permitting the prosecutor to use a Power-Point presentation in his opening statement because the presentation involved a "computer-generated exhibit. Although a computer was used in the presentation, the actual presentation did not include any computer simulation or other similar evidence; rather, it was essentially a slide show of photographic exhibits. The photographs . . . were the same ones disclosed to defendant during pretrial discovery and later admitted into evidence at trial."[16]

The Arizona Court of Appeals concluded that the trial court did not abuse its discretion in permitting the prosecutor's use of the PowerPoint presentation under these circumstances.

## Choose carefully

Keep in mind that if you play a defendant's admission during opening, the defendant will be entitled to play any other portion of the deposition that clarifies, explains, or limits the admission. Thus, when you are choosing video segments, think carefully about

whether you will open the door to having the admission explained away. But the fact that the defendant can play additional segments to clarify the admission actually provides your most powerful argument to a skeptical judge, which is that playing videotaped depositions works no unfairness on the defendant.

You need not videotape all depositions to take advantage of this technique for opening statements. Because you are likely to be limited to playing admissions of party opponents, you need only videotape the depositions of the named defendants (if they are individuals) or corporate designees, officers, and managing agents.[17] Though videotaping depositions may put deponents more on guard, you will usually get more truthful and candid answers when videotaping because of the witnesses' awareness that the camera is capturing their facial expressions and gestures. Furthermore, defense lawyers are less likely to materially interfere during a videotaped deposition, so witnesses are not coached on a question-by-question basis.

Using videotaped depositions of party opponents during opening statement is a powerful and persuasive trial technique. It satisfies jurors' expectations for the presentation of information through modern media formats and fosters trust in you as trial counsel. Just be sure that the deposition segments will ultimately be admitted into evidence before using them in your opening. ■

Notes

1. Information about this technology is available at http://smarttech.com.

2. *See* Fed. R. Evid. 801 (d) (2).

3. Fed. R. Civ. P. 32(a).

4. *People v. Green*, 302 P.2d 307, 312 (Cal. 1956) (quoting *People v. Arnold*, 250 P. 168, 174 (Cal. 1926) (en banc)), *overruled on other grounds, People v. Morse*, 388 P.2d 33 (Cal. 1964).

5. *See e.g. Ark. State Hwy. Commn. v. Basin Dev. Corp.*, 571 S.W.2d 578, 579 (Ark. 1978) (approving use of city map during opening); *McGee v. State*, 529 S.E.2d 366, 368 (Ga. 2000) (approving use of floor-plan drawing during opening); *Campbell v. Menze Constr. Co.*, 166 N.W.2d 624, 625-26 (Mich. App. 1968) (approving use of damages chart with auto repair costs, medical expenses, and lost wages during opening); *Porter v.*



# DEALING IN DANGERS

In construction
site accident
cases, you
should carefully
consider the role
and potential
liability of the
rental company
that provided
the equipment.
Look carefully to
distinguish the
dealer's and
customer's
responsibilities.

By || **DAVID KWASS**

Of 3,945 workplace deaths in
2012, 20 percent were in the
construction industry, according
to the Occupational Safety and
Health Administration (OSHA).[1]
The leading causes of worker
deaths on construction sites were
falls, followed by being struck
by objects, electrocution, and
being caught in between (when
injury results from being crushed
between objects). Many injuries
and deaths involve construction
equipment that is rented.

According to the American
Rental Association's (ARA) lat-
est forecast from the ARA Rental
Market Monitor, revenues in
the construction and industrial
rental market were expected to
reach $41.1 billion in 2014, an
approximate 7.5 percent increase
over 2013 revenues of $38 bil-
lion.[2] With increasing numbers
of construction machines at
work comes the risk that the
number of machinery-related
accidents will increase.[3]

When injured workers seek
to hold equipment dealers
(rental companies) account-
able, the dealers contend they
cannot be responsible for

ROD CANALS PHOTOGRAPHY/GETTY IMAGES



equipment-related accidents on construction sites because after they deliver machinery to a site, they are no longer present to supervise job operations and machine use. But if the injured plaintiff's lawyer understands the two most common theories of liability against equipment dealers—failing to provide equipment in "fit for service" condition and renting to an untrained operator—he or she can maximize the client's recovery while fostering positive change for the American workforce.

When a dealer rents out equipment, it must be in the condition the manufacturer specified in the owner's and operator's manual or the service manual. If a deviation from the manufacturer's specifications contributed to the accident, the rental company has breached its duties under *The Restatement (Second) of Torts* §388.[4]

For example, when an equipment dealer fails to provide a manufacturer-specified safety device and the customer is injured, the dealer has breached its duty to provide the machine in fit-for-service condition.[5] But the company will contend that the customer (typically the worker/equipment operator or the foreman) was obligated to perform a walk-around inspection before each shift, as set forth in the owner's and operator's manual, so the customer is responsible.

The key to winning these cases is determining the differing inspection responsibilities of the customer and the rental company. The operator's manual contains the customer's inspection duties. It details the preshift inspection the manufacturer requires before an operator can begin using the machine.

The equipment owner's responsibilities are set forth in the maintenance and service manual. It identifies the various inspections the equipment owner must perform, and it often contains inspection checklist forms. Industry standards or the rental company's own internal standards may dictate how long inspection records must be kept.

Typically, the equipment rental company will be obligated by the manufacturer to perform "frequent" predelivery inspections, as well as comprehensive annual inspections. There should be a checklist that the rental company completes each time the machine is rented, identifying the machine functions and components that were checked, any conditions that required



**WORKPLACE SAFETY** || *Dealing in Dangers*

service, the number of hours on the machine, and the service technician who inspected it. Annual inspection forms are even more detailed. The records of the dealer's frequent and annual inspections often yield clues as to how long a particular condition existed and how many opportunities the dealer had to correct it.

Although the customer's employee may have had several opportunities to notice and inquire about a machine's condition, juries often expect more from rental companies, which employ specially trained maintenance and service personnel and therefore have greater expertise, knowledge, and experience with the machine than the customer does.

### Negligent Entrustment

Under the traditional statement of the doctrine, negligent entrustment occurs when someone provides a dangerous instrumentality to another that the person knows or has reason to know is unqualified to use it safely.[6] The "rule of the road" is that equipment should never be rented to an untrained operator. The extent of an equipment dealer's responsibility varies based on the equipment, because different equipment is governed by different federal and industry standards.

Three types of equipment that are commonly used in construction illustrate some of the challenges these cases present and the roles of the equipment rental companies.

*Aerial lifts.* These include boom lifts, scissor lifts, and vertical mast lifts. Industry standards published by the American National Standards Institute (ANSI) A92 main committee govern aerial lift rentals. The ARA publishes a best practices manual for aerial lifts, which identifies the stakeholders involved as the dealer/rental company, manufacturer, operator, owner, qualified person, and user.[7] At the outset of the case, determine all the various stakeholders and where your

> Many judges and juries readily understand that if you rent a car, the company will check for a valid driver's license for each person who intends to drive the car. Why should equipment dealers, which profit from the rental of complex construction equipment, be allowed to do any less?

client and your client's employer fall in this mix. Each stakeholder has different duties and responsibilities, so tailor your discovery to the various defendants.

Under ANSI standards and ARA best practices, rental companies must rent equipment that is in fit-for-service condition, without modification and with all scheduled inspections.[8] With regard to training, rental companies providing aerial lifts to jobsites have two responsibilities: to offer (though not necessarily provide) comprehensive operator training and to familiarize an individual designated by the customer to accept delivery with the lift's model-specific features, including the location of the owner's and operator's manual, all safety features, and all equipment controls.[9]

There are several important differences between training and familiarization: Training is a 3- to 4-hour comprehensive program in which the applicant has classroom instruction and a test, followed by operational training and an operational test. Familiarization is a 15- to 60-minute process in which a trained operator is given model-specific information about the particular lift being delivered.[10] However, the manufacturer's operator's manuals often go beyond the base-level ANSI obligations and include further requirements that only trained operators may operate the aerial lift, and that to be a trained operator, the operator must receive training (not just familiarization) on the specific aerial lift model being delivered.

When an aerial lift tips over or hits overhead power lines, failures in operator training are often the culprit. Almost invariably, the dealer has rented the equipment to an operator who has not been trained on the model in question.

*Forklifts.* Prosecuting forklift accidents is more challenging because the relevant ANSI guidelines are silent on equipment dealers' responsibilities.[11] Most courts recognize a duty on the

DITTO/GLOW IMAGES

rental company's part to provide equipment in fit-for-service condition under §388 of the restatement.[12] But attempts to impose a duty on rental companies to provide training, or to confirm the customers' credentials to operate forklifts, have yet to succeed on appeal.[13] Dealers typically argue that ANSI B56.1 and OSHA place all responsibility for ensuring that forklift operators are properly trained on the employer, and that the negligent entrustment doctrine does not apply where the dealers lack actual knowledge as to who will be operating the machinery after it is delivered.

However, industry literature supports imposing a duty on the equipment dealer to check customer qualifications and rent equipment only to qualified operators.[14] Further, many judges and juries readily understand that if you rent a car, the company will check for a valid driver's license for each person who intends to drive the car. Why should equipment dealers, which profit from the rental of complex construction equipment, be allowed to do any less?

***Cranes.*** Crane accident claims differ from both aerial lift and forklift cases. In the crane industry, it is customary to rent out cranes with highly skilled operators employed by the crane rental company, rather than allowing customers to operate the cranes. When crane accidents occur, the crane company typically asserts that the customer, not the crane operator, was in charge of the lift operations.

Crane companies advance two arguments in support of this claim: Under ANSI B30.5, the customer is the "lift supervisor" or "lift director" with overall responsibility for the safety of lifting operations; and under the rental ticket, the crane operator is a borrowed employee of the customer. Therefore, even if a crane operator makes a mistake that injures the customer's employee, the crane company will claim that the injury was caused by the worker's "co-employee" (the crane operator), under the direction of another co-employee (the foreman or superintendent acting as lift supervisor).

Traditionally, courts were suspicious of these defenses, often allowing plaintiffs' claims to go to the jury, citing traditional agency principles.[15] Some of these opinions also relied on the "captain of the ship" doctrine embodied in the 1969 and 2004 versions of ANSI B30.5, which stated that crane operators "shall be held responsible for those operations under the operator's direct control."[16] Recent revisions to the ANSI standard limit the crane operator's responsibility and increase the responsibilities of the lift supervisor and riggers (employed by the customer).[17]

As a result, claims by a customer's employee against the crane company have become more challenging. Robust, focused discovery is required to uncover and highlight the crane operator's specific action or inaction that was both under his or her direct control and a cause of the accident.

## Discovery

The construction equipment rental industry rents many other types of equipment and machinery, not all of which are governed by industry standards. But the fundamentals of pursuing these cases are the same as those involving aerial lifts, forklifts, and cranes. First, read the owner's and operator's manual carefully. The language that the manufacturer uses to insulate itself from liability often works to your advantage in claims against the equipment rental company. In a recent case I handled against a dealer for failing to train the operator on utility vehicles, the owner's manual stated: "The owner shall be responsible for training all operators in safe operation of the vehicle." Because the dealer owned the equipment, both the manufacturer and the dealer were forced to acknowledge during discovery that the dealer had a duty to train the plaintiff-operator.

Also critical are the rental company's own internal standards and practices. Rental companies almost uniformly train their employees to operate the equipment, because salespeople, safety personnel, service technicians, and delivery drivers all need to operate the equipment to some extent. They do not allow untrained personnel to operate the machines, either on their property or at customer sites. The corporate designee for most rental companies will acknowledge it would never allow an untrained employee to operate construction equipment. The corporate representative should also admit that it would not be burdensome to ask customers for proof of training for its designated operators. The representative will have to admit that industry literature directs rental companies to confirm the qualifications of the customer's approved operators before making a rental, and no literature suggests otherwise. One deposition question cannot reasonably be denied: "You agree that an equipment dealer should never rent out construction machinery to an unqualified operator, right?"

The construction equipment rental

**MORE ON CONSTRUCTION ACCIDENT CASES**
 Visit the Web pages below for additional information.

**AAJ SECTION**
Motor Vehicle Collision, Highway, and Premises Liability
www.justice.org/sections

**AAJ LITIGATION GROUP**
Construction Accidents and Defects
www.justice.org/litgroups

**AAJ EDUCATION PROGRAM**
2013 Annual Convention: Products Liability Section CLE
www.PlaybackAAJ.com

**WORKPLACE SAFETY** || *Dealing in Dangers*

industry collects more in rental income than the equipment costs to purchase and maintain. As owners of these complex construction machines—and experts in their inspection, maintenance, and operation—dealers have vastly more knowledge about the equipment than the customers who rent it. Placing sole responsibility on the customer to ensure that operators are properly trained immunizes the more expert party in the rental transaction from any liability associated with equipment operations.

