# UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARA-AIMEE LONG CORRA and VALARIE HANNA, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br> v.<br><br>ACTS RETIREMENT SERVICES, INC.<br><br>    Defendant. | Case No. 2:22-cv-02917-GEKP |

### PLAINTIFFS' UNOPPOSED SUPPLEMENTAL SUBMISSION IN SUPPORT OF THEIR UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT

Plaintiffs Cara-Aimee Long Corra and Valarie Hanna ("Plaintiffs") submit this Unopposed Supplemental Submission in Support of Their Unopposed Motion for Preliminary Approval of a Class Action Settlement.

On July 17, 2023, Plaintiffs filed an Unopposed Motion for Preliminary Approval of a Class Action Settlement. Dkt. 37. The Court subsequently scheduled and held oral argument on that motion on September 21, 2023 (the "Hearing"). Dkts. 39, 41. During the Hearing, the Court raised several issues that it requested additional information about to better inform its analysis as part of preliminary approval. *In re National Football League Players' Concussion Injury Litig.*, 961 F.Supp. 2d 708, 714 (E.D. Pa. 2014) ("At the preliminary approval stage, the bar to meet the fair, reasonable and adequate standard is lowered, and the court is required to determine whether the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives.") (internal quotations and citations omitted).

The parties address each issue raised by the Court below.

### A. Former Employees versus Residents

At the Hearing, the Court raised the issue of whether the Class Representatives had the same incentive as residents of ACTS Retirement Services, Inc.'s ("ACTS" or "Defendant") facilities to obtain the maximum relief available in the settlement negotiation. Hearing Rough Tr., 9:8-23. The short answer is yes. First, both Class Representatives are *former* employees who worked for ACTS more than 20 years ago. Dkt. 37-1 (MOL ISO of Preliminary Approval) at 2. The Court's suggestion that as employees they "may want to make sure [they] have good evaluation with their employer" and as such "may be less aggressive" (Hearing Rough Tr., 9:8-23) as compared to a resident, is inapplicable for two reasons: (1) neither Class Representative had

1

been employed by ACTS for over 20 years; and (2) the Class is overwhelmingly made up of former employees, just like the Class Representatives.

First, as long-ago, former employees, neither have any present-day loyalty to ACTS nor do they have an incentive to curry favor with ACTS, over which the Court expressed concern. Both Class Representatives had the same incentive as the residents (and possibly current employees) to obtain the best recovery available considering the facts and governing law.

Second, as discussed during the Hearing, out of the 20,754 putative Class Members, 18,276 are *former* employees, just like the Class Representatives. Hearing Rough Tr., 36:2-15; *see also* Exhibit A (Def.'s Answer to Pls. Interrogatory No. 2) ("18,276 *former* employees [] received notice [of the breach] in or about July 2022…") (emphasis added). So, the Class Representatives are—and were at the time of mediation—identically situated with 88.06% of the putative Class as former employees, leaving just 11.86% or 2,462 as residents. *Id*.

This is nearly the precise issue this Court dealt with at preliminary approval in *In re Wawa, Inc. Data Security Litigation*, NO. 19-6019, 2021 WL 3276148, at *10 (E.D. Pa., July 30, 2021). In *Wawa*, certain former employees objected to their inclusion in the consumer settlement at preliminary approval. *See id*. This Court correctly reasoned that the former Wawa employees made up only a small fraction of the proposed Settlement Class and, in granting preliminary approval, the Court stated that if those former employees were "dissatisfied with the terms of the Settlement Agreement, they will be able to object or opt out of the settlement entirely." *Id*. The same is true here. If, after notice is provided, certain residents feel as though there is or was a better bargain, they are free to object to the Settlement's terms or opt-out and pursue their own relief.

### B. The Settlement Referee

During the Hearing, the Court expressed concern over the parties' agreement that, should a claimant dispute a determination reached by the Claims Administrator, the parties would agree on a referee, but if they were unable to agree on a proposed referee, the parties would bring that dispute to the Court and allow it to appoint a referee. *See* Dkt. 37-1, Exhibit 1 (the "Settlement Agreement") at § 3.9. Based on the Court's suggestion, the parties have amended the Settlement Agreement, and now this Court or its selected designee will act as a referee to resolve any claimant disputes. Hearing Rough Tr., 32:13-16 ("the Court will address the proper process by which a challenge would be resolved."); Exhibit B at § 3.9 (October 11, 2023, Amended Settlement Agreement).

### C. The Aggregate Settlement Cap

The Court raised concerns about the negotiated $350,000 aggregate settlement cap. Settlement Agreement at § 3.2. That cap limits the total amount that ACTS would pay in response to claims for the 3 separate cash components of the Settlement: (1) up to $75 for time lost dealing with the fallout of the data breach; (2) up to $350 for out-of-pocket expenses related to the data breach; and (3) up to $3,500 in compensation for actual documented monetary loss due to identity theft. *Id*. at § 3.1.

