**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARA-AIMEE LONG CORRA et al.** | : | **CIVIL ACTION** |
| *Plaintiffs,* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ACTS RETIREMENT SERVICES, INC.** | : | |
| *Defendant* | : | **NO. 22-2917** |

# MEMORANDUM

PRATTER, J.                                   JANUARY ___, 2024

### BACKGROUND

Carra-Aimee Long Corra and Valarie Hann both worked for ACTS Retirement Services, Inc. (ACTS)—a non-profit entity providing residential, assisted living, and skilled care services to senior citizens—over 20 years ago. ACTS collects and maintains personal identifying information for its current and former employees and its current and former residents. This personal information includes names, addresses, social security numbers, dates of birth, financial account numbers and routing numbers, and medical treatment or diagnosis information.

On or around April 29, 2022, cybercriminals hacked into ACTS' network and gained unauthorized access to this personal information ("Data Security Incident"). ACTS apparently discovered this breach on or around May 2, 2022. Two months later, ACTS began notifying victims about the breach. As a result of the breach, Ms. Corra suffered fraud on her checking account, had to freeze her credit, and has enrolled in credit monitoring. Ms. Hann has also had to enroll in monitoring. They both remain at a risk of suffering continued identity theft and fraud.

1

The parties agreed to private mediation in March 2023. After a full-day session with an experienced private mediator, the parties reached an agreement on the material terms of the settlement. The settlement was finalized on July 13, 2023, and the plaintiffs filed an Unopposed Motion for Preliminary Approval of a Class Action Settlement shortly thereafter. The Court heard from both parties at oral argument on the proposed settlement agreement and, after raising several concerns about some of the terms of the agreement, the Court requested supplemental briefing. The plaintiffs have submitted the requested supplemental briefing addressing these issues, along with an amended Settlement Agreement.

## I.     The Proposed Settlement

The proposed settlement class is composed of 20,754 individuals "whose personal identifying information and/or protected health information was potentially compromised in the Data Security Incident that occurred in April 2022, and who received notice from ACTS of that Data Security Incident." Doc. No. 42-2, at 9. Of these 20,754 people, 18,276 are former ACTS employees and 2,478 are current and former residents of facilities associated with ACTS. Doc. No. 42-3, at 58.

### A.     <u>The Settlement Benefits</u>

The proposed settlement provides for three-tiers of monetary relief: (Tier 1) up to $75 for time lost dealing with the fallout of the Data Security Incident, including, but not limited to, time spent on the telephone dealing with financial institutions or credit card companies; (Tier 2) up to $350 for out-of-pocket expenses caused by the Data Security Incident, such as bank fees, phone and data charges, postage and/or gasoline for travel to financial institutions, payment for credit reports, credit monitoring, or identity theft insurance; and (Tier 3) up to $3,500 for actual documented monetary losses due to identity theft that was more likely than not the result of the

2

Data Security Incident. Doc. No. 42-2, at 11–12. These cash components of the settlement are capped at an aggregate of $350,000, and payments to valid claimants will be reduced on a *pro rata* basis, based on the number of claims made, if the total exceeds this aggregate cap. *Id.* at 12–13.

In addition to this cash element, ACTS will also offer class members the opportunity to enroll in two years of credit monitoring and identity theft protection with $1 million in insurance through Pango Group's Identity Defense product. This credit monitoring and identity theft protection also includes enhanced dark web monitoring. This service "can cost anywhere from $7-20 per person, per month," and is not subject to a cap. *See* Doc. No. 37-1, at 5, 12–13.

Finally, ACTS has made certain data security changes in response to the Data Security Incident and this lawsuit, and as part of the proposed settlement, "agrees to pay for such ongoing security changes separate and apart from other settlement benefits." Doc. No. 42-2, at 13. These changes have increased the total annual amount ACTS spends on data security by approximately $428,000. Doc. No. 42, at 5.

ACTS has also agreed to pay a separate lump sum of $250,000 for attorneys' fees and expenses to be paid out unrelated to the cash available to the claimants. Doc. No. 42, at 6. Of the $250,000, $15,699 is to reimburse out-of-pocket litigation expenses. ACTS has also agreed to pay for the cost of notice and settlement administration, estimated to be $50,719 and, finally, a $2,500 service award to each of the two class representatives. *Id.* at 4–5.

The parties attest that this agreement was reached "with the assistance and recommendations of [the mediator]," and that negotiations regarding attorneys' fees did not commence until after the parties had finalized relief to the class. *Id.* at 5–6.

**B.** <u>**Notice Plan and Settlement Administration**</u>

Because ACTS has names and mailing addresses for all class members, the settlement administrator will provide direct notice to all class members by first-class U.S. Mail. This mailed notice will consist of a short form notice that guides recipients to the settlement website, where a long form notice will be posted. The website will provide detailed information about the lawsuit, the settlement, class members' rights and options, and instructions on, and deadlines for, filing a claim, objecting, or opting out. Class members will have 90 days from the date the short-form notice is mailed to submit a claim form either through the website or through the mail in hardcopy form. The settlement administrator will review each claim form to determine whether the submitted claim is valid and/or if additional information is necessary to substantiate the claim. If a claimant disputes in writing a claim determination and requests an appeal, the parties will meet and confer and, if the parties are unable to reach an agreement on how to resolve an appeal, this Court (or a designee) will serve as the claims referee to make a final and binding determination. Finally, the parties recommend appointing the Angeion Group, which has extensive experience administering similar consumer settlements, to serve as the settlement administrator.