If rental companies can escape liability for equipment-related construction site accidents, they will have little incentive to do more than drop off equipment and pick up checks. That is a recipe for more accidents, more lost time, and diminished productivity. 



**David Kwass** *is a partner with Saltz, Mongeluzzi, Barrett & Bendesky in Philadelphia. He can be reached at dlkwass@ smbb.com.*

**NOTES**

1. U.S. Dept. of Labor, Occupational Safety & Health Admin., *Commonly Used Statistics,* www.osha.gov/oshstats/commonstats.html.
2. Press Release, Am. Rental Assn., North American Rental Revenue to Reach $41 Billion in 2014 (Feb. 10, 2014).
3. For example, the number of workers fatally injured after being struck by objects or equipment increased by 7 percent from 2011 to 2012, including 199 struck by powered vehicles or mobile equipment. U.S. Dept. of Labor, Bureau of Labor Stands., *Census of Fatal Occupational Injuries Summary, 2012* (Aug. 22, 2013).
4. *See Restatement (Second) of Torts: Chattel Known to be Dangerous for Intended Use* §388 (1965).

5. *See e.g. J.C. Lewis Motor Co. v. Williams,* 69 S.E.2d 816, 19–20 (Ga. App. 1952).
6. *Restatement (Second) of Torts: Chattel for Use by Person Known to be Incompetent* §390.
7. Am. Rental Assn. et al., *Statement of Best Practices of General Training and Familiarization for Aerial Work Platform Equipment* 6 (Feb. 2010).
8. *See e.g.* Am. Natl. Stands. Inst., American National Standard—Boom-Supported Elevating Work Platforms, ANSI/SIA A92.5-2006, *Predelivery Preparation,* ¶5.3, at 13 (Feb. 26, 2006) ("Aerial platforms shall be inspected, serviced and adjusted to manufacturer's requirements prior to each delivery by sale, lease, or rental.").
9. *Id. Compare Training,* ¶5.7, at 14 ("The dealer shall offer appropriate training to facilitate owners, users, and operators to comply with requirements set forth in this standard regarding the inspection, maintenance, use, application, and operation of the aerial platform.") *with Familiarization Upon Delivery,* ¶5.8, at 14 ("Upon delivery by sale, lease, rental or any form of use, the dealer shall have the

responsibility with the person designated by the receiving entity for accepting the aerial platform to: (1) Identify the weather resistant compartment (for manual(s) storage) (2) Confirm that the manual(s), as specified by the manufacturer, are on the aerial platform (3) Review control functions (4) Review safety devices specific to the model aerial platform being delivered.").
10. Am. Rental Assn. et al., *supra* n. 7, at 14.
11. *See generally* Am. Natl. Stands. Inst., Safety Standard for Low Lift and High Lift Trucks, ANSI/ITSDF B56.1-2009 (Aug. 26, 2009).
12. *See e.g. Gail v. McDonald Indus.,* 926 P.2d 934 (1996) (truck lessor not entitled to summary judgment in negligence action under §388 where lessor's employee had altered truck's brake system); *Burke Enters., Inc. v. Mitchell,* 700 S.W.2d 789, 790–92 (Ky. 1985) (equipment lease company that materially altered post-hole digger liable for failing to warn of machine's dangers under §388).
13. *See e.g. Veliz v. Rental Serv. Corp. USA, Inc.,* 313 F. Supp. 2d 1317, 1332 (M.D. Fla. 2003)

(rental company owed no duty to confirm that customer's employees were certified to operate telescopic handler that tipped over); *Webb v. Day,* 615 S.E.2d 570 (Ga. App. 2005) (contractor did not negligently entrust forklift to operator whose negligence injured farm employee who was on forklift when it tipped over); *Vintimilla v. Natl. Lumber Co.,* 998 N.E.2d 353 (Mass. App. 2013) (lessor owed no duty to worker who was injured falling off forklift and brought negligent entrustment action against lessor); *Kitchens v. Dirt-works, Inc.,* 50 So.3d 388, 390–91 (Miss. App. 2010) (lessor did not negligently entrust forklift on which welder was injured absent showing that lessor's assumption, that lessee would properly use lift, was unreasonable). *But see Barsness v. Gen. Diesel & Equip. Co.,* 383 N.W.2d 840 (N.D. 1986) (construction worker injured in fall from crane entitled to pursue negligent entrustment claim against lessor where lessee-crane operator was inexperienced).
14. *See e.g.* Kim Phelan, *Safety Checkpoints for the Dealer's Rental Process,* Constr. Equip.

Distrib. (June 1, 2008) (directing dealers to "Establish and enforce rental qualifications" and "always provide an equipment demonstration"); Kim Phelan, *Would Your Equipment Rentals Be Found Liable?,* Constr. Equip. Distrib. (Feb. 1, 2006) (instructing dealers to "Ask your customers who will be operating the equipment, what it will be used for and whether the intended operator has been trained to use it.").
15. *See e.g. Inmon v. Crane Rental Servs., Inc.,* 67 P.3d 726, 732 (Ariz. App. 1st Div. 2003), citing *Restatement (Second) of Agency* §227(c) (1958); *Mature v. Angelo,* 97 A.2d 59 (Pa. 1953); *see also Phelps v. Paul L. Britton, Inc.,* 192 A.2d 689 (Pa. 1963); *Thompson v. Anthony Crane Rental, Inc.,* 473 A.2d 120 (Pa. Super. 1984).
16. Am. Natl. Stands. Inst., American National Standard—Mobile and Locomotive Cranes, ANSI/ASME B30.5-2004, *Conduct of Operators,* ¶5-3.1.3(d), at 29 (May 24, 2004).
17. Am. Natl. Stands. Inst., American National Standard—Mobile and Locomotive Cranes, ANSI/ASME B30.5-2011, *Conduct of Operators,* ¶5-3.1.3(d) (Jan. 17, 2012).



# Defuse the

# OSHA

# Citation

The federal government has stepped up its enforcement of construction safety regulations, but citations against an employer can hurt a plaintiff trying to prove non-employer defendants are liable. Some strategies, if adopted early, can help you neutralize the citations' impact.

*By* || **DAVID L. KWASS**

Over the past few years, the Occupational Safety and Health Administration (OSHA) has been ramping up its enforcement efforts on U.S. construction sites. OSHA is issuing more citations with higher fines than ever before. While this has not yet been shown to increase worker safety, it is having the unintended effect of bringing to the fore the role of OSHA citations in civil cases.

OSHA generally issues citations only to the plaintiff's employer, raising an inference of employer negligence. However, workers' compensation laws generally immunize employers from suit. Defendants therefore have an incentive to use OSHA citations issued to the plaintiff's employer to blame an empty chair at trial. But several strategies can help you keep citations out of evidence and neutralize them if they are admitted into evidence.

Under President Obama's administration, OSHA has been more assertive.[1] In 2010, OSHA announced that it was implementing a Severe Violator Enforcement Program and increasing civil penalties for the first time in 40 years.[2] The number of OSHA inspections increased about 6 percent from 2006 to 2010, despite a decrease in the number of workplace fatalities over the same period.[3] In 2010,

DIGITAL VISION/GETTY IMAGES

OSHA found almost 97,000 violations of the agency's standards and regulations in the nation's workplaces, a 15.3 percent increase since 2006. The total number of serious and repeat violations issued increased by about 22 percent and 8 percent, respectively, over those five years. The total number of willful violations issued has increased by about 217 percent since 2006 and by almost 279 percent since 2009.

OSHA contends that these numbers demonstrate that it is identifying and eliminating more serious hazards in the workplace, as well as identifying more employers who have intentionally violated OSHA standards and ignored their duty to provide a safe and healthful workplace under the Occupational Safety and Health Act (OSH Act).[4] While that may be true, OSHA's enforcement has also made it harder for injured employees to seek redress.

All states have express statutory prohibitions on suing employers who provide workers' compensation benefits to their employees. Under state statutes enacted between 1911 and 1948, no injured worker can sue an employer where the employer's conduct was garden-variety negligence.[5] There is an exception in a minority of states when the employer's conduct was intentional and the likelihood of injury was substantially certain.[6] But even in a state that allows recovery for intentional conduct, the bar is set high.

In *Reeves v. Structural Preservation Systems*, for example, the Louisiana Supreme Court held that an employer directing an employee to move a sandblasting pot that weighed more than 1,000 pounds when full—without any mechanical aids and in violation of OSHA regulations—did not constitute an intentional tort even though the employee's supervisor feared that such actions would eventually lead to an injury.[7] The court found determinative the facts that



The possibility that the plaintiff's employer may also have been negligent—even causally negligent—is irrelevant. Citations were issued to a nonparty, by a nonparty, and according to completely different legal standards from those in a civil action.

the employee had moved the pot on other occasions without incident and that the supervisor did not expect him to be injured that time.

## The Empty Chair

Because employers are responsible for their employees' safety on job sites but cannot be sued for negligence, third-party defendants in personal injury actions often seek to blame the plaintiff's employer. This makes good sense: The employers are not parties to the case and do not have counsel to defend their own conduct. Further, if a defendant wants to pin the accident on the plaintiff's conduct without seeming mean-spirited and alienating the jury, it can instead blame the employer for failing to train or supervise the employee properly. To jurors, a citation issued by the federal agency ultimately responsible for workplace safety is damning evidence of employer negligence.

While courts generally don't allow

OSHA citations issued to the employer to be admitted into evidence, some courts do allow evidence of OSHA violations to the extent it relates to causation.[8] Juries confronted with this evidence may assume incorrectly that your client has a great case against the employer and can recover from the employer.

Five strategies can help you keep employer citations out of the courtroom or mitigate their impact should they be admitted.

***Encourage the employer to fight the OSHA citation.*** Often, the employer has an incentive to cooperate. The employer may care about the injured worker; be asked by the workers' compensation carrier to assist in recouping its benefits paid to the injured worker; or recognize that because it is immune from suit, your only interest is to pin the blame elsewhere.

Explain to the employer that it has two valuable defenses to OSHA enforcement actions, the doctrines of impossibility and greater hazard.[9] The employer may establish an impossibility defense by demonstrating that it was impossible to comply with the OSHA standard's requirement or that compliance would have precluded performance of work, and no alternative means of employee protection were available. The related greater-hazard defense applies where compliance with an OSHA standard would result in greater hazards to employees than noncompliance, and no alternative means of employee protection were available.

These defenses arise frequently in fall protection situations, for example, where it can be challenging to have workers harnessed while they are setting up fall-safety devices for others. Almost always, the employer should be able to negotiate down not only the proposed penalty assessment but also the classification of the citation.[10] Judges are less likely to allow testimony about contested

and settled citations with reduced penalties than uncontested citations with substantial penalties.[11]

**Argue the citations are irrelevant.** Be prepared to argue from the start of the case that OSHA citations are irrelevant because the only question that will go to the jury is whether the defendant's conduct was a significant or substantial factor in causing the plaintiff's injuries.[12] Start with the jury charge in your jurisdiction on proximate cause or concurring cause. Most states have jury charges stating that a defendant's negligence need not be the sole cause of an accident for liability to attach. Some even specify that the existence of other causes of an accident will not relieve a defendant of liability if its negligent conduct was a substantial factor in causing the accident.[13] Assert this argument using objections during written discovery and depositions. During discovery, seek protective orders to limit discovery concerning the substance of the employer's alleged violations. Most important, start framing your motions in limine early.

The question in your case is whether the defendant's negligence or defective product was a legal cause of the plaintiff's harm. The possibility that the plaintiff's employer may also have been negligent—even causally negligent—is irrelevant. Citations were issued to a nonparty, by a nonparty, and according to completely different legal standards from those in a civil action. Moreover, the citations and fine were a negotiated, compromised settlement between a company that denies liability and an agency that never proved liability, and the administrative judge before whom the controversy was pending never made separate findings.

**Address the superseding or intervening cause defense.** This should be done during depositions of the defendant's safety directors or corporate designee. A superseding cause is an act of a third party that is so extraordinary and unforeseeable as to prevent the defendant from being held liable for the resulting harm, despite the defendant being negligent.[14] Bait defense deponents into saying that the plaintiff was comparatively negligent and that the plaintiff's negligence was a cause of the accident. This traps them into admitting that the employer's fault was *not* the sole cause of the accident. Once they admit that, the superseding/intervening cause defense is much less likely to be applied. "The finder of fact may allocate all or none of the total fault to the employer. It may not allocate only a portion of the total fault to the employer."[15] Where the employer's negligence is not alleged to be the sole cause of the accident, it cannot be a superseding cause because it is not extraordinary and unforeseeable.