As part of the settlement negotiations, Plaintiffs made an initial "all-in" modest 7-figure demand from which they intended to include the same, standard elements of data breach settlements, including a framework that accounted for reimbursement for out-of-pocket losses, lost time, and financial / credit monitoring, as well as the cost of notice and administration, attorneys' fees and costs, and service awards for the class representatives. For ACTS's part, it refused any

3

sort of "all in" resolution, and instead proposed an initial 5-figure aggregate cap with the same relief points (time lost, out-of-pockets, credit monitoring, etc.).

Over the course of a full 9-hour mediation session with Judge Andersen, the parties discussed the various strengths and weaknesses of the claims, with much of the discussion focused on the aggregate cap. On one hand was ACTS's potential exposure and the questions surrounding why the company had maintained this sensitive data for, in some instances, over 20 years. Additionally, the parties discussed the quickly escalating costs associated with protracted litigation; expert discovery was less than 30 days away, which would result in both parties incurring significant time and expense. *See* Dkt. 23 (Scheduling Order). On the other hand, Plaintiffs were presented with the propriety of class certification and proving class wide damage considering ACTS's allegation that only 187 of the 18,276 former employees "had financial information potentially impacted" (Exhibit A at pg. 5) as well as potential pitfalls in addressing the choice of law analysis as ACTS claimed its former employees reside in all 50 states, as well as the District of Columbia and Puerto Rico (*see id.*). *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 309 (3d Cir. 2011) ("the legal uncertainty resulting from the complicated choice-of-law issues would unduly complicate the process for establishing predominance under Rule 23.") (internal quotations and citations omitted); *Fulton-Green v. Accolade, Inc.*, 2019 WL 4677954, at *8 (E.D. Pa., 2019) (Pratter, J.) ("This is a complex case in a risky field of litigation because data breach class actions are uncertain and class certification is rare.") (citation omitted).

Ultimately, with the assistance and recommendations of Judge Andersen, the parties reached agreement on the terms of the Settlement presented to the Court. As discussed during the Hearing, ACTS has agreed to pay for any Class Member to enroll in the enhanced dark web credit monitoring for two (2) years, up to $350,000 in cash payments to claimants, the costs of notice

and administration which is estimated to be $50,719, $2,500 for each of the two Class Representatives as Service Awards, and $250,000 in attorneys' fees and litigation costs. *See In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig*., No. 3:08-1998, 2010 WL 3341200, at *6 (W.D. Ky. Aug. 23, 2010 (approving data breach settlement, in part, because "proceeding through the litigation process in this case is unlikely to produce the plaintiffs' desired results."). In addition, ACTS has agreed to implement additional data security improvements, increasing the total annual amount it spends on data security by approximately $428,000.

As this Court recognized in *Wawa,* the ACTS "[s]ettlement…compares favorably with other data breach settlements, many of which are quite modest. Being modest does not make a settlement insufficient or unsupportable." *In re Wawa, Inc. Data Security Litigation*, No. 19-6019, 2022 WL 1173179, at *7 (E.D. Pa. 2022) (collecting cases: *Linnins v. Haeco Ams., Inc.*, No. 16-cv-486, 2018 WL 5312193, at *1 (M.D.N.C. Oct. 26, 2018) (settlement included $312,500 claim fund for reimbursement of specified expenses to employees whose personally identifiable information was accessed in data breach); *Brady v. Due N. Holdings, LLC*, No. 17-cv-1313, Doc. No. 59, at 4 & Doc. No. 65, at 2 (S.D. Ind. Oct. 16, 2018) (settlement provided extension of identity theft protection services and reimbursement of out-of-pocket expenses of up to $150, $250, $350, or $500 depending on settlement tier); *In re Zappos Sec. Breach Litig*., No. 12-cv-325, 2019 WL 12026706, ¶ 2(D) (D. Nev. Dec. 23, 2019) (data breach settlement provided "10% coupon" for Zappos goods); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig*., No. 11-md-2258, Doc. No. 240-1, at 6–7 & Doc. No. 211 (S.D. Cal. May 4, 2015) (providing data breach reimbursement of actual identity theft losses with $1 million aggregate cap and choice of items from mix of Sony games, online display themes, or 3-month subscription to Sony PlayStation service)).