<h3 style="text-align:center">LEGAL STANDARDS</h3>

Under Federal Rule of Civil Procedure 23(e), parties seeking preliminary approval of a class settlement must first "provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class." Fed. R. Civ. P. 23(e)(1)(A). The Court then decides whether "giving notice is justified by the parties' showing that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). A class action may not be settled under Rule 23(e) without a determination by the district court that the proposed settlement is "fair, reasonable and

4

adequate." *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d at 785; *see also* Fed. R. Civ. P. 23(e)(1)(A). In "gauging fairness, district courts must weigh at least nine factors." *Frederick v. Range Resources-Appalachia, LLC,* Nos. 22-1827 & 22-1828, 2023 WL 418058, at *2 (3d Cir. Jan. 26, 2023) (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)). These nine *Girsh* factors "are in many respects" codified in Rule 23(e). *Vinh Du v. Blackford*, No. 17-cv-194, 2018 WL 6604484, at *5 (D. Del. Dec. 17, 2018). The Third Circuit Court of Appeals has cautioned that district courts should apply "an even more rigorous, heightened standard" of review in cases where, as here, settlement negotiations "precede class certification, and approval for settlement and certification are sought simultaneously." *In re Pet Food Products Liability Litig.*, 629 F.3d 333, 350 (3d Cir. 2010) (internal citations omitted).

At this preliminary approval stage, the Court may provisionally certify a class for the purposes of providing notice, "leaving the final certification decision for the subsequent fairness hearing." *Hall v. Accolade, Inc.*, No. 17-3423, 2019 WL 3996621, at *2 (E.D. Pa. Aug. 23, 2019). A proposed settlement class must satisfy the requirements of Rule 23(a) and at least one provision of Rule 23(b). *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620–22 (1977). The requirements of Rule 23(a) are: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims ... of the representative parties are typical of the claims ... of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. Rule. Civ. P. 23(a). And, under Rule 23(b), the "questions of law or fact common to class members [must] predominate over any questions affecting only individual members," and a "class action [must be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. Rule. Civ. P. 23(b).

DISCUSSION

## I.       Class Certification

To approve a class settlement agreement, the Court must first determine that the requirements

for class certification under Rule 23(a) and (b) are met. *See In re Pet Food Prods. Liab. Litig.*, 629

F.3d 333, 341 (3d Cir. 2010). Rule 23(a) authorizes certification only where:

> (1) The class is so numerous that joinder of all members is impracticable; (2)
> there are questions of law or fact common to the class; (3) the claims or defenses
> of the representative parties are typical of the claims or defenses of the class;
> and (4) the representative parties will fairly and adequately protect the interests
> of the class.

Fed. R. Civ. P. 23(a). If a district court finds that the proposed class satisfies these criteria, then

the Court will determine if the class fits within one of the categories of class actions set by Rule

23(b). *In re Processed Egg Prods. Litig.*, 284 F.R.D. 249, 259 (E.D. Pa. 2012). The proponents of

the Settlement here seek certification under Rule 23(b)(3), which requires that the "questions of

law or fact common to class predominate over any questions affecting only individual matters, and

that a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy. Fed. R. Civ. P. 23(b)(3). The Court finds that the proposed class meets the

requirements of both Rule 23(a) and (b)(3).

### C.   Rule 23(a)

#### 1.   *Numerosity*

To determine whether the proposed class is sufficiently numerous to make joinder

impracticable, the court considers several factors, including judicial economy, the ability and

motivation to litigate as joined plaintiffs, class members' financial resources, geographic

dispersion, the ability to identify future claimants, and whether the claims are for injunctive relief

or for damages. *See Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, No. 21-cv-3500, 2023 WL

2314911, at *7 (E.D. Pa. Feb. 28, 2023). Here, the proposed class easily satisfies the numerosity

requirement: the proposed class is composed of over 20,000 members, and classes of this size generally and sensibly satisfy the numerosity requirement. *See Hall*, 2019 WL 3996621, at *7; Doc. No. 42, at 2.

### 2. Commonality

This second factor requires the Court to determine whether "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is "easily met" because it "may be satisfied by a single common issue." *Hall*, 2019 WL 3996621, at *7 (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). Here, every single member of the proposed class was a victim of the Data Security Incident underlying this action, so there are multiple common questions, including "how the data breach occurred, whether [Defendant] had a duty to protect [the information], and whether [Defendant's employees and customers] were harmed by the breach." Doc. No. 37-1, at 15(citing *Fulton-Green v. Accolade, Inc.*, No. 18-2019 WL 316722, at *3). The proposed class meets the commonality requirement.

### 3. Typicality

To meet the typicality requirement, the representative plaintiffs must present claims "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The "typicality requirement merely serves to ensure that class representatives do not have 'unique interests that might motivate them to litigate against or settle with the defendants in a way that prejudices the absentees.'" *Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 156 (3d Cir. 2023) (quoting *Duncan v. Governor of Virgin Islands*, 48 F.4th 195, 207 (3d Cir. 2022)). Here, the class representatives' claims and those of the proposed class members arise from the same event, so the merits of the named plaintiffs' claim are "identical to those of the unnamed class members." *Boley v. Universal*

*Health Servs., Inc.*, 36 F.4th 124, 134 (3d Cir. 2022) ("[A] violative practice can support a class action embracing a variety of injuries so long as those injuries can all be linked to the practice.").

This Court requested supplemental briefing on several points, including whether the named plaintiffs, who are both former ACTS employees, are appropriate class representatives for a proposed class that includes current and former ACTS employees and residents of facilities associated with ACTS. The crux of the Court's concern was that the class representatives might have an incentive to "be less aggressive" in negotiating with their former employer. Sept. 21, 2023 Hearing Rough Tr., 9:8–23. The plaintiffs have sufficiently allayed this concern. As an initial matter, Ms. Corra and Ms. Hanna are *former* employees who worked for ACTS more than 20 years ago, and neither "have any present-day loyalty to ACTS nor do they have an incentive to curry favor with ACTS." Doc. No. 42, at 1–2. Moreover, the proposed class is overwhelmingly comprised of former employees, so the named plaintiffs are identically situated with 88.06% of the putative class. And if any of the resident-members are dissatisfied with the terms of the settlement agreement, they may object or opt out and pursue their own relief. *See In re Wawa, Inc., Data Security Litig.,* No. 19-6019, 2021 WL 3276148, at *10 (E.D. Pa. July 30, 2021). Ms. Corra and Ms. Hanna's interests are "sufficiently aligned with those of the class" to satisfy typicality. *Boley*, 36 F.4th at 134.