**Use the multi-employer doctrine.** Some defendants will trumpet that OSHA construction safety standards often apply on their face only to the plaintiff's employer. For example, under §1926.20(b)(I) of the OSH Act, "It shall be the responsibility of the employer to initiate and maintain such programs as may be necessary to comply with this part." According to §1926.20(b)(4), "The employer shall permit only those employees qualified by training or experience to operate equipment and machinery." Pursuant to §1926.501(a)(2), "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely." During discovery and trial, these regulations can feel like a noose tightening around your client's case—the statutory safety obligations all reside with the one entity that you cannot sue.

Fight back using the multi-employer doctrine. "The doctrine holds that on multi-employer work sites, an employer who creates a safety hazard can be liable under the act regardless of whether the employees threatened are its own or those of another employer on the site."[16] Further, "when an employer on a work site violates a safety regulation, it can face liability under the act regardless of whether those exposed to the resulting danger were the employer's own employees or those of another."[17] If the defendant has violated an OSHA standard and is *an* employer at the work site, it is no defense that the defendant was not the *plaintiff*'s employer. Prepare your construction safety expert to argue that because the OSH Act's definition of "employer" is broader than just the plaintiff's payroll employer, the same OSHA standards for which the plaintiff's employer was cited apply equally to the defendant.[18]

**Request a jury charge.** Ask that the jury be informed that the plaintiff is legally barred from suing his or her employer. It is a true, neutral statement of the law and is necessary to avoid jury confusion.[19] Such a charge will allow you to explain during closing that the question is not whether the plaintiff's employer was negligent or whether the employer's conduct contributed to the plaintiff's injuries. The employer's negligence is not a proper defense unless it is the sole cause of the accident. Instead, the questions in the case are whether the defendant was negligent, whether the defendant's negligence was a significant factor in causing the plaintiff's harm, and what the plaintiff needs to make up for that harm. Stated otherwise, knowledge plus opportunity equals responsibility—if the defendant knew of the hazard and had the opportunity to prevent it, it had the responsibility to do so, even if others also had knowledge and opportunity.

Although OSHA enforcement actions are on the rise and more nonparty employers are being cited in connection with workplace accidents, you can minimize their damage and often get them to work in your client's favor. ∎

**EMPLOYMENT LAW** || *Defuse the OSHA Citation*

plaintiff's negligence was a cause of the accident. This traps them into admitting that the employer's fault was *not* the sole cause of the accident. Once they admit that, the superseding/intervening cause defense is much less likely to be applied. "The finder of fact may allocate all or none of the total fault to the employer. It may not allocate only a portion of the total fault to the employer."[15] Where the employer's negligence is not alleged to be the sole cause of the accident, it cannot be a superseding cause because it is not extraordinary and unforeseeable.

***Use the multi-employer doctrine.*** Some defendants will trumpet that OSHA construction safety standards often apply on their face only to the plaintiff's employer. For example, under §1926.20(b)(1) of the OSH Act, "It shall be the responsibility of the employer to initiate and maintain such programs as may be necessary to comply with this part." According to §1926.20(b)(4), "The employer shall permit only those employees qualified by training or experience to operate equipment and machinery." Pursuant to §1926.501(a)(2), "The employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely." During discovery and trial, these regulations can feel like a noose tightening around your client's case—the statutory safety obligations all reside with the one entity you cannot sue.

Fight back using the multi-employer doctrine. "The doctrine holds that on multi-employer work sites, an employer who creates a safety hazard can be liable under the act regardless of whether the employees threatened are its own or those of another employer on the site."[16] Further, "when an employer on a work site violates a safety regulation, it can face liability under the act regardless of whether those exposed to the

> If the defendant knew of the hazard and had the opportunity to prevent it, it had the responsibility to do so, even if others also had knowledge and opportunity.

resulting danger were the employer's own employees or those of another."[17] If the defendant has violated an OSHA standard and is *an* employer at the work site, it is no defense that the defendant was not the *plaintiff's* employer. Prepare your construction safety expert to argue that because the OSH Act's definition of "employer" is broader than just the plaintiff's payroll employer, the same OSHA standards for which the plaintiff's employer was cited apply equally to the defendant.[18]

***Request a jury charge.*** Ask that the jury be informed that the plaintiff is legally barred from suing his or her employer. It is a true, neutral statement of the law and is necessary to avoid jury confusion.[19] Such a charge will allow you to explain during closing that the question is not whether the plaintiff's employer was negligent or whether the employer's conduct contributed to the plaintiff's injuries. The employer's negligence is not a proper defense unless it is the sole cause of the accident. Instead, the questions in the case are whether the defendant was negligent, whether the defendant's negligence was a significant

factor in causing the plaintiff's harm, and what the plaintiff needs to make up for that harm. Stated otherwise, knowledge plus opportunity equals responsibility—if the defendant knew of the hazard and had the opportunity to prevent it, it had the responsibility to do so, even if others also had knowledge and opportunity.

Although OSHA enforcement actions are on the rise and more nonparty employers are being cited in connection with workplace accidents, you can minimize their damage and often get them to work in your client's favor. █

*David L. Kwass is a partner with Saltz, Mongeluzzi, Barrett & Bendesky in Philadelphia. He can be reached at dkwass@smbb.com.*

**NOTES**

1. Shawna M. Bligh, *Responding to an OSHA Enforcement Action*, 26 Nat. Resources & Env. (newsltr. of Am. Bar. Assn.) 53 (Summer 2011).
2. *Id.*
3. U.S. Dept. of Lab., *SHA Enforcement: Committed to Safe and Healthful Workplaces* (2010). www.osha.gov/dep/2010_enforcement_summary.html.
4. *Id.*; 29 U.S.C.S. §§ 651–784 (2013).
5. Gregory P. Guyton, *A Brief History of Workers' Compensation*, 19 Iowa Orthopaedic J. 106, 108 (1999) ("The central tenet is that of 'no-fault' insurance; industrial accidents are accepted as a fact of life and the system exists to deal with their financial consequences in as expeditious a manner as possible. Employers participating in the system have the notable benefit of tort exemption for injuries covered by workers' compensation.")
6. *E.g.* Ohio Rev. Code Ann. §2745.01 (West 2012); *see also* W. Va. Code §23-4-2(d)(2)(ii)(A)&(B) (2012), which says the employer's immunity may be lost if "a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death," and the employer knew of the unsafe working condition; *Laidlow v. Hariton Machinery Co., Inc.*, 790 A.2d 884, 898 (N.J. 2002) (In New Jersey, an employer's conduct must create a substantial certainty that an injury to an employee will occur.) *Millison v. E.I. du*

## Notes

1. Shawna M. Bligh, *Responding to an OSHA Enforcement Action*, 26 Nat. Resources & Env. (newsltr. of Am. Bar. Assn.) 53 (Summer 2011).

2. *Id.*

3. U.S. Dept. of Lab., *SHA Enforcement: Committed to Safe and Healthful Workplaces* (2010). www.osha.gov/dep/2010_enforcement_summary.html.

4. *Id.*; 29 U.S.C.S. §§ 651–784 (2013).

5. Gregory P. Guyton, *A Brief History of Workers' Compensation*, 19 Iowa Orthopaedic J. 106, 108 (1999) ("The central tenet is that of 'no-fault' insurance; industrial accidents are accepted as a fact of life and the system exists to deal with their financial consequences in as expeditious a manner as possible. Employers participating in the system have the notable benefit of tort exemption for injuries covered by workers' compensation.")

6. *E.g.* Ohio Rev. Code Ann. §2745.01 (West 2012); *see also* W. Va. Code §23-4-2(d)(2)(ii)(A)&(B) (2012), which says the employer's immunity will be lost if "a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death," and the employer knew of the unsafe working condition; *Laidlow v. Hariton Machinery Co., Inc.*, 790 A.2d 884, 898 (N.J. 2002) (In New Jersey, an employer's conduct must create a substantial certainty that an injury to an employee will occur.) *Millison v. E.I. du Pont de Nemours & Co.*, 501 A.2d 505, 514–16 (N.J. 1985).

7. 731 So. 2d 208 (La. 1999).

8. *Compare Swartz v. Dow Chem. Co.*, 326 N.W.2d 804 (Mich. 1982) (excluding OSHA citations issued to the plaintiff's employer in products liability claim arising from use of solvent), and *Cardin v. Telfair Acres of Lowndes Co., Inc.*, 393 S.E.2d 731 (Ga. App. 1990) (excluding OSHA citations issued to the plaintiff's employer in trench collapse case); *with Brodsky ex rel. Brodsky v. Mile High Equip. Co.*, 69 Fed. Appx. 53, 56 (3d Cir. 2003) (admitting OSHA citations issued to the plaintiff's employer in ice machine electrocution as relevant to intervening/superseding cause defense); and *Valenzuela v. Heldenfels Bros., Inc.*, 2006 WL 2294562 at *2 (Tex. App. Aug. 10, 2006) (admitting OSHA citations issued to the plaintiff's employer in wrongful death claim).

9. *See e.g. E&R Erectors, Inc. v. Sec. of Lab.*, 107 F.3d 157, 163 (3d Cir. 1997).

10. Bligh, *supra* n. 1, at 54.

ously operate to bring about harm to another, the fact that the active and substantially simultaneous operation o effects of a third person's innocent, tortious, or criminal act is also a substa factor in bringing about the harm *does . protect the actor from liability*." (emphasis added).

13. For example, in New Jersey, Model Civil Jury Charge 6.12 (Proximate Cause) reads in part, "Nor is it necessary for the negligence of [defendant] to be the sole cause of accident/incident/event or injury/loss/harm"; in Florida, Standard Jury Instruction-Civil Cases Sec. 402.6(b) (Legal Cause/Concurring Cause) reads in part, "Negligence may be a legal cause of [loss] [injury] [or] [damage] even though it operates in combination with . . . some other cause. . . ."

14. *See Restatement (Second) of Torts* §440.

15. *Id.*

16. *U.S. v. Pitt-Des Moines, Inc.*, 168 F.3d 976, 982 (7th Cir. 1999).

17. *Id.* at 982–83.

18. General contractors have direct obligations under OSHA regulations, starting with 29 C.F.R. §1926.16(b) (2013) ("By contracting for full performance of a contract subject to section 107 of the act, the prime contractor assumes all obligations prescribed as employer obligations under the standards contained in this part, whether or not he subcontracts any part of the work.")

19. Some attorneys incorporate that statement into a stipulation with defense counsel that the defendant may introduce evidence that the plaintiff's bills were paid by workers' compensation but that the plaintiff will be required to pay them back to workers' comp from any recovery in the third-party case.

11. Although evidence for this statement is anecdotal, it makes sense because judges are accustomed to excluding evidence of settlements. Frame the issue not as whether evidence of OSHA citations should be admitted, but whether the employer's OSHA settlement should be excluded.

12. *The Restatement (Second) of Torts* §439 (1965) provides: "If the effects of the actor's negligent conduct actively and continu-

**The Legal Intelligencer** | Special Section | February 2015

# Products Liability

# Deposing a Corporate Designee in Products Cases

**BY LARRY BENDESKY
AND ROBERT W. ZIMMERMAN**
*Special to the Legal*

The court in *Tincher v. Omega Flex,* 2014 Pa. Lexis 3031, held that a plaintiff pursuing a cause of action under a theory of strict liability still must prove that the product was in a defective condition, as defined in Section 402A of the Second Restatement. The court set forth two ways in which a plaintiff now must prove a products liability case:

• The danger must be unknowable and unacceptable to the average or ordinary consumer (the "consumer expectations" analysis).

• A reasonable person would conclude that the probability and seriousness of harm caused by the product outweighs the burden or costs of taking precautions (the "risk-utility" analysis).

These theories of liability must be resolved by the fact-finder. While *Tincher* provides the new framework for products liability law in Pennsylvania, many of the same tools available to plaintiffs attorneys before this ruling still exist in the post-*Tincher* world. One of the most powerful tools in products liability cases is the corporate designee deposition. Under Pennsylvania Rule of Civil Procedure 4007.1(e), a plaintiff may name a defendant corporation or other business organization as a deponent. Plaintiffs counsel must describe the areas of inquiry and the docu-

 

**BENDESKY**　　**ZIMMERMAN**

**LARRY BENDESKY** *is the managing shareholder of Saltz, Mongeluzzi, Barrett & Bendesky. He concentrates his practice on complex products liability cases and catastrophic construction accidents.*

**ROBERT W. ZIMMERMAN** *is an associate at the firm. He focuses his practice on products liability cases and workplace accidents.*

ments to be produced by the company at the deposition. The company must produce one or more employees to testify in the areas outlined in the notice of deposition. The designated individual must then testify to matters known or reasonably available to the company. Too many plaintiffs lawyers fail to realize the importance and power of the corporate designee deposition. This tool can and should be utilized in every products liability case.