**D. Attorneys' Fees and Expenses**

The negotiation over attorneys' fees and costs in this litigation did *not* begin until the parties had finalized the relief to the Class. Exhibit C (Oct. 5, 2023, Declaration of Hon. Wayne Andersen, ¶6). Plaintiffs' counsel, Saltz, Mongeluzzi & Bendesky, P.C. and Turke & Strauss, LLP, have successfully partnered on numerous data breach class actions since 2020. Where, as here, they agreed to act as Co-Class Counsel, they have agreed to split any attorneys' fees award, less costs, equally.[1] Of the $250,000 agreed upon attorneys' fee and cost award, $15,699, will be used strictly for reimbursement of the current out-of-pocket litigation expenses, leaving $234,301 for attorneys' fees.[2] Based on more than 200 hours of work, the total current lodestar is approximately $148,891.50, which—as of the date of this filing— would yield a small multiplier of 1.57. *In re All-Clad Metalcrafters, LLC, Cookware Marketing and Sales Practices Litig,*, No. 21-mc-491-NR, 2023 WL 2071481, at *12 (W.D. Pa. 2023) (awarding lodestar multiplier of 1.35 for a claims made class action settlement with an aggregate cap).[3] However, should the Court preliminarily approve the settlement, there is more work to be done, including responding to

---

[1] There are cases that the firms have worked together where one firm agrees to serve just as local counsel, or the firms agree to split the attorneys' fees based on each firm's respective lodestar and relative financial contribution to the case. Neither situation is applicable here.

[2] There will likely be additional expenses associated with travel to attend the final approval hearing, should the Court preliminarily approve the settlement.

[3] At the Hearing, Plaintiffs' counsel was not prepared to discuss the specific details surrounding the requested attorneys' fees. That discussion tends to occur after preliminary approval and in the context of final approval and together with a motion for an award of attorneys' fees and litigation costs. *In re Wawa, Inc. Data Security Litigation*, 2021 WL 3276148, at *13 (noting at preliminary approval in response to objections concerning the attorneys' fees, "[a]t this time, the Court declines to further address attorneys' fees issues because a formal motion will be filed at a later date, at which time the Court can fully analyze the request and any opposition to it."). To the extent Plaintiffs' counsel misspoke about the state of the lodestar, hours, or current rates, it was entirely unintentional and a function of not reviewing those materials before the hearing.

questions and concerns of Class Members, working with the Settlement Administrator, preparing the final approval briefing, and appearing at the final fairness hearing. And, as with every class action, the work does not end the day final approval is awarded. There are always administration decisions, claimant disputes, and responding to general questions from Class Members well into the future. These efforts will largely diminish any multiple (assuming there will be one).

Plaintiffs' counsel accepted this matter and litigated on contingency with no guarantee of payment or reimbursement of their out-of-pocket expenses. Philadelphia's Community Legal Services fee schedule of rates, effective January 19, 2023, makes clear that its "rates do not reflect any adjustment for contingency, and are based on Philadelphia law firm market survey data and increases in the Consumer Price Index." Exhibit D (Jan. 19, 20203, Philadelphia CLS rate schedule). But even so, Plaintiffs' counsels' billing rates are largely in line with Philadelphia CLS's rates, where the rates range from $150-$350 for paralegals and senior paraprofessionals, $475 for associate attorneys with 6-10 years' experience, and $700-$725 for partners with 12-22 years' experience, all working on contingency. *See In re Viropharma Inc., Sec. Litig.*, No. 12-2714, 2016 WL 312108, at *18 (E.D. Pa. Jan. 25, 2016) ("The hourly billing rates of all of Plaintiff's Counsel range from $610 to $925 for partners, $475 to $750 for of counsels, and $350 to $700 for other attorneys."); *In re Avandia Mktg., Sales Practices and Products Liability Litig.*, No. 07-1871, 2012 WL 6923367, at * 10 (E.D. Pa. 2012) (concluding a top hourly rate of $595 was "particularly reasonable in comparison" to the hourly rates of top Philadelphia firms).

Plaintiffs' counsel respectfully submits that there is nothing untoward or improper with the negotiated attorneys' fees and costs. Plaintiffs request that the Court grant preliminary approval of the Settlement.

Respectfully submitted,

Dated:  October 11, 2023          By: */s/ Patrick Howard*
                                  Patrick Howard, Esq. (Atty. ID #88572)
                                  **SALTZ MONGELUZZI & BENDESKY, PC**
                                  1650 Market Street, 52nd Floor
                                  One Liberty Place
                                  Philadelphia, PA  19103
                                  Telephone:  215-575-3895
                                  Facsimile:  215-754-4443
                                  phoward@smbb.com

                                  Samuel J. Strauss
                                  Raina C. Borrelli
                                  Brittany Resch
                                  **TURKE & STRAUSS LLP**
                                  613 Williamson St., Suite 201
                                  Madison, WI 53703
                                  Telephone (608) 237-1775
                                  Facsimile: (608) 509-4423
                                  sam@turkestrauss.com
                                  raina@turkestrauss.com
                                  brittanyr@turkestrauss.com

                                  *Attorneys for Plaintiffs and the Proposed Class*