### 4.  *Adequacy of Representation*

This final factor requires the Court to determine whether "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This factor "tests the qualifications of class counsel and the class representatives. It also aims to root out conflicts of interest within the class to ensure that all class members are fairly represented in the negotiations." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428

(3d Cir. 2016). The Court must "assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant." *In re Gen. Motors Corp.*, 55 F.3d at 801.

Here, proposed Co-Class Counsel have litigated and settled numerous class actions, including data breach class actions. Counsel aver that they have "vigorously prosecuted the action and have devoted substantial effort and resources on behalf of the Class." *See* Doc. No. 37-1, at 16. Furthermore, the parties negotiated the settlement agreement at arm's length over the course of a full nine-hour mediation session with an experienced mediator and former jurist. Thus, this fourth and final Rule 23(a) factor is satisfied.

### B. **Rule 23(b)(3)**

Because the proposed class satisfies the Rule 23(a) criteria, the Court will determine if the class fits within one of the categories of class actions set by Rule 23(b). *In re Processed Egg Prods. Litig.*, 284 F.R.D. 249, 259 (E.D. Pa. 2012). The proponents of the Settlement here argue "questions of law or fact common to class members predominate over any questions affecting only individual matters, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Doc. No. 37-1, at 16-17 (quoting Fed. R. Civ. P. 23(b)(3)).

#### *1. Predominance*

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (internal citations and quotations omitted). The Court of Appeals for the Third Circuit has emphasized that "the focus of the predominance inquiry is on whether the defendant's conduct

was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Id.* at 298.

Here, ACTS' conduct was common as to all class members, and all class members were harmed by that conduct. The "common, aggregation-enabling" questions of law and fact here are numerous, and include (1) whether ACTS owed a duty to these Class Members to adequately protect their personal information; (2) whether ACTS breached that duty; (3) whether ACTS knew or would have known that its systems were vulnerable; and (4) whether ACTS' actions or inaction was the proximate cause of the breach. *See* Doc. No. 37-1, at 17; *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." (internal quotations omitted)).

Although there may be slight differences among class members regarding degree of damages or the exact type of injury suffered (*e.g.*, breach of sensitive financial information or breach of health data), none of these differences would preclude resolution on a class-wide basis. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (finding commonality because liability depended on the defendant's conduct and not "on the conduct of individual class members."); *In re National Football League Players Concussion Injury Litg.*, 821 F.3d at 427 (finding commonality despite unique injuries because the "negligence and fraud claims still depend on the same common questions regarding the [defendant's] conduct."). Therefore, predominance is met.

### 2. Superiority

Finally, prior to certifying the proposed class, the Court must find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R.

Civ. P. 23(b)(3). At its core, "[t]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998) (internal quotations omitted).

Rule 23(b)(3) suggests that courts consider the following non-exhaustive list of factors when making this determination:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). After considering these factors, the Court finds that they weigh in favor of granting preliminary class certification for settlement purposes. At this juncture, there is no indication that any members of the proposed class would be interested in litigating individual claims. Certainly, the cost and complexity of the litigation would likely preclude most class members from filing suit individually, especially considering that the value of any individual claim is generally modest. *See Fulton-Green*, 2019 WL 316722, at *4 (preliminarily certifying Rule 23(b)(3) class where "the value of the individual claims may be modest and thus impractical to litigate on a case by case basis."). And the instant lawsuit is the only action concerning the ACTS Data Security Incident. Finally, where, as here, the Court is "[c]onfronted with a request for settlement-only class certification, [the Court] need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem Prods.*, 521 U.S. at 620.

The proposed settlement provides class members with "an immediate tangible benefit" of up to $3,500 for documented identity theft and two years of credit monitoring, identity theft

protection with $1 million in insurance, and Dark Web monitoring worth about $7-$20 per person, per month. The superiority requirement is met.

## II.   Notice

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." *Prudential*, 148 F.3d at 306. To be proper, the notice must:

> [C]learly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). Here, the Court is satisfied that the proposed notice program provides class members with the best appropriate notice practicable under the circumstances and is therefore proper under Rule 23(c)(2)(B). ACTS has mailing addresses for all the class members, so the settlement provides for a direct mailing notice program using a short form notice that guides recipients to the settlement website, where a long form notice will be posted. *See* Doc. No. 37-1, at 19–20; *see Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 175 (1974) (holding that individual notice by mail "is clearly the best notice practicable within the meaning of Rule 23(c)(2) and our prior decisions" where defendant has names and addresses of class members).

The long form notice clearly and concisely provides all the necessary information in language accessible to non-lawyers. *See* Doc. No. 37-2, Exs. A and B; *see also In re Wawa*, 2023 WL 6690705, *6 (E.D. Pa. Oct. 12, 2023) ("Notices in [data breach cases] always present a challenge of trying to mold complicated concepts into 'plain English' to explain the reader's rights, recognizing that the reader may well have been completely in the dark about the claim until

opening a puzzling envelope. The proposed notice here, however, includes all the information required under the Federal Rules and presents it in a clear manner, with large headings and subheadings that can easily guide a class member."). Deadlines and key dates are in bold print and underlined, and the notice is designed to walk the reader through each step of the claims, objection, and exclusion processes, and anticipates and answers common questions. Accordingly, the Court is satisfied that notice is adequate under Rule 23.

### III.     Fair, Reasonable, and Adequate

"Approving a class-action settlement 'is left to the sound discretion of the district court.'" *Frederick*, 2023 WL 418058, at *2 (quoting *Girsh*, 521 F.2d at 156). The Court must protect absentee class members by ensuring that these class members receive appropriate compensation in exchange for the release of claims. *In re Processed Egg Prods.*, 284 F.R.D. at 266 (citing *Prudential*, 148 F.3d at 316–17). To that end, the Court must determine whether the proposed settlement is "fair, reasonable and adequate." *General Motors*, 55 F.3d at 785; *see also* Fed. R. Civ. P. 23(e)(2). The Third Circuit Court of Appeals has cautioned that district courts should apply "an even more rigorous, heightened standard" of review in cases where, as here, "settlement negotiations precede class certification, and approval for settlement and class certification are sought simultaneously." *In re Pet Food Prods.*, 629 F.3d at 350 (internal citations and quotations omitted).