The following steps should be taken to ensure that plaintiffs counsel is firmly educated on the product, understands the criti-

cal evidence, asks the crucial questions at deposition, and locks the defendant in on the critical testimony, admissions and defenses of the company.

**LOCK IN THE DESIGNEE**

The corporate designee speaks on behalf of the defendant corporation. Any admissions made by the deponent are not only admissions made by himself or herself, but are also admissions made by the company. It is crucial to confirm the understanding of the witness that he or she is being deposed not only in an individual capacity, but also on behalf of the company. This witness' testimony will bind the corporation for this case.

The deposition will allow you to lock in what the company knows as well as what the company doesn't know. If a defendant produces a corporate designee who is unable to answer your critical questions, this can be used to argue that the corporation, through its designee, does not have answers to these questions.

Importantly, make sure you videotape the deposition. Videotaping the deposition will ensure less gamesmanship by the witness and allow the jury to see delays in answering the questions and the body language of the designee. Under Rules 4017.1 and 4020, all or portions of the videotape of the designee can be used in a plaintiff's case at trial.

**SIMILAR INCIDENTS**

Evidence of other accidents and injuries is admissible at trial when the other incidents are sufficiently similar to the plaintiff's accident. The plaintiff in a strict products liability case may rely on evidence of other similar accidents involving the product to prove notice or defectiveness, as in *Hutchinson v. Penske Truck Leasing,* 876 A.2d 978 (Pa. Super. 2005).

Evidence of other incidents is often a battleground between plaintiffs and defense lawyers at the motions in limine stage of litigation. Prior accident information is often seen by the jury as powerful evidence. Obtain similar accident information before the corporate designee deposition from discovery requests to defendant and, more importantly, through independent research. The corporate designee must testify regarding the defendant's knowledge of each potentially similar accident and all similarities with the subject accident. You must get all information the defendant has regarding the prior accidents, as well as the testing and analysis the defendant did following the accidents. If accidents occurred on different models designed by the defendant, establish similarities between the models, particularly with regard to the design element you claim is defective.

Conversely, if there is no evidence of prior, similar incidents, the defendant will attempt to argue to the jury the lack of other

---

similar incidents proves that the product is safe, as in *Spino v. John S. Tilley Ladder,* 671 A.2d 726 (Pa. Super. 1996). The testimony of the defendant's corporate designee is important to destroy the lack-of-similar-incidents defense. Ask the witness the defendant's methods for receiving information; its procedures for investigating incidents; and its policies for tracking and recording information from incidents. The corporate designee should be asked for:

• Information on the product directing users to contact the company in the event of an accident.

• Literature accompanying the product directing users to contact the company in the event of an accident.

• Information provided to dealers regarding what they should do if an accident is reported to them.

• Who the corporation has designated to receive information on accidents and what that person does with the information.

• Whether the defendant generally learns of accidents from lawsuits and how the defendant found out about the plaintiff's accident.

• The defendant's policies for record retention and storage concerning accidents.

• The defendant's investigative policies after being contacted regarding accidents.

If the defendant's policies and procedures do not adequately capture, investigate, record and retain other potential accidents, and do not give users and sellers information on how to report problems with the product, the defendant will not be permitted to introduce evidence that no other similar accidents exist.

**ALTERNATIVE FEASIBLE DESIGNS**

It is important to always have an expert conceptualize an alternative, feasible design to the defendant's product. In the right case, get your expert to prepare a diagram or mock-up of an alternative design and ask the designee questions on the feasibility, cost and safety implications of the proposed alternative design. Under *Tincher,* a cost-benefit analysis is relevant to the jury's analysis of the product defect. For example, in a failure-to-guard case, ask the corporate designee the cost of the guard proposed by the plaintiff's expert. Generally, the cost of a guard will be minimal in relation to the overall cost of the product. The plaintiff's attorney should know the retail price of the product, and should discover during the deposition the defendant's cost to manufacture the product. Make the corporate designee admit that the guard would not limit the functionality of the product.

**SUBSEQUENT REMEDIAL MEASURES**

Under Pennsylvania Rule of Evidence 407, when measures are taken by a party that would have made an accident less likely to occur, evidence of subsequent measures taken by the company is not admissible to prove a defect in the design of a product. However, evidence of product changes can be admissible for other reasons, such as impeaching a witness, showing control or showing that the change was feasible before the accident. In every case involving a change to a product after an accident, devastating admissions can be gained from the corporate designee.

The corporate designee should be asked whether the product changes were undertaken to make the product safer and prevent future accidents. In some cases, corporate designees are determined to testify that the product was perfectly safe at the time of the accident. The designee may testify that post-accident changes were made to the product for reasons other than safety, such as to change the aesthetics of a product or to change the performance of the product. If the corporate designee will not admit that the changes were made to make the product safer, this testimony (and the post-accident changes) should be admissible.

Conversely, the corporate designee may attempt to hide behind the protections of Rule 407. To do this, the witness must admit

the product changes were done to make the product safer and to prevent accidents such as the one that injured your client. If this approach is taken, the testimony to prove that a safer design was available at the time of the accident and was not used. Plaintiffs counsel should ask the following:

• Whether the added safety feature could have been implemented before the accident.

• Whether the added safety feature makes the product safer.

• Whether there is any downside to implementing the added safety feature.

• Whether there is any prohibition in implementing the added safety feature.

• What the cost of the added safety feature would be.

• Whether the added safety feature would compromise the function of the product in any way.

• Whether the added safety feature would have prevented the subject accident.

Even if the jury does not learn of the subsequent product changes, admissions by the designee that the product could have been designed more safely and exactly as your expert says it should have been designed can be devastating to the defendant's case. •



# Larry Bendesky
## Shareholder
Office:215.575.2952
lbendesky@smbb.com

Mr. Bendesky has lectured lawyers, judges and other professional groups more than 35 times on trial techniques, cross-examinations, evidence and the latest developments in product liability and construction litigation.

## Lectures/Seminars

- Cross Examination Lecture to Temple LLM Students (September 11, 2014)
- Cross Examination Lecture to Temple LLM Students (September 19, 2013)
- Cross Examination Lecture to Temple LLM Students (November 23, 2013)
- "A Litigation Primer for Paralegals", The Philadelphia Association of Paralegals' 2013 Education Conference, Philadelphia, PA (November 8, 2013)
- "Powerful and Persuasive Tactics and Techniques and Using Depositions in the Opening Statement – Expanding the Horizon", Orlando, FL (February 20, 2013)
- Workplace Accident Seminar, Rutgers Law Center, One Constitution Square, New Brunswick, NJ (April 6, 2013)
- Cross Examination Lecture to Temple LLM Students (November 17, 2012)
- Cross Examination Lecture to Temple LLM Students (November 19, 2011)
- Cross Examination and Evidence, Bucks County Bar Association (June 8, 2011)
- Defense Association CLE, North Hills Country Club (June 7, 2011)
- Cross Examination Seminar, Fort Washington, PA ( April 30, 2011)
- *"Entertaining" Evidence- Cross Examination for the 21st Century,* Mechanicsburg, PA (December 15, 2010)

- *"Entertaining" Evidence- Cross Examination for the 21ˢᵗ Century,* Philadelphia, PA (December 9, 2010)

- Cross Examination Lecture to Temple LLM Students (November 19, 2010)

- Cross Examination Lecture to Temple LLM Students (November 11, 2010)

- *"Entertaining" Evidence- Cross Examination for the 21ˢᵗ Century,* Media, PA (November 10, 2010)

- Pennsylvania Institute of Certified Public Accountants, Forensic & Litigation Services Conference: *Dos and Don'ts of Testifying*, King of Prussia, PA (November 10, 2009)

- Cross Examination Lecture to Temple LLM Students (October 16, 2009)

- Cross Examination Lecture to Temple LLM Students (October 7, 2009)

- U.A.W. Regional Conference: Workers' Compensation Act, Fort Washington, PA (May 14, 2009)

- *The Stress and Success of Cross Examination,* Allentown, PA (April 28, 2009)

- *The Stress and Success of Cross Examination,* Philadelphia, PA (April 21, 2009)

- *The Stress and Success of Cross Examination,* State College, PA (April 17, 2009)

- *Evidence on Film*, Pennsylvania Conference of State Trial Judges and Administrative Office of Pennsylvania Courts, Pittsburgh, PA (February 20, 2009)

- Pennsylvania Association for Justice's Premises Liability Seminar, Philadelphia, PA (November 11, 2008)

- *How to Make Your Next Cross Examination The Greatest Cross Examination Ever!*, Pittsburgh, PA (April 29, 2008)

- *Linking Technology to Victory: The Art of Preparing, Settling and Trying Cases in the Digital Age*, Philadelphia, PA (December 19, 2007)

- *Linking Technology to Victory: The Art of Preparing, Settling and Trying Cases in the Digital Age*, Pittsburgh, PA (December 14, 2007)

- *Linking Technology to Victory: The Art of Preparing, Settling and Trying Cases in the Digital Age*, Mechanicsburg, PA (December 4, 2007)

- *The CSI Construction Lawyer: What Happened at the Tropicana Garage? What Did the Focus Group Think? Hear How They Achieved a 100-Million Dollar Settlement*, East Rutherford, NJ (October 19, 2007)

- *Construction Litigation – Tropicana Parking Garage Collapse Litigation*, Philadelphia, PA (October 18, 2007)

- *Judge Bernstein Presents Evidence Through the Movies with Larry Bendesky*, Allentown, PA (April 19, 2007)

- *Judge Bernstein Presents Evidence Through the Movies with Larry Bendesky*, Scranton, PA (April 17, 2007)

- *Judge Bernstein Presents Evidence Through the Movies with Larry Bendesky*, Philadelphia and Pittsburgh, PA (April 4, 2007)

- *Judge Bernstein Presents Evidence Through the Movies with Larry Bendesky*, Mechanicsburg, PA (March 29, 2007)

- Legal Issues for Pennsylvania Architects - *Construction Site Safety Issues*, Fort Washington, PA (January 25, 2007)

- Pennsylvania Trial Lawyers Association: Annual Update for Civil Litigators, Philadelphia, PA (October 6, 2006)

- *Breakfast at Bernstein's – Evidence with Bernstein*, Atlantic City, NJ (September 30, 2006)

- *Excavation and Trench Safety Procedures in Pennsylvania*, Philadelphia, PA (August 15, 2006)

- Pennsylvania Trial Lawyers Association: Annual Update PTLA Convention Seminar, Nemacolin, PA (July 7, 2006)

- Premises Liability: Strategies for Winning Your Case: *Proving Damages*, Philadelphia, PA (December 9, 2005)

- *Damages – Visual Persuasion*, Philadelphia, PA (March 15, 2005)

- Pennsylvania Trial Lawyers Association: Annual Update for Civil Litigators, Philadelphia, PA (October 4, 2004)

- *Liability Issues Resulting From Construction Safety Hazards: The Plaintiff's Perspective*, Philadelphia, PA (May 7, 2004)









The Phillies aren't the only pinstriped champions in Philadelphia. **Saltz, Mongeluzzi, Barrett & Bendesky, P.C.**
have always been the legal champions of injured workers and the victims of medical malpractice.
Like the Phillies, the attorneys at SMBB are record-setters.

**These records include:**

**$101 million** settlement of the Tropicana garage collapse – the largest settlement of a construction case in American history

**$75 million** verdict – the largest ever awarded for an injured construction worker in American history

**$29.5 million** settlement of the Pier 34 collapse – one of the largest premises liability settlements in Philadelphia history

**$20 million** settlement – the largest reported bad faith settlement in Pennsylvania history

**150 VERDICTS OR SETTLEMENTS OF $1 MILLION OR MORE, AN ASTONISHING RECORD OF ACHIEVEMENT**



SALTZ MONGELUZZI
BARRETT & BENDESKY p.c
TRIAL LAWYERS

One Liberty Place, 52nd Floor, 1650 Market Street, Philadelphia, PA 19103 • Voice: 215.496.8282 • Fax: 215.496.0999 • www.SMBB.com

*These results and cases are unique. They are shown to illustrate some of the cases we have handled. They should not create any expectations that our firm, or any firm, can achieve similar results.*

Reprinted from the special advertising section in the June 2009 issue of *Philadelphia* magazine.
©2009 Key Professional Media, Inc. Reprinted with permission. All Rights Reserved. Super Lawyers® is a registered trademark of Key Professional Media, Inc.