The Court applies the nine factors established in *Girsh* to evaluate the fairness of the proposed settlement. These are:

> (1) The complexity, expense and likely duration of the litigation
> (2) The reaction of the class to the settlement
> (3) The stage of the proceedings and the amount of discovery completed
> (4) The risks of establishing liability
> (5) The risks of establishing damages
> (6) The risks of maintaining the class action through the trial

(7) The ability of the defendants to withstand a greater judgment

(8) The range of reasonableness of the settlement fund in light of the best possible recovery

(9) The range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh*, 521 F.2d at 157 (cleaned up). In *Prudential*, the Court of Appeals for the Third Circuit identified additional, nonexclusive factors in response to a "sea-change in the nature of class actions" after *Girsh* was decided. *In re Pet Food Prods.*, 629 F.3d at 350 (quoting *Prudential*, 148 F.3d at 323). These *Prudential* factors include:

[1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;

[2] the existence and probable outcome of claims by other classes and subclasses;

[3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants;

[4] whether class or subclass members are accorded the right to opt out of the settlement;

[5] whether any provisions for attorneys' fees are reasonable; and

[6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential*, 148 F.3d at 323. The Court must make findings as to each of the *Girsh* factors, and the *Prudential* factors where appropriate, and cannot "substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms." *In re Pet Food Prods.*, 629 F.3d at 350–51. And if the parties have not supplied sufficient information for the Court to determine if the settlement is fair, reasonable, and adequate, the Court may "affirmatively seek out such information." *Id.* at 351.

The Court will address each *Girsh* factor in turn, and then address the relevant *Prudential* factors.

**A. *Girsh* Factors**

*1. The Complexity, Expense and Likely Duration of the Litigation*

The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation. *Warfarin*, 391 F.3d at 353–36 (internal citation and quotation omitted). Counsel for plaintiffs have already dedicated more than 200 hours to this case, with a total lodestar of approximately $148,891.50, as of October 11, 2023. *See* Doc. No. 42, at 6. Were the litigation to continue, the parties would have to expend significant time and money obtaining and maintaining class certification through trial (and a possible appeal), briefing motions for summary judgment, and preparing and defending expert opinions. Moreover, considering the nature of the injuries suffered by class members, litigating damages would likely be complex and protracted. Therefore, the first *Girsh* factor weighs in favor of approving the proposed settlement agreement.

*2. The Reaction of the Class to the Settlement*

This second factor requires the Court to "gauge whether members of the class support the settlement." *Prudential*, 148 F.3d at 318. At the preliminary approval stage, the Court cannot fully evaluate this factor because notice has not yet been sent to the class members. Provided that the notice program affords class members with an adequate amount to time to object to the settlement, the Court will defer determination of this factor at this time.

*3. Stage of Proceedings and Amount of Discovery Completed*

The third *Girsh* factor "captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiation." *In re Automotive Refinishing Paint Antitrust Litig.*, 617 F.Supp. 2d 336, 342 (3d Cir. 2007) (cleaned up). Where, as here, the case is in the early stages, counsel may demonstrate the requisite case development by having

"conducted significant independent discovery or investigations to develop the merits of their case (as opposed to supporting the value of the settlement), that they had retained their own experts, or that they had deposed a significant number of the individuals implicated in the materials from other proceedings." *In re Gen. Motors*, 55 F.3d at 814. The parties engaged in written discovery and document production, and fully briefed and argued the merits of ACTS' motion to dismiss the amended complaint. Doc. 37-1, at 3–4. Though this case is at a somewhat early stage in the litigation process, the Court finds that counsel have adequately developed the case to weigh this factor in favor of preliminary approval of the settlement.

       4.   *& 5. Risks of Establishing Liability and Damages and Maintaining the Class Action Through Trial*

These *Girsh* factors require the Court to "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." *Warfarin*, 391 F.3d at 537. The Court must balance "the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Prudential*, 148 F.3d at 319.

Here there is no certainty that the plaintiffs would succeed in proving liability and damages. *See Fulton-Green*, 2019 WL 4677954, at *8 ("This is a complex case in a risky field of litigation because data breach class actions are uncertain and class certification is rare.") (citation omitted). And class counsel emphasize the risk specific to this case due to ACTS' "allegation that only 187 of the 18,276 former employees 'had financial information potentially impacted' . . . as well as potential pitfalls in addressing the choice of law analysis as ACTS claimed its former employees reside in all 50 states, as well as the District of Columbia and Puerto Rico." Doc. No. 42, at 4; *see Sullivan*, 667 F.3d 273, 309 (3d Cir. 2011) ("[T]he legal uncertainty resulting from the complicated choice-of-law issues would unduly complicate the process for establishing predominance under

Rule 23."). Thus, there is no guarantee that the plaintiffs would prevail in this case, and therefore a settlement is appropriate in this still developing, novel area of the law. These two factors weigh in favor of the proposed settlement.

### 6. Risks of Maintaining Class Status

The Sixth *Girsh* factor reflects that a district court can alter or amend its decision to certify the class under Rule 23(c)(1)(C). *See Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 116 (E.D. Pa. 2005) (citing *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 631 (E.D. Pa. 2004)). The Court of Appeals for the Third Circuit has recognized that "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *Prudential*, 148 F.3d at 321. Here, for the reasons described above, there is no certainty that the plaintiffs would have secured class certification, nor is it clear that they would be able to maintain that status throughout the entire litigation. The risks of continued litigation and maintaining the class action weigh in favor of an early resolution.