**ON TOP**

**Robert N. Braker**
rbraker@smbb.com

**Michael F. Barrett**
Top 100 in Philadelphia
Top 100 in Pennsylvania
mfbarrett@smbb.com

**Robert J. Mongeluzzi**
2nd highest point getter
in Pennsylvania
rjmongeluzzi@smbb.com

**Larry Bendesky**
lbendesky@smbb.com

**Andrew R. Duffy**
aduffy@smbb.com

**Carmen P. Belefonte**
cbelefonte@smbb.com

**Saltz, Mongeluzzi, Barrett & Bendesky's** attorneys have consistently been ranked at the top
of their profession—and consistently produced the top results in the region.

These records include:

**$101 million** settlement of the Tropicana garage collapse—the top settlement of a construction case in American history

**$75 million** verdict—the top award ever for an injured construction worker in American history

**$36 million** settlement reached in the Riverwalk apartment complex fire in Conshohocken

**$29.5 million** settlement of the Pier 34 collapse—one of the top premises liability settlements in Philadelphia history

**$20 million** settlement of an insurance bad faith case—the top ever reported in Pennsylvania

**$14 million** settlement—one of the top product liability recoveries in Philadelphia history

**$12 million** medical malpractice verdict—one of the top failure to diagnose breast cancer cases in Philadelphia

**MORE THAN 200 VERDICTS OR SETTLEMENTS OF $1 MILLION OR MORE.**



## SALTZ MONGELUZZI
### BARRETT & BENDESKY PC
#### TRIAL LAWYERS

One Liberty Place, 52nd Floor, 1650 Market Street, Philadelphia, PA 19103 • Voice: 215.496.8282 • Fax: 215.496.0999 • www.SMBB.com

*These results and cases are unique. They are shown to illustrate some of the cases we have handled. They should not create any expectations that our firm, or any firm, can achieve similar results.*

Reprinted from the special advertising section in the June 2010 issue of *Philadelphia* magazine. © 2010 *Super Lawyers*®, a Thomson Reuters business. All rights reserved.



**POWER PLAYERS**

© 2011 GrahamStudios.com

| Andrew R. Duffy | Robert N. Braker | Michael F. Barrett | Robert J. Mongeluzzi | Larry Bendesky | Carmen P. Belefonte | Donna Lee Jones |
| aduffy@smbb.com | rbraker@smbb.com | Top 100 in Pennsylvania | 2nd highest point getter | lbendesky@smbb.com | cbelefonte@smbb.com | dljones@smbb.com |
| | | Top 100 in Philadelphia | In Pennsylvania | | | |
| | | mfbarrett@smbb.com | rjmongeluzzi@smbb.com | | | |

**Saltz Mongeluzzi Barrett & Bendesky's** attorneys have been the region's top **scorers**
and continue to set national, state and local **records**

**$101 million** settlement of the Tropicana garage collapse - a record for a construction case in America

**$75 million** verdict - the top verdict ever recorded for an injured construction worker in American history

**$36 million** settlement reached in the Riverwalk apartment complex fire in Conshohocken

**$29.5 million** settlement of the Pier 34 collapse - one of the top premises liability settlements in Philadelphia history

**$20 million** settlement of an insurance bad faith case - the largest ever recorded in Pennsylvania

**$16.5 million** settlement of an industrial accident - the top settlement in the history of Lehigh County

**$12 million** medical malpractice verdict - one of the top failure to diagnose breast cancer verdicts in Philadelphia

## MORE THAN **250** VERDICTS OR SETTLEMENTS OF $1 MILLION OR MORE.



**SALTZ MONGELUZZI
BARRETT & BENDESKY** PC
TRIAL LAWYERS

One Liberty Place, 52nd Floor, 1650 Market Street, Philadelphia, PA 19103 • Voice: 215.496.8282 • Fax: 215.496.0999 • www.SMBB.com
These results and cases are unique. They are shown to illustrate some of the cases we have handled. They should not create any expectations that our firm, or any firm, can achieve similar results.



## SALTZ MONGELUZZI BARRETT & BENDESKY:
## COURTROOM STARS WITH THE STATS TO PROVE IT

**$101 million** settlement of the Tropicana garage collapse - a record for a construction case in America

**$75 million** verdict - the largest for an injured construction worker in American history

**$36 million** settlement reached in the Riverwalk apartment complex fire in Conshohocken

**$29.5 million** settlement of the Pier 34 collapse - one of the top premises liability settlements in Philadelphia history

**$20 million** settlement of an insurance bad faith case - the largest ever recorded in Pennsylvania

**$17 million** settlement of the Duck Boat case

### MORE THAN 300 VERDICTS OR SETTLEMENTS OF $1 MILLION OR MORE.



SALTZ MONGELUZZI
BARRETT & BENDESKY PC
TRIAL LAWYERS

One Liberty Place, 52nd Floor, 1650 Market Street, Philadelphia, PA 19103 •Voice: 215.496.8282 •Fax: 215.496.0999 •www.SMBB.com

These results and cases are unique. They are shown to illustrate some of the cases we have handled. They should not create any expectations that our firm, or any firm, can achieve similar results.



# SALTZ MONGELUZZI
# BARRETT & BENDESKY PC

**Philadelphia Office**
**One Liberty Place**
**52nd Floor**
**1650 Market Street**
**Philadelphia Pa 19103**

**Voice (215) 496-8282**
**Fax (215) 496-0999**

**New Jersey Office**
**8000 Sagemore Drive**
**Suite 8303**
**Marlton, NJ 08053**

**Voice (856) 751-8383**
**FAX (856) 751-0868**

**EMAIL** INFO@SMBB.COM
**WEB** WWW.SMBB.COM

CONCENTRATING IN:
CONSTRUCTION ACCIDENTS
WORKPLACE ACCIDENTS
MEDICAL MALPRACTICE
PRODUCTS LIABILITY
PREMISES LIABILITY
MOTOR VEHICLE
WRONGFUL DEATH
PERSONAL INJURY

Stephen T. Saltz (1941-2006)
Robert J. Mongeluzzi
Michael F. Barrett
Larry Bendesky
Robert N. Braker
David L. Kwass
Ara R. Avrigan
Eunice Trevor
Andrew R. Duffy
Brian E. Fritz
Simon B. Paris
Patrick Howard
Adam J. Pantano
Carmen P. Belefonte
Danny A. Schwarz
Brian D. Rosenthal
Stanley M. Schwarz
John E. Savoth
Keith P. Mecca
Catherine E. Margolis
Mary T. Gidaro
Tracy D. Schwartz
Robert W. Zimmerman
Charles J. Kocher
Jeffrey P. Goodman
David J. Langsam
Joseph DeAngelo
Benjamin J. Baer
Michael A. Budner
Sandra L. Rosenberg
Matthew A. Grubman
Drew Heinold

Turke & Strauss LLP

613 Williamson Street, Suite 201
Madison, Wisconsin 53703
P: 608.237.1775
F: 608.237.4423
www.turkestrauss.com

# Our Firm

Turke & Strauss is a law firm based in Madison, Wisconsin that focuses on complex civil and commercial litigation with an emphasis on consumer protection, data privacy, data breach, employment, wage and hour, business, and real estate matters. The attorneys of Turke & Strauss have extensive experience in complex litigation, including class actions. The attorneys of Turke & Strauss have prosecuted a variety of multi-million-dollar consumer fraud, product defect, privacy, and antitrust class actions and served as class counsel in cases at the federal level. The defendants in these cases have included companies such as Wells Fargo Bank, N.A., LG Electronics U.S.A., Inc., The Clorox Company, Best Buy, Monsanto Company, Kimpton Hotel & Restaurant Group, LLC, Stearns Lending, LLC, Fiat Chrysler Automobiles, and American Power & Gas.

# Our Cases

## CONSUMER PROTECTION

*Fowler, et al. v. Wells Fargo Bank, N.A.* **(N.D. Cal.)**
Filed on behalf of consumers who were overcharged fees on FHA mortgages. The case settled on a class-wide basis for $30,000,000 in 2018, and final approval was granted in January 2019.

*Jones, et al. v. Monsanto Company* **(W.D. Mo.)**
Filed on behalf of individuals who purchased mislabeled RoundUp® products. The case settled on a class-wide basis in 2020 for $39,550,000. Final approval was granted in May 2021 and the case is currently on appeal to the United States Court of Appeals for the Eight Circuit.

*Crawford, et al. v. FCA US LLC* **(E.D. Mich.)**
Filed on behalf of consumers who purchased or leased Dodge Ram 1500 and 1500 Classic vehicles equipped with 3.0L EcoDiesel engines between 2013 and 2019. Plaintiffs allege unfair, deceptive, and fraudulent practices in the Defendants' marketing and sale of vehicles with allegedly defective EGR coolers. This case is currently pending in the United States District Court for the Eastern District of Michigan.

*In re: Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices and Products Liability Litigation* **(N.D. Cal.)**
Filed on behalf of consumers against Fiat Chrysler and Bosch alleging unfair, deceptive, and fraudulent practices in the Defendants' marketing and sale of certain EcoDiesel vehicles. The class contained over 100,000 vehicles, including 2014-2016 model-year Jeep Grand Cherokees and Dodge Ram 1500 trucks that were allegedly outfitted with devices that masked actual emission levels. The case settled on a class-wide basis for $307,500,000, and final approval was granted in May 2019.

*Rolland, et al. v. Spark Energy, LLC* **(D.N.J.)**
Filed on behalf of consumers who were forced to pay considerably more for their electricity than they should otherwise have paid due to Spark Energy's deceptive pricing practices. Plaintiff alleges that Spark Energy engages in a bait-and-switch deceptive marketing scheme luring consumers to switch utility companies by offering lower than local utility rates. These lower rates are fixed for only a limited number of months and then switch to a variable market rate that is significantly

higher than the rates local utilities charge. The case settled on a class-wide basis for $11,000,000 in 2022, and final approval was granted in December 2022.

### *Haines v. Washington Trust Bank* **(Wash. Sup. Ct., King Cty.)**
Turke & Strauss represents consumers who were charged $35 overdraft fees by Washington Trust Bank on accounts that were never actually overdrawn. Plaintiff filed suit against Washington Trust Bank for the unfair and unlawful assessment of these overdraft fees. This case settled on a class-wide basis in 2021, and is final approval was granted in November 2021.

### *Pryor v. Eastern Bank* **(Mass. Sup. Ct., Suffolk Cty.)**
Turke & Strauss represents consumers who were charged $35 overdraft fees by Eastern Bank on accounts that were never actually overdrawn. Plaintiff filed suit against Eastern Bank for the unfair and unlawful assessment of these overdraft fees. This case settled on a class-wide basis in 2021, and final approval was granted in March 2021.

### *Benanav, et al. v. Healthy Paws Pet Insurance LLC* **(W.D. Wash.)**
Turke & Strauss represents consumers who were deceived by Healthy Paws Pet Insurance, an insurance provider that markets and administers pet insurance policies, regarding the true cost of its pet insurance policies. Plaintiffs allege that purchasers of Healthy Paws Pet Insurance's policies found that their policy premiums increased drastically from year to year, at a rate far outpacing the general costs of veterinary medicine, despite Healthy Paws Pet Insurance's representations to the contrary. This case is currently pending in the United States District Court for the Western District of Washington.

## DATA BREACH

### *Walters v. Kimpton Hotel & Restaurant Group, LLP* **(N.D. Cal.)**
Filed on behalf of consumers whose private information and personal identifiable information, including credit and debit card numbers, names, mailing addresses, and other personal information, was compromised and stolen from Kimpton Hotel & Restaurant Group by hackers. The case settled on a class-wide basis in 2018, and final approval was granted in July 2019.

### *Reetz v. Advocate Aurora Health, Inc.* **(Wis. Cir. Ct., Milwaukee Cty.)**
Filed on behalf of employees of Aurora Advocate Health, the 10th largest not-for-profit integrated health care system in the United States, whose personally identifiable information was breached and stolen through an email phishing campaign beginning in January 2020. Many of these individuals have lost time

and money responding to the data breach and they face an ongoing risk of identity theft, identity fraud, or other harm. This case is currently pending in the Circuit Court of Wisconsin for the County of Milwaukee.

***Goetz v. Benefit Recovery Specialists, Inc.* (Wis. Cir. Ct., Walworth Cty.)**
Turke & Strauss represented a class of consumers whose personal health information was compromised and stolen from Benefit Recovery Specialists, Inc., a Houston-based billing and collections services firm that provides billing and collection services to healthcare providers across the country. Many of these consumers have lost time and money responding to the data breach and they face an ongoing risk of identity theft, identity fraud, or other harm. This case settled on a class-wide basis in 2022 and final approval was granted in July 2022.

***In re BJC Healthcare Data Breach Litigation* (Mo. Cir. Ct., St. Louis Cty.)**
Turke & Strauss represented a class of consumers whose personal health information was compromised and stolen from BJC Healthcare, a major regional health system. Many of these consumers lost time and money responding to the data breach and they face an ongoing risk of identity theft, identity fraud, or other harm. This case settled on a class-wide basis in 2021 and final approval was granted in September 2022.