### 7. The Ability of the Defendant to Withstand a Greater Judgment

This *Girsh* factor compels the Court to determine whether ACTS "could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant Corp. Litig.*, 246 F.3d 201, 240 (3d Cir. 2001). This factor is "most clearly relevant where a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." *Reibstein v. Rite Aid Corp*, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011). At present, it appears that ACTS could easily withstand a judgment greater than $350,000 (plus the cost of the non-cash relief). ACTS is a "one of the strongest companies of its kind . . . with combined assets exceeding $2.4 billion."[1] Regardless, courts in the Third Circuit "regularly find a

---

[1] ACTS 2022 Annual Report, at 4, https://www.actsretirement.org/staticcontent/flipbooks/actsannualreport2022/index.html

settlement to be fair even though the defendant has the practical ability to pay greater amounts." *McDonough v. Toys R. Us, Inc.*, 80 F. Supp. 3d 626, 645 (E.D. Pa. 2015). Because it appears that ACTS could withstand a greater judgment, and approximately 20,754 people were affected by the data breach, this factor could weigh against approval.

> ### 8. & 9. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

"The last two *Girsh* factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Prudential*, 148 F.3d at 322. In other words, these factors "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Warfarin*, 391 F.3d at 538. The Court must first determine a plaintiff's expected recovery from the litigation and then compare that with the proposed settlement amount.

As discussed above, the plaintiffs face a significant risk in this case for several reasons: class certification is rare in data breach cases and there are complicated issues regarding choice-of-law and how to prove damages class-wide. Considering this risk, $350,000 and two-years of credit monitoring, negotiated at arm's-length with the hands-on involvement of an experienced mediator, is particularly reasonable where there is such a high probability that proceeding to trial would yield nothing for the more than 20,000 people whose personal information was potentially accessed through this breach. Therefore, these two factors weigh in favor of approving the settlement.

**B.** ***Prudential* Factors**

In *Prudential*, the Court of Appeals for the Third Circuit expanded on the *Girsh* analysis by outlining additional factors for district courts to evaluate "when appropriate."148 F.3d at 323. Here, it is appropriate to consider several of the *Prudential* factors.

        *1. Whether class or subclass members are accorded the right to opt out of the settlement.*

This factor weighs in favor of approving the preliminary settlement. Page 20 of the proposed agreement reads in large, bold-print: "OPT-OUT PROCEDURE," and then describes the process by which class members may opt out of the settlement. Doc. No. 42-2, at 20. Additionally, both the short-form notice informs the recipient that they have the ability to "get out of the Settlement and keep [their] right to sue about the claims in this Lawsuit," and the long-form notice provides explicit instructions in accessible language for how to opt-out and the consequences of doing so. *See* Doc. No. 37-2, Exs. A & B. In sum, class members have a clearly communicated right to opt out of the settlement, so this *Prudential* factor weighs in favor of approval.

        *2. Whether the procedure for processing individual claims under the settlement is fair and reasonable.*

This factor also weighs in favor of approving the settlement. Class counsel have suggested appointing the Angeion Group to serve as the settlement administrator. Angeion Group is an independent, internationally recognized settlement administration company that has managed over 2,000 class action administrations and notice programs, including a number of data breach class action settlements—Angeion is capable of ensuring a fair and reasonable procedure for individual claims. Moreover, the parties have agreed to designate this Court (or this Court's designee) as the final arbiter of any claimant disputes.

*3. Whether any provision for attorneys' fees is reasonable.*

Class counsel is currently set to receive a fee and cost award of no less than $250,000, $15,699 of which will be used to cover litigation expenses, leaving $234,301 for attorneys' fees. Attorneys' fee awards are governed by Rule 23(h) of the Federal Rules of Civil Procedure, which requires those fees to be "reasonable."[2]

"In assessing attorneys' fees, courts typically apply either the percentage-of-recovery method or the lodestar method." *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005). Percentage-of-recovery "applies a certain percentage to the settlement fund." *In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009) (cleaned up). The lodestar method "multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." *Id.* The percentage-of-recovery method is generally favored in common fund cases, whereas the lodestar method is more typically applied in cases involving statutory fee-shifting or in cases "'where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation' or in cases where the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method." *In re Rite Aid Corp.*, 396 F.3d 294, 300 (3d Cir. 2005) (quotation omitted).

Here, class counsel have negotiated with ACTS for a fee that is paid out separately from the settlement, so this is not a traditional common fund case, and the lodestar approach is the

---

[2] The Court of Appeals for the Third Circuit recently noted that "reasonable" is a "capacious phrase." *In re Wawa Data Security Litig.*, 84 F.4th 712, 718 (3d Cir. 2023). District courts employ a "variety of factors" to determine whether a fee award is reasonable, including "the result actually achieved for class members ... the manner and operation of any applicable claims procedure ... [whether the] settlement involve[es] nonmonetary provisions for class members [and whether] ... these provisions have actual value to the class." Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment. Courts should also consider "any directions or orders made by the court in connection with appointing class counsel ... agreements among the parties regarding the fee motion, and [] agreements between class counsel and others about the fees claimed by the motion." *Id.*

appropriate principal method for determining if an award of $234,301 is reasonable. *See Fulton-Green*, 2019 WL 4677954, at *11, *13 ("Most courts use the Lodestar method in data breach cases . . . "). However, the Court of Appeals for the Third Circuit has clarified that "it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation," so the Court will review the proposed fee award using the lodestar method and then crosscheck via percentage-of-recovery. *In re Rite Aid Corp.*, 386 F.3d at 300.

    i.   The Lodestar Method

Under the lodestar method, the fee award is analyzed by "multiplying the number of hours reasonably worked … by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys. The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Id.* at 305-306. Class counsel assert that "based on more than 200 hours of work, the total current lodestar [as of October 11, 2023] is approximately $148,891.50, which … would yield a small multiplier of 1.57." Doc. No. 42, at 6.