***Daum, et al. v. K & B Surgical Center, LLC* (Cal. Sup. Ct., Los Angeles Cty.)**
Turke & Strauss represents a class of consumers whose personal health information and protected health information was compromised and stolen from K & B Surgical Center. Many of these consumers have lost time and money responding to the data breach and they face an ongoing risk of identity theft, identity fraud, or other harm. The case settled on a class-wide basis in 2022 and preliminary approval is pending the Superior Court of California for the County of Los Angeles.

***In re: Netgain Technology, LLC, Consumer Data Breach Litigation* (D. Minn.)**
Filed on behalf of consumers whose personal identifiable information and protected health information was breached and stolen from Netgain Technology, LLC beginning in September 2020. Turke & Strauss partner, Raina Borrelli, serves as a member of the Executive Committee in this multidistrict litigation. Many of the individuals impacted by the breach have lost time and money responding to the data breach and they face an ongoing risk of identity theft, identity fraud, or other harm. This case is currently pending in The United States District Court for the District of Minnesota.

***Dusterhoff, et al. v. OneTouchPoint Corp.* (E.D. Wisc.)**

Filed on behalf of 2.6 million consumers whose personal identifiable information and protected health information was breached and stolen from OneTouchPoint Corp., a mailing and printing services vendor, beginning in April 2022. Turke & Strauss partner, Raina Borrelli, serves as a member of the Plaintiffs' Steering Committee in this litigation. Many of the individuals impacted by the breach have lost time and money responding to the data breach and they face an ongoing risk of identity theft, identity fraud, or other harm. This case is currently pending in The United States District Court for the Eastern District of Wisconsin.

***In re Lincare Holdings Inc. Data Breach Litigation* (M.D. Fla.)**

Filed on behalf of consumers whose personal identifiable information and protected health information was breached and stolen from Lincare Holdings Inc., a medical products and services provider, beginning in September 2021. Turke & Strauss partner, Raina Borrelli, serves as co-lead counsel for plaintiffs and the class in this multidistrict litigation. Many of the individuals impacted by the breach have lost time and money responding to the data breach and they face an ongoing risk of identity theft, identity fraud, or other harm. This case is currently pending in The United States District Court for the Middle District of Florida.

***Forslund, et al. v. R.R. Donnelley & Sons Company* (N.D. Ill.)**

Filed on behalf of consumers whose personal identifiable information was breached and stolen from R.R. Donnelley & Sons Company, a Fortune 500 marketing, packaging, and printing company, beginning in November 2021. Turke & Strauss partner, Raina Borrelli, serves as co-lead counsel for plaintiffs and the class in this litigation. Many of the individuals impacted by the breach have lost time and money responding to the data breach and they face an ongoing risk of identity theft, identity fraud, or other harm. This case is currently pending in The United States District Court for the Northern District of Illinois.

## DATA PRIVACY

***Patterson v. Respondus, Inc., et al.* (N.D. Ill.)**

Filed on behalf of all persons who took an exam using Respondus' online exam proctoring software, Respondus Monitor, in the state of Illinois. Plaintiffs allege that Respondus collects, uses, and discloses students' biometric identifiers and biometric information in violation of Illinois' Biometric Information Privacy Act. This case is currently pending in the United States District Court for the Northern District of Illinois.

***Powell v. DePaul University*** **(N.D. Ill.)**

Turke & Strauss represents a class of DePaul University students located in the state of Illinois who were required to take exams using Respondus Monitor, which collects, uses, and discloses students' biometric identifiers and biometric information in violation of Illinois' Biometric Information Privacy Act. Plaintiff alleges that DePaul University collects students' biometric identifiers and biometric information without written consent and without legally compliant written public policies. This case is currently on appeal before the United States Court of Appeals for the Seventh Circuit.

***Fee v. Illinois Institute of Technology*** **(N.D. Ill.)**

Turke & Strauss represents a class of DePaul University students located in the state of Illinois who were required to take exams using Respondus Monitor, which collects, uses, and discloses students' biometric identifiers and biometric information in violation of Illinois' Biometric Information Privacy Act. Plaintiff alleges that DePaul University collects students' biometric identifiers and biometric information without written consent and without legally compliant written public policies. This case is currently pending in the United States District Court for the Northern District of Illinois.

***Harvey v. Resurrection University*** **(N.D. Ill.)**

Turke & Strauss represents a class of Resurrection University students located in the state of Illinois who were required to take exams using Respondus Monitor, which collects, uses, and discloses students' biometric identifiers and biometric information in violation of Illinois' Biometric Information Privacy Act. Plaintiff alleges that Resurrection University collects students' biometric identifiers and biometric information without written consent and without legally compliant written public policies. This case is currently pending in the United States District Court for the Northern District of Illinois.

## RIGHT OF PUBLICITY

***Abraham, et al. v. PeopleConnect, Inc., et al.*** **(N.D. California)**

Filed on behalf of California residents against PeopleConnect alleging violations of California law that recognizes the intellectual property and privacy rights of individuals to control the commercial use of their names and likenesses. Plaintiffs allege that PeopleConnect violates these legal rights by using California residents' names and childhood photographs in advertisements promoting paid subscriptions to its website, classmates.com. The case is pending in the United States District Court for the Northern District of California.

***Boshears, et al. v. PeopleConnect, Inc., et al.* (W.D. Wash.)**
Filed on behalf of Indiana residents against PeopleConnect alleging violations of Indiana's Right of Publicity Statute and Indiana's common law prohibiting misappropriation of a name or likeness. Plaintiffs allege that PeopleConnect violates these legal rights by using Indiana residents' personalities, including their names and childhood photographs, in advertisements promoting paid subscriptions to its website, classmates.com. The case is currently on appeal before the United States Court of Appeals for the Ninth Circuit.

***Loendorf v. PeopleConnect, Inc., et al.* (N.D. Ill.)**
***Mackey v. PeopleConnect, Inc., et al.* (N.D. Ill.)**
Both actions were filed on behalf of Illinois residents against PeopleConnect alleging violations of Illinois' Right of Publicity Act and Illinois common law prohibiting unjust enrichment. Plaintiffs allege that PeopleConnect violates these legal rights by using Illinois residents' names, personas, and personal information in advertisements promoting paid subscriptions to its website, classmates.com, and unlawfully profiting from it. The cases are pending in the United States District Court for the Northern District of Illinois.

***Sessa, et al. v. Ancestry.com Operations Inc., et al.* (D. Nev.)**
Filed on behalf of Nevada residents against Ancestry.com alleging violations of Nevada's right to publicity statute, Nevada law prohibiting deceptive trade practice, Nevada common law protection against Intrusion upon Seclusion, and Nevada Unjust Enrichment law. Plaintiffs allege that Ancestry.com violates these legal rights by knowingly misappropriating the photographs, likenesses, names, and identities of Nevada residents for the commercial purpose of selling access to and advertising them in Ancestry.com products and services without their prior consent. The case is pending in the United States District Court for the District of Nevada.

***Braundmeier v. Ancestry.com Operations, Inc., et al.* (N.D. Ill.)**
Filed on behalf of Illinois residents against Ancestry.com alleging violations of Illinois' Right of Publicity Act and Illinois common law prohibiting unjust enrichment. Plaintiffs allege that Ancestry.com violates these legal rights by knowingly misappropriating the photographs, likenesses, names, and identities of Illinois residents for the commercial purpose of selling access to and advertising them in Ancestry.com products and services without their prior consent. The case is pending in the United States District Court for the Northern District of Illinois.

**Spindler v. Seamless Contacts Inc.** (N.D. Cal.)
Filed on behalf of California residents against Seamless Contacts Inc. alleging violations of California law that recognizes the intellectual property and privacy rights of individuals to control the commercial use of their names and likenesses. Plaintiffs allege that Seamless Contacts violates these legal rights by using California residents' names, likenesses, photographs, and personas in advertisements promoting paid subscriptions to its website, seamless.ai. The case is pending in the United States District Court for the Northern District of California.

**Martinez v. ZoomInfo Technologies Inc.** (W.D. Wash.)
Filed on behalf of California residents against ZoomInfo Technologies Inc. alleging violations of California law that recognizes the intellectual property and privacy rights of individuals to control the commercial use of their names and likenesses. Plaintiffs allege that ZoomInfo Technologies violates these legal rights by using California residents' names and person information in advertisements promoting paid subscriptions to its website, zoominfo.com, as well as selling access to their names and personal information as part of its products. The case is currently on appeal before the United States Court of Appeals for the Ninth Circuit.

**Gbeintor v. DemandBase, Inc., et al.** (N.D. Cal.)
Filed on behalf of California residents against DemandBase, Inc. and InsideView Technologies, Inc. alleging violations of California law that recognizes the intellectual property and privacy rights of individuals to control the commercial use of their names and likenesses. Plaintiffs allege that DemandBase and InsideView Technologies violate these legal rights by using California residents' names, likenesses, photographs, and personas in advertisements promoting paid subscriptions to its website, insideview.com, without their consent. The case is currently on appeal before the United States Court of Appeals for the Ninth Circuit.

**Kellman, et al. v. Spokeo, Inc.** (N.D. Cal.)
Filed on behalf of California residents against Spokeo, Inc. alleging violations of California law that recognizes the intellectual property and privacy rights of individuals to control the commercial use of their names and likenesses. Plaintiffs allege that Spokeo violates these legal rights by using California residents' names, likenesses, photographs, and personas in advertisements promoting paid subscriptions to its website without their consent. The case is pending in the United States District Court for the Northern District of California.

## TELEPHONE CONSUMER PROTECTION ACT

***Evans v. American Power & Gas, LLC, et al.*** **(S.D. Ohio)**
Filed on behalf of consumers who received automated solicitation telephone calls on their cellular telephones without their prior express consent within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. The case settled on a class-wide basis for $6,000,000, and final approval was granted in May 2019.

***Murray, et al. v. Grocery Delivery E-Services USA Inc. d/b/a Hello Fresh*** **(D. Mass.)**
Filed on behalf of consumers who received automated solicitation telephone calls on their cellular and residential telephones without their prior express consent within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*.  The case settled on a class-wide basis for $14,000,000 in 2020. Final approval was granted in October 2021 and the case is currently on appeal to the United States Court of Appeals for the First Circuit.

***Baldwin, et al. v. Miracle-Ear, Inc., et al.*** **(D. Minn.)**
Filed on behalf of consumers who received automated or prerecorded telemarketing telephone calls on their cellular and residential telephones without their prior express consent within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. The case settled on a class-wide basis fir $8,000,000 in 2021 and final approval was granted in October 2022.

***Goodell, et al. v. Van Tuyl Group***, LLC **(D. Az.)**
Filed on behalf of consumers who received automated solicitation telephone calls on their cellular and residential telephones without their prior express consent within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. This case is currently pending in the United States District Court for the District of Arizona.

***Doup v. Van Tuyl Group***, LLC **(N.D. Tex.)**
Filed on behalf of consumers who received solicitation telephone calls on their cellular and residential telephones that were listed on the National Do-Not-Call Registry, without their prior express consent within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. This case is currently pending in the United States District Court for the Northern District of Texas.

**Dickson v. Direct Energy, LP, et al. (N.D. Ohio)**

Filed on behalf of consumers who received automated or prerecorded telemarketing telephone calls on their cellular telephones without their prior express consent within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. This case is currently on appeal to the United States Court of Appeals for the Sixth Circuit.

**Learned, et al. v. McClatchy Company, LLC (E.D. Cal.)**

Filed on behalf of consumers who received solicitation telephone calls on their cellular and residential telephones that were listed on the National Do-Not-Call Registry and/or who requested Defendant stop calling them, without their prior express consent within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. This case is currently pending in the United States District Court for the Eastern District of California.

**Rogers, et al. v. Assurance IQ, LLC, et al. (W.D. Wash.)**

Filed on behalf of consumers who received automated solicitation telephone calls on their cellular and residential telephones, some that were listed on the National Do-Not-Call Registry, without their prior express consent within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. This case is currently pending in the United States District Court for the Western District of Washington.

# Our Professionals

## SAMUEL J. STRAUSS

Samuel J. Strauss is a founding member of Turke & Strauss LLP. Mr. Strauss concentrates his practice in class action litigation with an emphasis on consumer protection and privacy issues. Mr. Strauss has a national practice and appears in federal courts across the country. Over the course of his career, Mr. Strauss has represented plaintiffs in cases which have resulted in the recovery of hundreds of millions of dollars for consumers.