At this juncture, the Court cannot fully analyze whether $234,301 is reasonable based on the lodestar because: (1) the Court does not yet have an adequate record of the hours incurred by each biller, hourly rates of those billers, and descriptions of the work done; and (2) "there is still more work to be done" because this settlement is only at the preliminary approval stage. However, the Court will note that a multiplier of 1.57 is within the range of reasonableness and consistent with multipliers commonly awarded in the Third Circuit. *See e.g., Stevens v. SEI Invs. Co.*, No. 18-cv-4205, 2020 WL 996418, at *13 (E.D. Pa. Feb. 28, 2020) (approving 6.16 multiplier); *Dickerson v. York Int'l Corp.*, No. 15-cv-1105, 2017 WL 3601948, at *11 (M.D. Pa. Aug. 22, 2017) ("Multipliers between one and four are routinely approved in the Third Circuit.").

21

The Court is also satisfied at this point with the manner in which the parties negotiated the proposed award. An experienced mediator supervised the negotiation of the fee award, and the negotiation did not begin until after the parties had finalized an agreement about relief to the class. *See* Doc. No. 42, at 6 (citing Oct. 5, 2023, Decl. of Hon. Wayne Andersen, ¶ 6). The Court will conduct a more fulsome analysis of the proposed award using the lodestar method in the context of the final approval or any motion for award of attorneys' fees, expenses, and service awards.

ii.   The Percentage-of-Recovery Method

The percentage-of-recovery method "applies a certain percentage to the [settlement] fund" to calculate the fee award. *In re Diet Drugs*, 582 F.3d at 540 (quotation omitted). In determining what constitutes a reasonable percentage fee award, district courts traditionally consider the ten factors identified in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, (3d Cir. 2000), and *Prudential*, 148 F.3d 283. These factors are:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs*, 582 F.3d at 541 (first citing *Gunter*, 223 F.3d at 195 n.1, then citing *Prudential*, 148 F.3d at 336–40) (cleaned up).

Recently, the Third Circuit Court of Appeals wrote that it was "clarifying two considerations that loom large" in the determination of whether class counsel are set to receive "only a *reasonable* fee award" using the percentage-of-recovery method. *In re Wawa*, 85 F. 4th at

715. The court of appeals first clarified that, when assessing the reasonableness of the fee award,[3] district courts are to focus on "how the amount awarded stacks up against the benefit given to the class, using *either the amounts paid or the sums promised*[.]" *In re Wawa.*, 85 F.4th 712, 718–19 (3d Cir. 2023) (emphasis added). The Court of Appeals then added another factor to the inquiry: "whether side agreements between class counsel and the defendant suggest an unreasonable attorney's fee award." *Id.* Even in the absence of a reason for the appellate cynicism concerning the possibility of a "side agreement," the Court will crosscheck the proposed fee award under the above *Gunter/Prudential* factors as modified by *Wawa.*

(1) The size of the fund created and the number of persons benefitted

The first *Gunter/Prudential* factor, as clarified by the court of appeals in *Wawa*, involves comparing the fee award to the sum promised in the Agreement and/or the amounts actually paid out to claimants. *See Wawa*, 85 F.4th at 724–25. Here, ACTS has agreed to pay class counsel $234,301 separately from the relief to the Class, so the attorneys' fees will not diminish the settlement funds available.

The proposed class includes more than 20,000 people, but the Settlement Agreement contemplates an aggregate settlement cap of $350,000, which limits the total amount ACTS would pay out for claims for the three cash components of the Settlement: (1) up to $75 for time lost taking steps to mitigate risk attendant to the data breach; (2) up to $350 for out-of-pocket expenses related to the data breach; and (3) up to $3,500 in compensation for documented losses due to

---

[3]       Although the Court of Appeals did not explicitly state that it was clarifying the first *Gunter/Prudential* factor (the size of the fund created and the number of persons benefitted), it decided to vacate the district court's reasonableness finding because the district court, in analyzing the fee award under the first prong of *Gunter*, explicitly limited its analysis to the "funds made available to class members rather than the amount actually claimed during the claims process." *In re Wawa, Inc. Data Security Litig.*, 2022 WL 1173179, at *9 (E.D. Pa. Apr. 20, 2022); *see In re Wawa*, 85 F.4th at 71. Therefore, the Court will interpret the Court of Appeals' holding on this point as intending to declare a new approach for the first *Gunter/Prudential* factor.

identity theft. Payments to class members will be reduced on a *pro rata* basis based on the number of claims made if the total exceeds the aggregate cap.[4]

Where, as here, attorneys' fees, expenses, and settlement administration costs are paid directly by the defendant rather than from a common fund, courts in the Third Circuit have valued the settlement fund, *i.e.,* "the benefit to the class," by including the costs and fees for which the class would otherwise be responsible, including attorneys' fees. *See, e.g., Jackson v. Wells Fargo Bank, N.A.*, 136 F. Supp. 3d 687, 706 (W.D. Pa. 2015); *Rose v. Travelers Home & Marine Ins. Co.*, No. 19-cv-977, 2020 WL 4059613, at *9 (E.D. Pa. July 20, 2020); *Hall v. Best Buy Co.*, 274 F.R.D. 154, 171-73 (E.D. Pa. 2011).[5] So, under this approach, the "sum promised" is at least $600,000.

---

[4]     The Court expressed some concerns about this aggregate settlement cap at the initial preliminary approval hearing. Without this cap, if every single class member were to file legitimate claims for the maximum payout, ACTS could be responsible for tens of millions of dollars. ACTS avers that, of the 20,754 members of the class, only 187 had financial information "potentially impacted" by the breach. *See* Doc. No. 42-3, at 5. But even if only these 187 people collect the maximum payout based on documented financial losses, that would still overtop the $350,000 aggregate cap. There is a similar scenario where even a fraction of the class were to just seek the $75 compensation for time lost monitoring their accounts. To put it simply: the $350,000 cap could significantly limit the amount of cash-based recovery available to the class members. This all being said, the Court recognizes that data breach cases such as this one are complex and risky, and recovery at trial is decidedly uncertain—$350,000 in cash is significantly better than nothing. Moreover, there is no cap on the non-cash aspects of the agreement, including the credit and dark web monitoring, and ACTS has agreed to implement additional data security improvements to the tune of $428,000 annually.