Mr. Strauss received his J.D. with honors from the University of Washington School of Law in 2013. Prior to forming Turke & Strauss in 2016, Mr. Strauss was an associate at Terrell Marshall Law Group in Seattle, Washington, where he successfully prosecuted complex class actions in federal and state courts.

Mr. Strauss is a member of bars of the states of Washington, Wisconsin, and Illinios and has been admitted to practice in the United States District Court for the Western District of Washington, United States District Court for the Eastern District of Washington, United States District Court for the Western District of Wisconsin, the United States District Court for the Eastern District of Wisconsin, the United States District Court for the Northern District of Illinois, the United States District Court for the Eastern District of Michigan, and the United States Court of Appeals for the Ninth Circuit.

In recent years, Mr. Strauss has been actively involved in a number of complex class action matters in state and federal courts including:

- *Daum, et al. v. K & B Surgical Center, LLC*, No. 21STCV41347 (Cal. Sup. Ct., Los Angeles Cty.)
- *Reetz v. Advocate Aurora Health, Inc.*, No. 20CV2361 (Wis. Cir. Ct., Branch 22, Milwaukee Cty.)
- *Goetz v. Benefit Recovery Specialists, Inc.*, No. 2020CV000550 (Wis. Cir. Ct., Walworth Cty.)
- *Joyner v. Behavioral Health Network, Inc.*, No. 2079CV00629 (Mass. Sup. Ct., Hampden Cty.)
- *In re BJC Healthcare Data Breach Litigation*, No. 2022-CC09492 (Mo. Cir. Ct., St. Louis City)
- *Baldwin, et al. v. National Western Life Insurance Company,* No. 2:21-cv-04066 (W.D. Mo.)

- *Pryor v. Eastern Bank*, No. 1984CV03467-BLS1 (Mass. Sup. Ct., Suffolk Cty.)
- *Murray v. Grocery Delivery E-Services USA Inc. d/b/a Hello Fresh*, No. 19-cv-12608 (D. Mass.)
- *Baldwin v. Miracle-Ear, Inc.*, No. 20-cv-01502 (D. Minn.)
- *Goodell v. Van Tuyl Group, LLC*, No. 20-cv-01657 (D. Az.)
- *Weister v. Vantage Point AI, LLC,* No. 21-cv-01250 (M.D. Fla.).
- *Lang v. Colonial Penn Life Insurance Company*, No. 21-cv-00165 (N.D. Fla.)
- *Mackey v. PeopleConnect, Inc.*, No. 1:22-cv-00342 (N.D. Ill.)
- *Sessa v. Ancestry.com Operations Inc., et al.*, No. 2:20-cv-02292 (D. Nev.)
- *Boshears v. PeopleConnect, Inc.*, No. 21-cv-01222 (W.D. Wash.)
- *Braundmeier v. Ancestry.com Operations, Inc.*, No. 1:20-cv-07390 (N.D. Ill.)
- *Martinez v. ZoomInfo Technologies Inc.*, No. 21-cv-05725 (W.D. Wash.)
- *Uhhariet v. MyLife.com, Inc.*, No. 21-cv-08229 (N.D. Cal.)
- *Kellman v. Spokeo, Inc.*, No. 21-cv-08976 (N.D. Cal.)
- *Patterson v. Respondus, Inc.*, No. 20-cv-07692 (N.D. Ill.)
- *Bridges v. Respondus, Inc.*, No. 21-cv-01785 (N.D. Ill.)
- *Hudock v. LG Electronics USA, Inc.*, No. 16-cv-1220 (D. Minn.)
- *Crawford v. FCA US LLC,* No. 20-cv-12341 (E.D. Mich.)
- *Klaehn, et al. v. Cali Bamboo, LLC*, No. 19-cv-01498 (S.D. Cal.)
- *Jones v. Monsanto Company*, No. 19-cv-00102 (W.D. Mo.)
- *Dickson v. Direct Energy, LP, et al.*, No. 18-cv-00182 (N.D. Ohio)
- *Rolland v. Spark Energy, LLC*, Case. No. 17-cv-02680 (D.N.J.)
- *Evans v. American Power & Gas, LLC*, No. 17-cv-00515 (S.D. Ohio)
- *Fowler v. Wells Fargo Bank, N.A.*, No. 17-cv-02092 (N.D. Cal.)
- *Wilkins v. HSBC Bank Nevada, N.A., et al.*, No. 14-cv-00190 (N.D. Ill.)
- *Ott v. Mortgage Investors Corporation*, No. 14-cv-00645 (D. Or)
- *Booth v. AppStack, et al.*, No. 13-cv-01533 (W.D. Wash.)
- *Melito v. American Eagle Outfitters, Inc.*, No. 14-cv-02440-VEC (S.D.N.Y.)
- *Spencer v. FedEx Ground Package System, Inc.*, No. 14-2-30110-3 SEA (Wa. Sup. Ct., King Cty.)

## MARY C. TURKE

Mary C. Turke is a founding member of Turke & Strauss. Ms. Turke concentrates her practice in civil and commercial litigation. Ms. Turke regularly prosecutes consumer class actions, including those involving violations of the Illinois Biometric Information Privacy Act and the Telephone Consumer Protection Act. Mr. Turke has extensive experience representing parties in multi-national disputes in both state and federal courts throughout the United States.

Ms. Turke received her J.D. *cum laude* from the University of Wisconsin Law School, Order of the Coif, in 1996. Prior to forming Turke & Strauss in May 2016, Ms. Turke was the managing partner of the Madison, Wisconsin, office of Michel Best & Friedrich LLP, where she practiced civil litigation. Ms. Turke is an active member of the Wisconsin State Bar. Ms. Turke has repeatedly been named to the annual Wisconsin Super Lawyers list (2011-2021) by SuperLawyers Magazine as well as The Best Lawyers in America® list (2013-2020) by Woodward/White, Inc. In 2017, shortly after forming Turke & Strauss, Ms. Turke received the Legal Innovator Award from the Wisconsin State Bar.

Ms. Turke is a member of the Wisconsin State Bar and has been admitted to practice in the United States District Court for the Western District of Wisconsin, the United States District Court for the Eastern District of Wisconsin, the United States District Court for the Northern District of Illinois, the United States District Court for the District of Colorado, and the United States Court of Appeals for the Seventh Circuit.

In recent years, Ms. Turke has been substantially involved in a number of complex class action matters in state and federal courts including:

- *Patterson v. Respondus, Inc.*, No. 1:20-cv-07692 (N.D. Ill.)
- *Reetz v. Advocate Aurora Health, Inc.*, No. 20CV2361 (Wis. Cir. Ct., Branch 22, Milwaukee Cty.)
- *Goetz v. Benefit Recovery Specialists, Inc.*, No. 2020CV000550 (Wis. Cir. Ct., Walworth Cty.)
- *Murray v. Grocery Delivery E-Services USA Inc. d/b/a Hello Fresh*, No. 1:19-cv-12608 (D. Mass.)
- *Goodell, et al. v. Van Tuyl Group*, LLC, No. 2:20-cv-01657 (D. Az.)
- *Doe v. Northwestern University*, No. 1:21-cv-01579 (N.D. Ill.)
- *Duerr v. Bradley University*, No. 1:21-cv-01096-SLD-JEH (C.D. Ill.)
- *Bridges v. Respondus, Inc.*, No. 1:21-cv-01785 (N.D. Ill.)

- *Powell v. DePaul University*, No. 1:21-cv-03001 (N.D. Ill.)
- *Doe v. Chamberlain University*, No. 2021CH01183 (Il. Cir. Ct., Cook Cty.)
- *Fee v. Illinois Institute of Technology*, No. 1:21-cv-02512 (N.D. Ill.)
- *Harvey v. Resurrection University*, No. 1:21-cv-03203 (N.D. Ill.)

## RAINA C. BORRELLI

Raina C. Borrelli is a partner at Turke & Strauss whose practice focuses on complex class action litigation, including data privacy, Telephone Consumer Protection Act ("TCPA"), false advertising, and consumer protection cases in both state and federal courts around the country. Ms. Borrelli has served as lead, co-lead, and class counsel in numerous national class actions, including multi-district litigation. Additionally, Ms. Borrelli has substantial experience leading discovery teams in these complex class action matters, as well as in working with class damages experts and class damages models in consumer protection cases.

Ms. Borrelli received her J.D. *magna cum laude* from the University of Minnesota Law School in 2011. Prior to joining Turke & Strauss, Ms. Borrelli was a partner at Gustafson Gluek, where she successfully prosecuted complex class actions in federal and state courts. Ms. Borrelli is an active member of the Minnesota Women's Lawyers and the Federal Bar Association, where she has assisted in the representation of *pro se* litigants though the *Pro Se* Project. Ms. Borrelli has repeatedly been named to the annual Minnesota "Rising Star" Super Lawyers list (2014-2021) by SuperLawyers Magazine. She has also been repeatedly certified as a North Star Lawyer by the Minnesota State Bar Association (2012-2015; 2018-2020) for providing a minimum of 50 hours of pro bono legal services.

Ms. Borrelli is a member of the Minnesota State Bar Association and has been admitted to practice in the United States District Court for the District of Minnesota, the United States District Court for the Eastern District of Wisconsin, the United States District Court for the Eastern District of Michigan, the United States District Court for the Northern District of Illinois, and the United States Court of Appeals for the Tenth Circuit.

In recent years, Ms. Borrelli has been appointed to leadership positions in a number of data privacy cases, including *In re Netgain Technology, LLC Consumer Data Breach Litigation*, No. 21-cv-01210 (D. Minn.) (Executive Committee member); *Dusterhoff, et al. v. OneTouchPoint Corp.*, No. 2:22-cv-00882 (E.D. Wisc.) (Plaintiffs' Steering Committee member); *In re Lincare Holdings Inc. Data Breach Litigation*, No. 8:22-cv-01472 (M.D. Fl.) (co-lead counsel); *Forslund v. R.R. Donnelley & Sons Company*, No. 1:22-cv-04260 (N.D. Ill.) (co-lead counsel); and *Medina v. PracticeMax Incorporated*, No. 2:22-cv-0126 (D. Az.) (Executive Leadership Committee member). Ms. Borrelli has been substantially involved in a number of

complex class action matters in state and federal courts including:

- *Daum, et al. v. K & B Surgical Center, LLC*, No. 21STCV41347 (Cal. Sup. Ct., Los Angeles Cty.)
- *Grogan v. McGrath RentCorp*, No. 3:22-cv-00490 (N.D. Cal.)
- *Benedetto, et al. v Southeastern Pennsylvania Transportation Authority*, No. 210201425 (C.C.P. Phila.)
- *Reetz v. Advocate Aurora Health, Inc.*, No. 20CV2361 (Wis. Cir. Ct., Branch 22, Milwaukee Cty.)
- *Goetz v. Benefit Recovery Specialists, Inc.*, No. 2020CV000550 (Wis. Cir. Ct., Walworth Cty.)
- *Reese v. Teen Challenge Training Center, Inc.*, No. 00093 (C.C.P. Phila.)
- *Lhota v. Michigan Avenue Immediate Care, S.C.*, No. 2022CH06616 (Ill. Cir. Ct., Cook Cty.)
- *Johnson, et al. v. Yuma Regional Medical Center*, No. 2:22-cv-01061 (D. Az.)
- *Baldwin v. Miracle-Ear, Inc.*, No. 20-cv-01502 (D. Minn.)
- *Murray, et al. v. Grocery Delivery E-Services USA Inc. d/b/a Hello Fresh*, No. 1:19-cv-12608 (D. Mass.)
- *Goodell v. Van Tuyl Group, LLC*, No. 20-cv-01657 (D. Az.)
- *Learned, et al. v. McClatchy Company LLC*, No. 2:21-cv-01960 (E.D. Cal.)
- *Lang v. Colonial Penn Life Insurance Company*, No. 21-cv-00165 (N.D. Fla.)
- *Martinez v. ZoomInfo Technologies Inc.*, No. 21-cv-05725 (W.D. Wash.)
- *Abraham, et al. v. PeopleConnect, Inc.*, No. 3:20-cv-09203 (N.D. Cal.)
- *Boshears v. PeopleConnect, Inc.*, No. 21-cv-01222 (W.D. Wash.)
- *Mackey v. PeopleConnect, Inc.*, No. 1:22-cv-00342 (N.D. Ill.)
- *Sessa v. Ancestry.com Operations Inc., et al.*, No. 2:20-cv-02292 (D. Nev.)
- *Braundmeier v. Ancestry.com Operations, Inc.*, No. 1:20-cv-07390 (N.D. Ill.)
- *DeBose v. Dun & Bradstreet Holdings, Inc.*, No. 2:22-cv-00209 (D.N.J.)
- *Gbeintor, et al. v. DemandBase, Inc., et al.*, No. 3:21-cv-09470 (N.D. Cal.)
- *Spindler v. Seamless Contacts Inc.*, No. 4:22-cv-00787 (N.D. Cal.)
- *Kellman, et al. v. Spokeo, Inc.*, No. 3:21-cv-08976 (N.D. Cal.)
- *Brown v. Coty, Inc.*, No. 1:22-cv-02696 (S.D.N.Y.)
- *Benanav v. Healthy Paws Pet Insurance LLC*, No. 2:20-cv-00421 (W.D. Wash.)
- *Spindler, et al. v. General Motors LLC*, No. 3:21-cv-09311 (N.D. Cal.)
- *Hudock v. LG Electronics USA, Inc.*, No. 16-cv-1220 (JRT/KMM) (D. Minn.)
- *Patterson v. Respondus, Inc.*, No. 1:20-cv-07692 (N.D. Ill.)
- *Powell v. DePaul University*, No. 1:21-cv-03001 (N.D. Ill.)
- *Fee v. Illinois Institute of Technology*, No. 1:21-cv-02512 (N.D. Ill.)
- *Harvey v. Resurrection University*, No. 1:21-cv-03203 (N.D. Ill.)
- *In re FCA Monostable Gearshifts Litig.*, No. 16-md-02744 (E.D. Mich.)