[5]     It is not clear whether this approach survives *Wawa*, which emphasized that the key inquiry is "how the amount awarded stacks up against the *benefit given to the* class, using either the amounts paid or the sums promised." *Wawa*, 85 F.4th at 718 (emphasis added). In *Wawa,* the Court of Appeals vacated the district court's order approving the fee award and remanded for the district court to "take a closer look at the reasonableness of the attorney's fees in proportion to class benefit." *Id.* at 727. In so holding, where the Court of Appeals did not determine whether the district court properly included costs and fees in the valuation of the settlement, but it did specify that the district court should consider "the amounts distributed to and *expected to be claimed by the class.*" *Id.* at 725 (emphasis added). This language would seem to exclude fees and costs from the "benefit given to the class" for the purposes of determining the reasonableness of the fee award, even though an award of fees and costs "benefits" the class to the extent that class members would otherwise be responsible for those bills.

In addition to the $350,000 in cash, ACTS will offer the opportunity for class members to enroll in two years of credit monitoring and identity theft protection with $1 million in insurance through Pango Group's Identity Defense product. This service "can cost anywhere from $7-[$]20 per person, per month," and is not subject to a cap, so the "sum promised" is actually in the millions. *See* Doc. No. 37-1, at 5, 12-13 ("Assuming only 25% of the 20,754 Class Members elect to enroll in Pango's Identity Defense, at the minimum $7 per month for 2 years equates to $871,668, which is in addition to the $350,000 available cash fund.").

Finally, the settlement includes injunctive relief: ACTS has made security changes, including, but not limited to, extending multi-factor authentication, implementing new technical safeguards and mobile device management controls, updating data retention approaches, and adding a "24/7 Managed Detection and Response service." Doc. No. 42-2, at 13. ACTS has agreed to pay for such ongoing security changes separate and apart from other settlement benefits, increasing its annual spending on data security by approximately $428,000. Doc. No. 42, at 5. Although this increased security is likely of great value to the class members in that it ensures that their information is better protected from data security incidents, it is difficult for the Court to assign specific numerical value to the injunctive relief because its value to the class members is not necessarily equal to the cost to the defendant. *Cf. Ericsson GE Mobile Commc'ns, Inc. v. Motorola Commc'ns & Elecs., Inc.*, 120 F.3d 216, 219 (11th Cir. 1997) (valuing injunctive relief from the plaintiff's viewpoint); *Lovell v. State Farm Mut. Auto. Ins. Co.*, 466 F.3d 893, 897 (10th Cir. 2006) (valuing injunctive relief by reference to either the value to the plaintiff or the cost to the defendant).

Accordingly, the Court cannot at this time make a final determination as to whether a $234,301 attorneys' fee is reasonable when compared to either the "sum promised" or the

"amounts paid" because: (1) the "sum promised" is somewhere between $350,000 and several million dollars, depending on which aspects of the Settlement count in this valuation process;[6] and (2) for obvious reasons, at this early stage the Court can only guess as to the amount that will be paid. If the "sum promised" is only $350,000, then $234,301 is likely not reasonable under the percentage-of-recovery method considering that "the average attorney's fees percentage in [surveyed class action] cases was 31.71% and that the median fee award was 33.3%." *See Wiliams v. Aramark Sports, LLC*, Nos. 10-1044, 10-1547, 2011 WL 4018205, at *10 (E.D. Pa. Sept. 9, 2011) (citing *Boone v. City of Philadelphia*, 668 F. Supp. 2d 693, 714 (E.D. Pa. 2009)). However, if the "sum promised" includes the $250,000 fee and cost award and/or the value of the enhanced credit monitoring and identity theft protection, then $234,301 constitutes a *much* smaller, much more reasonable percentage of the promised benefit to the class. The Court will defer final determination of reasonableness using the percentage-of-recovery method as a cross-check until the denominator—the "benefit to the class"—is more clearly set.

---

[6]   Although the Court of Appeals for the Third Circuit clarified some aspects of the attorneys' fee inquiry, it neglected to address whether non-cash aspects of a settlement are to be included in a district court's determination of the "sum promised." It would appear from the *Wawa* court's opinion that insofar as injunctive relief is a part of the agreement, it is irrelevant to the Court of Appeals in the valuation of the settlement for the purposes of comparing the settlement to the "sum promised" because the Court of Appeals focused entirely on the monetary value of the gift cards as compared to the fee award. The district court, like the class, may well have a different view. But in any case, the offer of credit monitoring here is different from the sort of "injunctive relief" common in these cases—upgraded security and processing systems to prevent future breaches—in that the credit monitoring directly benefits class members individually if they opt in. And this relief is designed to remedy what is likely the most common injury suffered by the class members—emotional distress caused by the substantial risk of identity theft. *See* Doc. No. 42, at 4 (allegedly only 187 class members "had financial information potentially impacted."). For these reasons, the Court includes the estimated cost to ACTS of the credit monitoring in the "sum promised."

(2) <u>The presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel</u>

Again, at the preliminary approval stage, the Court cannot fully evaluate this factor because notice has not yet been sent to the class members, so the Court will defer determination of this factor at this time.

(3) <u>The skill and efficiency of the attorneys involved</u>

As already discussed above, class counsel have litigated and settled numerous class actions, including data breach class actions, and have demonstrated that they are capable class counsel for this case. *See* Doc. No. 37-1, at 21. This factor weighs in favor of determining that the fee is reasonable. *See Fulton-Green*, 2019 WL 4677954, at *13.

(4) <u>The complexity and duration of the litigation</u>

Data breach litigation is inherently complex, *id.* at *8, and as class counsel acknowledge, there is legal uncertainty in this specific case due to complicated choice-of-law issues, the difficulty of proving class wide damages, and issues about the duty of care ACTS owes to its employees in storing their personal information. On the other hand, the short duration of the litigation could weigh against determining that the proposed fee is reasonable: as of October 11, 2023, counsel have devoted about 200 hours to this case, *see* Doc. No. 42, at 6, which is fewer hours than those reported in early settlements in similar data breach cases. *See, e.g., Fulton-Green*, 2019 WL 4677954, at *11 (class counsel devoted 560 hours in reaching settlement before motion to dismiss was decided). It is certainly possible that this low number of hours is the result of counsel exercising their judgment in imposing billing reductions, and this factor should not be employed so as to discourage counsel from working efficiently to reach an early resolution. The Court will defer determination until such time as the Court has more information from counsel about the work done on this case.