- *Zeiger v. WellPet LLC*, No. 17-cv-04056 (N.D. Cal.)
- *Wyoming v. Procter & Gamble*, No. 15-cv-2101 (D. Minn.)
- *In re Big Heart Pet Brands Litig.*, No. 18-cv-00861 (N.D. Cal.)
- *Sullivan v. Fluidmaster*, No. 14-cv-05696 (N.D. Ill.)
- *Rice v. Electrolux Home Prod., Inc.*, No. 15-cv-00371 (M.D. Pa.)
- *Gorczynski v. Electrolux Home Products, Inc.*, No. 18-cv-10661 (D.N.J.)
- *Reitman v. Champion Petfoods*, No. 18-cv-1736 (C.D. Cal.)
- *Reynolds, et al., v. FCA US, LLC*, No. 19-cv-11745 (E.D. Mich.).

# BRITTANY RESCH

Brittany Resch is an associate at Turke & Strauss. Ms. Resch's practice focuses on complex class action litigation, including antitrust litigation, data-breach, Telephone Consumer Protection Act ("TCPA"), false advertising, and consumer protection cases in both state and federal courts around the country. Ms. Resch has substantial experience managing discovery in these complex class action matters.

Ms. Resch received her J.D. from the University of Minnesota Law School in 2015. Prior to joining Turke & Strauss, Ms. Resch was an associate at Gustafson Gluek, where she successfully prosecuted complex class actions in federal and state courts. Ms. Resch also clerked for the Honorable Richard H. Kyle, Senior United States District Judge for the District of Minnesota. Ms. Resch is an active member of the Minnesota Women's Lawyers and the Federal Bar Association, where she has assisted in the representation of *pro se* litigants though the *Pro Se* Project.

Ms. Resch is a member of the Minnesota State Bar Association and has been admitted to practice in the United States District Court for the District of Minnesota and the United States District Court for the Northern District of Illinois.

In recent years, Ms. Resch has been substantially involved in a number of complex class action matters in state and federal courts including:

- *Benedetto v. Southeastern Pennsylvania Transportation Authority*, No. 210201425 (C.C.P. Phila.)
- *In re Netgain Technology, LLC Consumer Data Breach Litigation*, No. 21-cv-01210 (D. Minn.)
- *Perkins v. WelldyneRx, LLC*, No. 8:22-cv-02051 (M.D. Fla.)
- *Forslund v. R.R. Donnelley & Sons Company*, No. 1:22-cv-04260 (N.D. Ill.)
- *Corra, et al. v. ACTS Retirement Services, Inc.*, No. 2:22-cv-02917 (E.D. Pa.)
- *Lamie, et al. v. LendingTree, LLC*, No. 3:22-cv-00307 (W.D.N.C)
- *In re Lincare Holdings Inc. Data Breach Litigation*, No. 8:22-cv-01472 (M.D. Fl.)
- *Benanav, et al. v. Healthy Paws Pet Insurance, LLC*, No. 2:20-cv-00421-RSM (W.D. Wash.)
- *Martinez v. ZoomInfo Technologies Inc.*, No. 21-cv-05725 (W.D. Wash.)
- *Abraham, et al. v. PeopleConnect, Inc.*, No. 3:20-cv-09203 (N.D. Cal.)
- *Boshears v. PeopleConnect, Inc.*, No. 21-cv-01222 (W.D. Wash.)
- *Mackey v. PeopleConnect, Inc.*, No. 1:22-cv-00342 (N.D. Ill.)

- *Sessa v. Ancestry.com Operations Inc., et al.*, No. 2:20-cv-02292 (D. Nev.)
- *Braundmeier v. Ancestry.com Operations, Inc.*, No. 1:20-cv-07390 (N.D. Ill.)
- *DeBose v. Dun & Bradstreet Holdings, Inc.*, No. 2:22-cv-00209 (D.N.J.)
- *Gbeintor, et al. v. DemandBase, Inc., et al.*, No. 3:21-cv-09470 (N.D. Cal.)
- *Spindler v. Seamless Contacts Inc.*, No. 4:22-cv-00787 (N.D. Cal.)
- *Kellman, et al. v. Spokeo, Inc.*, No. 3:21-cv-08976 (N.D. Cal.)
- *Kis v. Cognism Inc.*, No. 4:22-cv-05322 (N.D. Cal.)
- *Uhhariet v. MyLife.com, Inc.*, No. 21-cv-08229 (N.D. Cal.)
- *Brown v. Coty, Inc.*, No. 1:22-cv-02696 (S.D.N.Y.)
- *Emmrich v. General Motors LLC*, No. 21-cv-05990 (N.D. Ill.)
- *Spindler v. General Motors LLC*, No. 21-cv-09311 (N.D. Cal.)
- *Goodell v. Van Tuyl Group, LLC*, No. 20-cv-01657 (D. Az.)
- *Learned, et al. v. McClatchy Company LLC*, No. 2:21-cv-01960 (E.D. Cal.)
- *Clemens v. O'Neil Insurance Company, Inc.*, No. 21-cv-00678 (E.D. Mo.)
- *Patterson v. Respondus University, et al.*, No. 1:20-cv-07692 (N.D. Ill.)
- *Bridges v. Respondus University, et al.*, No. 1:21-cv-01785 (N.D. Ill.)
- *Hudock v. LG Electronics USA, Inc.*, No. 16-cv-1220 (JRT/KMM) (D. Minn.)
- *In re Broiler Chicken Antitrust Litigation*, No. 16-cv-08637 (N.D. Ill.)
- *In re Disposable Contact Lens Antitrust Litigation*, No. 15-md-02626 (M.D. Fla.)
- *In re Pork Antitrust Litigation*, No. 21-md-02998 (D. Minn.)
- *In re DPP Beef Litigation,*
- *In re Asacol Antitrust Litigation*, No. 15-cv-12730 (D. Mass.)
- *In re Automotive Parts Antitrust Litigation*, No. 12-md-02311 (E.D. Mich.)

## ALEX S. PHILLIPS

Alex Phillips is an associate at Turke & Strauss. Mr. Phillips concentrates his practice in complex class action litigation and commercial litigation. He has represented both plaintiffs and defendants in high stakes litigation. Mr. Phillips has successfully obtained trial verdicts on behalf of his clients as well as negotiated numerous high-value settlements.

Mr. Phillips received his J.D. from the University of Wisconsin School of Law in 2017 and has been an active member of the Wisconsin State Bar as well as the Dane, Jefferson, and Dodge County Bar Associations.

In recent years, Mr. Phillips has been involved in a number of complex class action matters in state and federal courts including:

- *Benedetto v. Southeastern Pennsylvania Transportation Authority*, No. 210201425 (C.C.P. Phila.)
- *Grogan v. McGrath RentCorp*, No. 3:22-cv-00490 (N.D. Cal.)
- *Koeller, et al. v. Numrich Gun Parts Corporation*, No. 1:22-cv-00675 (S.D.N.Y.)
- *Mayhood v. Wilkins Recreational Vehicles, Inc.*, No. E2022-0701 (N.Y. Sup. Ct., Steuben Cty.)
- *Perkins v. WelldyneRx, LLC*, No. 8:22-cv-02051 (M.D. Fla.)
- *Batis v. Dun & Bradstreet Holdings, Inc.*, No. 3:22-cv-09124 (N.D. Cal.)
- *Sessa v. Ancestry.com Operations Inc., et al.*, No. 2:20-cv-02292 (D. Nev.)
- *Ambramson v. First American Home Warranty Corporation*, No. 2:22-cv-01003 (W.D. Pa.)
- *DeVivo v. Sovereign Lending Group Incorporated*, No. 3:22-cv-05254 (W.D. Wash.)
- *Murray, et al. v. Grocery Delivery E-Services USA Inc. d/b/a Hello Fresh*, No. 1:19-cv-12608 (D. Mass.)
- *Spindler v. General Motors LLC*, No. 21-cv-09311 (N.D. Cal.)
- *Kellman v. Spokeo, Inc.*, No. 21-cv-08976 (N.D. Cal.)
- *Reetz v. Advocate Aurora Health, Inc.*, No. 20CV2361 (Wis. Cir. Ct., Branch 22, Milwaukee Cty.)
- *Goetz v. Benefit Recovery Specialists, Inc.*, No. 2020CV000550 (Wis. Cir. Ct., Walworth Cty.)
- *Hudock v. LG Electronics USA, Inc.*, No. 16-cv-1220 (D. Minn.)
- *Dickson v. Direct Energy, LP, et al.*, No. 18-cv-00182 (N.D. Ohio)
- *Benanav. v. Healthy Paws Pet Insurance, LLC*, No. 20-cv-00421 (W.D. Wash.)
- *Klaehn, et al. v. Cali Bamboo, LLC, et al.*, No. 19-cv-01498 (S.D. Cal.)

## ZOG BEGOLLI

Zog Begolli is an associate at Turke & Strauss. Mr. Begolli concentrates his practice in complex class action litigation, with an emphasis on cases involving data privacy, the Telephone Consumer Protection Act, the Illinois Biometric Information Privacy Act, various states' consumer protection acts, and financial industry regulations.

Mr. Begolli received his J.D. from the University of Wisconsin School of Law in 2017 and is an active member of the Wisconsin State Bar. During law school, Mr. Begolli was a member of the University of Wisconsin Law and Entrepreneurship Clinic, which provides legal services to nascent entrepreneurs and early stage companies.

In recent years, Mr. Begolli has been actively involved in a number of complex class action matters in state and federal courts including:

- *Baldwin v. Miracle-Ear, Inc.*, No. 20-cv-01502 (JRT/HB) (D. Minn.)
- *Murray v. Grocery Delivery E-Services USA Inc. d/b/a Hello Fresh*, No. 19-cv-12608 (D. Mass.)
- *Learned, et al. v. McClatchy Company LLC*, No. 2:21-cv-01960 (E.D. Cal.)
- *Patterson v. Respondus, Inc.*, No. 1:20-cv-07692 (N.D. Ill.)
- *Grogan v. McGrath RentCorp*, No. 3:22-cv-00490 (N.D. Cal.)
- *In re Netgain Technology, LLC Consumer Data Breach Litigation*, No. 21-cv-01210 (D. Minn.)
- *Reetz v. Advocate Aurora Health, Inc.*, No. 20CV2361 (Wis. Cir. Ct., Branch 22, Milwaukee Cty.)
- *Goetz v. Benefit Recovery Specialists, Inc.*, No. 2020CV000550 (Wis. Cir. Ct., Walworth Cty.)
- *Reese v. Teen Challenge Training Center, Inc.*, No. 00093 (Philadelphia Ct. Common Pleas)
- *Abraham, et al. v. PeopleConnect, Inc.*, No. 3:20-cv-09203 (N.D. Cal.)
- *Loendorf v. PeopleConnect, Inc.*, No. 1:22-cv-00051 (N.D. Ill.)
- *Braundmeier v. Ancestry.com Operations, Inc.*, No. 1:20-cv-07390 (N.D. Ill.)
- *Crawford, et al. v. FCA US LLC*, No. 20-cv-12341 (E.D. Mich.)
- *Hudock v. LG Electronics USA, Inc.*, No. 16-cv-1220 (D. Minn.)
- *Klaehn, et al. v. Cali Bamboo, LLC, et al.*, No. 19-cv-01498 (S.D. Cal.)
- *Fowler, et al. v. Wells Fargo Bank, N.A.*, No. 17-cv-02092 (N.D. Cal.)