(5) <u>The risk of nonpayment</u>

Class counsel took on this case on a contingent basis with no guarantee of payment or reimbursement of their out-of-pocket expenses. *See* Doc. No. 42, at 7. As of October 11, 2023, they have incurred $15,699 in out-of-pocket litigation expenses. *Id.* at 6. Taking such a risk on behalf of the class lends credence to the fee request, *see Fulton-Green*, 2019 WL 4677954, at *13, and thus this factor supports approval.

(6) <u>The amount of time devoted to the case by plaintiffs' counsel</u>

As of October 11, 2023, class counsel have devoted "more than 200 hours" to this case. As discussed above, 200 hours is fewer than those reported in early settlements in similar data breach cases, but because the Court does not yet have sufficient information from class counsel about the nature of the work done on this case or whether the hours devoted are reasonable based on the needs of this specific case, the Court will defer determination of this factor.

(7) <u>The awards in similar cases</u>

The attorneys' fee award proposed here is consistent with, if not lower than, attorneys' fee awards in similar cases. *See, e.g., Fulton-Green*, 2019 WL 4677954, at *3 (granting final approval of the class settlement and awarding attorneys' fees of $300,000). This factor therefore weighs in favor of awarding the proposed fee.

(8) <u>The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations</u>

There is no indication that any other groups, such as government agencies conducting investigations, have contributed to this case and Settlement. This factor weighs in favor of approval.

(9) <u>The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained</u>

Assuming that the "total benefit to the class" is the $350,000 cash fund plus the significant cost (millions of dollars) to ACTS for two years of credit monitoring for each class member, then the proposed award of $234,301 is a very small percentage fee, well below the range commonly entered into in private fee agreements. *See e.g., Hall*, 2020 WL 1477688, at *11 ("Contingency fees generally range between 30% to 40%."). However, as noted above, the Court will defer final determination of reasonableness using the percentage-of-recovery method as a cross-check until such time as the denominator—the "benefit to the class"—is more clearly defined.

(10) <u>Innovative terms of the settlement</u>

This factor weighs in favor of approving the fee because the settlement includes non-cash recovery designed to address the injury most commonly suffered in data-breach cases like this one: anxiety caused by the tangible risk of identity theft or financial fraud. Specifically, ACTS has agreed to offer class members two years of free enhanced dark web and credit monitoring. Doc. No. 42, at 4. Although credit monitoring is generally a common term in these types of settlements, *see e.g., Fulton-Green*, 2019 WL 316722, at *2, the inclusion of dark web monitoring is responsive to the realities of modern cybercrime and will provide enhanced peace-of-mind and security for those class members who take advantage of ACTS' offer.

(11) <u>Side agreements between class counsel and the defendant</u>

Finally, *Wawa* requires the Court to "take a hard look at side agreements between class counsel and the defendant." *Wawa,* 85 F.4th at 724–25. The existence of side agreements "require[s] deeper inquiry to assess whether the fee award is reasonable." *Id.* at 725. Here, class counsel and ACTS have negotiated a "clear sailing provision" where ACTS promises as part of the terms of the agreement not to object to an application by class counsel requesting the agreed-

upon attorneys' fee award. *See* Doc. No. 42-2, at ¶ 3.6. Although such an agreement is "not an automatic bar to settlement approval," *Wawa*, 85 F.4th at 725, its inclusion seems to trigger appellate suspicion, causing the district court to carefully scrutinize "the process and substance of the settlement and satisfy itself that the agreement does not indicate collusion or otherwise pose a problem." *Id.* at 725–26 (quoting 821 F.3d at 447).

In an attempt to assuage any concerns the appellate court might have about "collusion," class counsel emphasize the fact that the negotiation was mediated by a neutral third-party and that the discussion about fees and costs "did *not* begin until the parties had finalized the relief to the Class." Doc. No. 42, at 4, 6-7 (emphasis supplied). Although the timing of the fee negotiations and the presence of a neutral mediator are both factors weighing in favor of finding reasonableness and non-collusiveness, they alone are not "'dispositive of whether the end product is a fair, adequate, and reasonable settlement agreement." *Wawa*, 85 F.4th at 726 (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011)). Class counsel have also provided a brief narrative, Doc. No. 42, at 3-5, accompanied by a supporting declaration of the mediator, Doc. No. 42-4, detailing the negotiations process to the extent allowed by the parties' confidentiality agreement. In his declaration, the mediator describes the mediation as "hard-fought on both sides" and avers that, because "the parties' respective position were [initially] quite far apart," he had to spend "significant time working with both sides ... to assist them in reaching a compromise on settlement terms." Doc. No. 42-4. Based on this narrative and the accompanying declaration, the Court is satisfied that the clear-sailing agreement is not a result of collusion, especially in light of the fact that the clear-sailing agreement is the only "side-agreement" (to use the Court of Appeals' term) between class counsel and ACTS.

Though the Court must defer final determination as to the reasonableness of the attorneys' fee award, the Court is presently satisfied that the manner in which the parties negotiated the fee award—and the award itself—does not indicate any impropriety or collusion. Thus, the settlement agreement meets the relevant *Girsh, Prudential*, and *Gunter/Prudential/Wawa* factors. *Cf. In re Nat'l Football League Players' Concussion Inj. Litig.*, 961 F. Supp. 2d 708, 714 (E.D. Pa. 2014) ("At the preliminary approval stage, the bar to meet the fair, reasonable and adequate standard is lowered, and the court is required to determine whether the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives. . . .") (internal quotations and citations omitted).

## CONCLUSION

For the reasons set forth in this memorandum, the Court grants the Motion for Preliminary Approval of a Class Action Settlement (Doc. No. 37) and preliminarily approves the amended settlement (Doc. No. 42-2). An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

31